# EXHIBIT W-4

# PUBLIC VERSION

# [REDACTED]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
CASPER DIVISION

30(b)(6) DEPOSITION OF
ROUNDPOINT MORTGAGE SERVICING,
LLC's DESIGNATED AGENT -
MATTHEW WADDELL

GARY VENTLING, in his own right and as representative of a class of persons similarly situated,

Plaintiff,

vs. Civil Action No. 1:24-cv-158

ROUNDPOINT MORTGAGE SERVICING, LLC,

Defendant.

________________________________________________

CONFIDENTIAL TRANSCRIPT - ATTORNEYS' EYES ONLY

________________________________________________

DEPONENT: MATTHEW WADDELL
DATE: December 1, 2025
TIME: 10:39 a.m.
LOCATION: VIA VIDEOCONFERENCE

REPORTED BY: PAULA MAXWELL

A P P E A R A N C E S

(All appearances via videoconference)

ON BEHALF OF PLAINTIFF:

BAILEY & GLASSER, LLP
BY: JAMES L. KAUFFMAN
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007

ON BEHALF OF DEFENDANT:

DENTONS US, LLP
BY: DEBORAH RENNER
BY: MARGRET FLODEEN
1221 Avenue of the Americas
New York, NY 10020-1089

ALSO PRESENT: Cassandra Swartz, vice president and assistant general counsel for RoundPoint Mortgage Servicing, LLC

Gary Ventling

INDEX


| EXAMINATION | PAGE |
|---|---|
| BY MR. KAUFFMAN | 6 |
| BY MS. RENNER | 262 |
| CERTIFICATE | 268 |
| DEPONENT CORRECTION SHEET | 269 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 30 | Letter dated 11-26-25 | 9 |
| Exhibit No. 31 | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition of Defendant RoundPoint Mortgage Servicing, LLC's Designated Agent | 36 |
| Exhibit No. 32 | Defendant's Objections and Responses to Plaintiff's First Set of Requests for Admission | 77 |
| Exhibit No. 33 | Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories | 92 |
| Exhibit No. 34 | Defendant's Objections and Responses to Plaintiff's First Set of Requests for Production | 97 |
| Exhibit No. 35 | Defendant's Supplemental Objections and Responses to Interrogatory No. 15 of Plaintiff's First Set of Interrogatories | 98 |
| Exhibit No. 37 | Letter from RoundPoint dated September 26, 2025 | 117 |
| Exhibit No. 36 | Notice of servicing transfer | 118 |

| | | | |
|---|---|---|---|
| Exhibit No. | 38 | Cash management policies with an effective date December 5, 2022, version 15 | 130 |
| Exhibit No. | 39 | Cash management procedures dated December 5, 2023, version 16 | 144 |
| Exhibit No. | 40 | In-house monthly payment processing procedures dated August 8, 2023 | 145 |
| Exhibit No. | 41 | Lockbox maintenance tasks dated July 11, 2022 | 147 |
| Exhibit No. | 42 | Lockbox maintenance tasks dated February 22, 2023 | 149 |
| Exhibit No. | 43 | Lockbox maintenance tasks dated February 23, 2024 | 150 |
| Exhibit No. | 44 | Ventling Payment History 11.5 | 153 |
| Exhibit No. | 45 | Treasury management agreement with the effective date of November 6, 2012 | 172 |
| Exhibit No. | 46 | Excel file Bates stamped 5968 | 180 |
| Exhibit No. | 47 | Excel file Bates stamped 5969 | 180 |
| Exhibit No. | 48 | Excel file Bates stamped 5970 | 180 |
| Exhibit No. | 49 | Excel file Bates stamped 5971 | 181 |
| Exhibit No. | 50 | Excel file Bates stamped 5972 | 181 |
| Exhibit No. | 51 | Excel file Bates stamped 5973 | 181 |
| Exhibit No. | 52 | Excel file Bates stamped 5974 | 181 |

| | | |
|---|---|---|
| Exhibit No. 53 | Excel file Bates stamped 5975 | 181 |
| Exhibit No. 54 | Excel file Bates stamped 5976 | 181 |
| Exhibit No. 55 | Excel file Bates stamped 5977 | 181 |
| Exhibit No. 56 | Excel file Bates stamped 5978 | 182 |
| Exhibit No. 57 | Excel file Bates stamped 5979 | 182 |
| Exhibit No. 58 | Correspondence policy with an effective date of February 20, 2023 | 200 |
| Exhibit No. 59 | Customer resolution policies dated February 28, 2024 | 201 |
| Exhibit No. 60 | Complaint management, dated 3-6-24 | 203 |
| Exhibit No. 61 | Proof of Payment, ID 568 | 204 |
| Exhibit No. 62 | Glacier Bank 1-4 | 222 |
| Exhibit No. 63 | Response from Jack Henry | 227 |
| Exhibit No. 64 | Proof of Payment for Payment ID 563 | 232 |
| Exhibit No. 65 | Proof of Payment for Payment ID 586 | 242 |
| Exhibit No. 66 | Answer to Plaintiff's Complaint | 252 |

MATTHEW WADDELL,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KAUFFMAN:

Q. All right. Good morning. We met just before we got on the record, but could you please state and spell your full name?

A. First name is Matthew, M-A-T-T-H-E-W. Middle name Van, V-A-N. Last name Waddell, W-A-D-D-E-L-L.

Q. You pronounce it Waddell?

A. Yes.

Q. Okay. Thank you, Mr. Waddell. My name is James Kauffman. I'm an attorney who represents the plaintiff in a proposed class in a lawsuit against RoundPoint. Do you understand that?

A. Yes, I do.

Q. Okay. Have you ever had your deposition taken before?

A. No.

MS. RENNER: Mr. Kauffman, if I can just interrupt for one second.

MR. KAUFFMAN: Oh, absolutely.

Sure.

MS. RENNER: Yeah, I just want to make -- it's Deborah Renner from Dentons, and I just want to state that my colleague, Margret Flodeen, is also on Zoom with us, as is Cassandra Swartz, who is the vice president and assistant general counsel at RoundPoint. And just in order to make things move along a little bit more efficiently, I just wanted to put a couple of objections on the record now and have them be sort of a continuing -- continuing objection or continuing understanding.

This deposition was scheduled just a couple of weeks ago, and there remain a number of objections and areas of disagreement. Nevertheless, the parties decided to go forward with the deposition today with the understanding that there are these areas of disagreement and unresolved objections.

One of the key objections is the definition of the relevant time period. Plaintiff maintains that it runs from August 16th of 2014 to the present, and RoundPoint has consistently maintained that the relevant time period is December 31, 2020, to August 16, 2024.

As I said, this is an unresolved objection. And today, Mr. Waddell is going to testify to the time period of December 31, 2020, to August 16, 2024. And to the extent he has existing knowledge of prior periods, he may testify based on that knowledge. However, as we stated during our November 25th meet-and-confer, Mr. Waddell did not join RoundPoint until 2018. So there are a number of disagreements besides the time period.

Oh, and I'm going to ask that the time period objection be a continuing objection so I don't have to keep interrupting Mr. Kauffman. And given all -- given a number of disagreements that we have and a number of objections that have not been resolved and the lack of time to prepare the witness as to the amended notice, as we informed Mr. Kauffman, Mr. Waddell may not be knowledgeable as to the details of all the topics in the amended notice.

To the extent he lacks knowledge in certain areas based on the circumstances in the agreement of the parties, Mr. Kauffman, I believe you've agreed on behalf of plaintiff that Mr. Waddell's knowledge is not going to be held

against him or RoundPoint, and that following today's deposition, if there are areas where we need to meet-and-confer, we will do so.

And with that, I'd like to rely on the objections that we've made to the amended notice in a letter dated November 26, 2025, and have that marked as Exhibit 30 to this deposition.

(Exhibit No. 30 marked for identification.)

MS. RENNER: Mr. Kauffman, are you okay with all of that?

MR. KAUFFMAN: Yes, that's consistent with what we've discussed.

Q. And, Mr. Waddell, we may hold this deposition -- in fact, at the end of it, we will hold it open because there will be some areas that I understand are going to be unresolved regardless of the time period that we're talking about. But I understand those limitations and I will be asking you questions that hopefully you'll have knowledge, and if you don't have knowledge, you can let me know that.

A. Yep.

Q. Okay. Before Ms. Renner read in her objection, I asked you if you had your deposition

taken before.
A. The answer was no.
Q. And you have not had your deposition taken before?
A. Correct.
Q. Okay. Not in any case?
A. Correct. First time.
Q. Have you ever given testimony in court?
A. I have not.
Q. Okay. So this may be a little new to you, so I'm going to very carefully go through a couple of -- I call them ground rules. You know, Ms. Renner and myself have taken a number of depositions over the years, and we both typically go through these because it helps streamline, makes for an efficient record and deposition.
So the first one is if at any time I ask you a question, if it's unclear or confusing to you, let me know and I'll try to rephrase that. Do you understand that you can do that?
A. Yes.
Q. Okay. Now, if you answer, I'm going to assume that you understood the question. Is that fair?
A. Yes.

Q. Okay. You're doing a great job right now in waiting for me to complete my question before you begin your answer, and that's very important because Paula, our court reporter, is making a stenographic record of today's deposition. So you understand that you have to wait for me to finish my question before you give your answer?

A. Yes.

Q. Okay. I will extend you the same courtesy. If you're giving an answer, I will try not to interrupt you. It inevitably happens where we may step on each other during a conversation like today, but I will extend you the same courtesy of letting you finish your response before I ask my next question. Do you understand that?

A. Yes.

Q. Now, because there is a record, a written record of today's deposition, although we're on camera, the record does not reflect very well body language or nods of the head, shakes of the head, or things like that, so I need you to give an audible response to every question. Do you understand that?

A. Yes.
Q. Now, occasionally as you heard at the beginning of this deposition, your counsel, Ms. Renner, may lodge an objection, and that does not necessarily mean that you don't answer the question. It means that maybe there was something wrong with the form of my question, but unless Ms. Renner instructs you not to answer, you are to try to the best of your ability to answer my question. Do you understand that?
A. Yes.
Q. Your deposition, you were sworn in under oath to begin the deposition. It carries the same force and effect as if you were in court, sworn to tell the truth under penalty of perjury. Do you understand that?
A. Yes.
Q. Finally, this is not a marathon. I am going to be fairly direct in my questioning, but if at any time you need a break, just let me know and I will let you take a break except for the fact that if there's a question pending, I ask that you completely answer the question before we take that break. Do you understand that you can take a break at any time?

A. Yes.
Q. Okay. Now, Mr. Waddell, who is your current employer?
A. RoundPoint Mortgage Servicing, LLC.
Q. How long have you been with RoundPoint?
A. Since July 2018.
Q. Have you had any other employers since July of 2018?
A. No.
Q. Who did you work for before RoundPoint?
A. Assurant is the name of the company, so they're a mortgage -- they're an insurance vendor.
Q. You mean an insurance vendor within the mortgage industry?
A. Yes, sir.
Q. Okay. Things like homeowner's insurance or --
A. Correct. Yes.
Q. How long were you at Assurant?
A. From 2012 to 2018.
Q. Okay. What is your current role at RoundPoint?
A. I am the vice president of cash processing.

Q. Can you explain to me in very kind of an overview terms what that means and what your duties are?
A. Sure. So I have a couple of teams that report to me, so one of my duties is managing people. Those people perform work that are tied to the receipt collection and understanding of the payments we receive as well as any work that follows from that. So payment research, misapplication reversals, those kind of things.
Q. Okay. This case is about Mr. Ventling and we also allege other similarly situated who sent in paper checks to the P.O. Box or P.O. Box designated by RoundPoint. Does your department deal with those types of payments?
A. It does. I have general oversight, yes.
Q. Okay. And what is your oversight with regard to payments received in the mail at the P.O. Box?
A. So that P.O. Box is in Dallas, Texas. We have a vendor, and there's a history of, you know, relationships tied to the vendor service. At the time of the case, PNC was the lockbox vendor, so that was the entity responsible and that we were, you know, contracted with to

receive those payments, deposit them on our behalf, and send us the posting details so that we could record them in our servicing system.

Q. Okay. And with regard to -- you mentioned the P.O. Box vendor being PNC.

A. Yes.

Q. Was there a different vendor -- well, let me ask a better question. From when to when do you understand that PNC was the lockbox vendor?

A. So when I began at RoundPoint, the lockbox was -- the lockbox vendor was BBVA Compass. BBVA was acquired by PNC; and in 2021, late 2021, PNC took ownership of the lockbox process from BBVA.

Q. In your role of oversight and management, did you understand any of the duties to change with regard to the lockbox vendor when it switched from BBVA to PNC?

A. Yes. There was a change in the processing mechanism at BBVA versus PNC. At BBVA, they did not or were unable to designate the day of receipt of a payment, so as a result, every payment that came into BBVA that could not be processed same day had to be put in a FedEx

package and overnighted to the RoundPoint office for physical processing. When PNC took over, they were able to record day of receipt and include that in the file they provide to us.

Q. So during the point in time -- if you'll just pause one second. I've got to get myself a drink of water because my throat is a little dry. Just give me one second.

Sorry about that. If you ever need to take a break for a similar reason, just let me know. I just had to step back there and grab some water.

Okay. So when BBVA was handling the lockbox responsibilities prior to 2021, they -- as I understand it, they received -- they collected payments received at the P.O. Box and then FedExed those payments to RoundPoint?

A. No. They collected the payments from the post office, right? They have a similar process in that they would scan those checks and, you know, build the posting file that we used to apply payments to loans and deposit those checks on our behalf. But the distinction is they were unable to affix to that payment the day they received it.

So the way it was established with BBVA was that if you could not tell me the day you received it, everything at the end of the day that was unprocessed needed to then be forwarded to RoundPoint for processing.

Q. Now, to your knowledge, what would be the circumstances in which BBVA would not be able to process a check that it had received?

A. Well, there are -- so even in today's environment, there are exceptions to the process, right? Loans transfer, for example. So if a loan leaves here and goes somewhere else, now I received a payment on that borrower's behalf. I need to forward it on to the new location. Loans also pay in full. So I receive a payment, that loan no longer has a balance.

There are default statuses on loans, so sometimes in those scenarios, I don't want to receive one payment from the customer. I need the borrower to reinstate, so I don't want to accept their one monthly installment. It's wrong of me to take your one payment and then foreclose on you. So those payments -- they didn't return payments on our behalf, so they would forward them to us for that work.

There's also a general -- so those kind of scenarios are what we call hard rejects in that there's a payment receipt that I cannot accept a payment on. There are also more soft exceptions, if you will, payments that come in the door where some evaluation of that item needs to be reviewed. Somebody has to look at the item and make a decision on it.

Customers have a -- there's a coupon on your billing statement where borrowers can fill in, you know, the amount they're sending. Sometimes the amount filled in on that statement versus the check amount don't align. Somebody needs to say, what is the right amount that we're accepting?

There's a process -- and we can get into this, but there's a process by which we understand the loan numbers that we accept payments on. If you don't send the coupon with your check, somebody has to look at that image and associate it with a loan. So every day, there's a cutoff in the system, meaning a time stamp by which after that point in time, like the items aren't going to make it into that day's processing file.

So in BBVA's world, if you couldn't get my checks into the, you know, decision by the cutoff so they made it into that day's posting, since they couldn't keep a record of the day they got it, they had to send that payment to RoundPoint for manual processing so that day two, when the FedEx package showed up here, we knew that was yesterday's receipts.

Q. And that would be assuming that BBVA sent the checks immediately upon receipt --

A. Correct.

Q. -- to confirm that there were these issues?

A. Correct.

Q. Do you agree that sometimes those -- and I want to -- I'll explore some of the hard and soft reject circumstances, but those circumstances may take a couple of days to process; is that fair?

MS. RENNER: Objection. I'm not clear what you're asking him.

Q. I'm asking if the process by which BBVA would understand that there was a soft reject or hard reject, or is that something -- let me ask you this. Let me ask a better question. Let's

go through the circumstances for a hard reject.
A. Okay.
Q. So you mentioned one of those would be if the borrower was in foreclosure.
A. So let me back you up a step and kind of walk you through the process.
Q. Okay.
A. The process remains the same throughout for a hard reject status. The process begins every morning a file from our system goes to the lockbox vendor, and that file contains a list of the loan numbers for which we accept payments on, so we know what -- well, we're communicating to the lockbox these are the loan records for which we have an active loan that we will take a -- you know, a payment on in the space.
If the loan is transferred off or it has a zero UPB, those loans aren't going to land on that accept file that we send through automation every day to the lockbox, so --
Q. Okay. I don't mean to interrupt you, but I need to break this up a little bit just so I can understand piece by piece. I'm not trying to interrupt you and not hear the rest of it.
But with regard to the list of loan

numbers that you send to the lockbox vendor that you accept, to your knowledge -- and I know that part of the preparation for today was probably looking at Mr. Ventling's loan. To your knowledge, was Mr. Ventling ever not on that list? Was he ever --

A. Mr. Ventling didn't come to RoundPoint until April of '23, so he was never part of the -- he was never part of the PNC -- sorry, the BBVA population, but his loan -- since it arrived here, his loan would have been on the accept file because it was a loan in good standing.

Q. Okay. So the whole time that his loan was in good standing, he would have been on the list and you had said that the list of loan numbers that we accept payment for was sent to BBVA. Is that the same process as --

A. Yes.

Q. -- PNC?

A. Yes.

Q. Okay. And for the period of time that Mr. Ventling had his loan, to your knowledge, his loan was always listed on --

A. Correct.

Q. -- the list of loan numbers for which

RoundPoint has said accept payment for these loans?
A. Yes, sir.
Q. Do you know approximately how many loan numbers are on that list?
A. It's affixed to that portfolio, so it has changed over time. I mean, our portfolio has seen, you know, contraction and growth over the history of RoundPoint, but we don't have that many loans in a default status, so in today's world, it's going to be north of 800,000 accounts.
Q. Okay. Okay. And then I interrupted you. I just wanted to get certain aspects of this and how it may relate to Mr. Ventling's loan. So you had been talking about a hard reject, and you said let me back you up a step, and you had talked about the list that goes to PNC and to BBVA. What's the next step?
A. From a lockbox position, right, they're going to then receive checks every day, right? The courier that runs from the post office is going to deliver them, you know, a tray of mail that has those envelopes and check receipts in it, right? The lockbox at that point in time is

going to queue those items up for processing, so they have a scanner, all the mail is run through the scanner. It's opened, contents parsed and an image taken of the contents of that envelope.

Q. Do you know if the scans were performed at both BBVA and PNC?

A. Yes, they were.

Q. Okay. And do you know if those scans bear a date for the file upon which that --

A. They do not.

Q. -- payment -- payment --

A. The scans are just check -- images of the check itself.

Q. Okay. But do those scans themselves have a date associated with them that that item was scanned by the lockbox vendor?

A. They do not. The file they provide has a date, but the images do not.

Q. Now, the file that they provide, that's the lockbox -- is that the lockbox Excel files that we've seen produced in discovery?

A. It is.

Q. We'll get to them later. Okay. So I'm sorry, I interrupted you. So they scan an image of the contents, and then what's the next step

after that?

A. Okay. So items that are, you know, they conform, there's no exception. The amount on the coupon matches -- they can make a match on the loan number. Those items are deposited and those items then appear on our daily deposit file.

Q. Okay. Let me back you up one second. So Mr. Ventling, I think his checks came from a bank, and they had his name on it and had the amounts on it but didn't necessarily have his account number on it.

A. Correct.

Q. Would those be part of the soft exception where they would be -- you're just nodding your head so let me finish my question. His checks that were sent to RoundPoint from his bank would be part of the soft exception; is that correct?

A. That is correct.

Q. Okay. Does RoundPoint know on a daily, monthly basis how many such soft exceptions there may be?

A. On average during the PNC time -- I'm not sure on the BBVA exception side of it, but on average, RoundPoint in PNC's period, it was

probably between 150 to 200 loans a day that could be in the exception population.

Q. Okay. And if you're saying it's in the exception population, that means that a payment's been received and there's something that just doesn't match up?

A. Correct.

Q. And then if there is an exception, can you take me through -- well, let's first talk through what could be the reasons for the exception. One that we said is check doesn't contain loan number?

A. Correct.

Q. That may be one.

A. Not his check. Not -- coupon. So every month borrower receives a billing statement. That billing statement comes with a perforated tear-off section that lists both the payment address and the itemization where you can fill in the amounts that you are sending. The lockbox is geared to take an image of the coupon and understand your loan number based on the coupon because every check is a little bit different, but the coupon is uniform. So the zones that the OCR scan is reading on the coupon is affixed to

tell it where the loan number is.
     Q.  Okay.  If there is no coupon in the envelope received at the P.O. Box, that -- does that create an exception?
     A.  100 percent of the time.
     Q.  Okay.  And what happens under those circumstances?
     A.  So once the scan is complete, anything that becomes an exception are loaded to a portal. So PNC had a -- has a web portal that our group -- when I say our group, I mean the cash department at RoundPoint interacts with on a daily basis to review the images and accept or reject those payments.
     Q.  And how long does that process take as far as reviewing exceptions and communicating back to the lockbox?
     A.  For an individual loan or individual check review, a few minutes depending on the issue, right?  It's not a long process.  In the case of like Mr. Ventling, somebody's going to need to look at the image.  They're not going to have anything to go on other than the name, and so they're going to go into our master servicing system and name search the borrower, right?  Find

his account, you know, then go back into the PNC portal, enter a loan number and accept the payment if there's no other changes that need to be made.

And by those, I mean, if they read the coupon and they said, okay, I added up what the borrower wanted for payment and principal and I get a different amount than the check, they would potentially change the received amount on the item before accepting it.

In Mr. Ventling's case, they'll be adding a loan number to his, you know, portal record and accepting that payment to continue with the processing through the system.

Q. And do you have an idea -- can you give me a matter of degrees about how long that process may take --

A. In --

Q. -- in the usual course of business? Like is it --

A. It's a -- it's a general daily process. It's one of just the things that we do that live within our space. So while an individual loan may take just a matter of minutes, there's a queue and so the team is kind of constantly going

in, reviewing the queue, and making decisions on those payments that live in the portal.

Q. And it just depends on how deep the queue is depending on when they would get to Mr. Ventling's exception; is that right?

A. That's correct.

Q. And that queue just getting to his exception, that may take several days; is that fair?

A. I wouldn't -- it -- in theory, yes, but I don't think that any one check that arrives in the queue would take more than a full processing day, you know?

Q. Okay. And then once it is received in the exceptions -- I'm going to get to the next step, but I want to go through some of the other reasons why there might be an exception. You mentioned one, if the amount on the check doesn't necessarily match the amount of the monthly payment. Is that another exception?

A. Not by itself. It's not like -- okay. So if you say I wrote a check for a thousand dollars and your monthly payment is $2,000, that doesn't necessarily cause an exception.

What causes an exception is if you write

on your coupon my monthly payment -- so the coupon has four places for you to input information; your monthly payment, an amount you want to go to additional principal, an amount you want to go to additional escrow, and then the total sum.

So what causes an exception is if somebody fills out that coupon and does not add properly or math those numbers to the amount of the check. So if you wrote a check for a thousand dollars but you told me on your coupon, I want a thousand dollars to go to my payment and $50 to go to my principal, well, your coupon says 1,050 and your check is only a thousand. That is an exception that somebody needs to review.

Q. And if the -- like in Mr. Ventling's case, he at times rounded up and would pay, I think we'll see, something like $4.88 or something like that more than the principal amount -- or I'm sorry, more than the payment amount, that monthly payment amount that was due. Would that create an exception?

A. No. The only -- every check he sent was an exception, but it specifically tied to the lack of a loan number, lack of a coupon --

Q. Okay.
A. The amount -- he's sending more -- I'm sure we'll get into this, but there's payment -- there's automation behind the posting so that he sent more. It follows our waterfall.
Q. Okay. And then for those exceptions, someone at RoundPoint has to review the check images, open up the account information, compare it against it, and then communicate something back to the lockbox. Is that --
A. That's correct.
Q. Okay. And that just depends on when -- how many employees do you have that do that work?
A. So I can talk about total department structure, but, you know, on average, there's probably two to three people working that queue on a -- on a rotating basis.
Q. Okay. And is that their only duties is to work the queue, or are they doing other things?
A. They're doing other things.
Q. What type of other things are those people doing?
A. So our department is split into two department -- two teams that live in one

department that we call cash. One team is dedicated to the handling of physical payments that we receive here in our Fort Mill office, so we do process payments on-site. We get checks in-house in Fort Mill. Those have to be deposited and posted to a loan.

They also handle electronic funds. We get pay-off wires throughout the day. So they are working a queue of electronic funds received. So, again, one team dedicated to the receipt of physical payments, whether electronic or paper, and dealing with those funds. There's another team that's kind of the everything -- we call it cash ops, but it's everything else for cash. It's payment research, misapplication reversals, you know, payments bounce, overturned payment management. There are a lot of pay-off quoting. There are a lot of little processes that live within that team.

A lot of the work that RoundPoint does is what we call a task, so we have a servicing system in the way other departments communicate to our department that there's a work item that needs to be done is a task in our system. If the call center needs to talk to me, they open a

task. So there's also a queue of those, you know, work items that a team is processing every day.

So amongst the work that needs to be done, the first team I spoke about, the processing team, they've got a person going in to work that queue of items daily.

Q. Do you recall any specific tasks or communications with the employees that you oversee with regard to any of the payments made by Mr. Ventling?

A. Not specifically, no. I mean, I think looking at his history, I know at least one was open because we did a misapplication reversal of money applied to his late fee that the payments involved were reversed off and funds were then re-applied so that he got a curtailment for those two $4.88, you know, extra allotments. That reversal process requires a task request to initiate that activity. So I know it did happen, yes.

Q. Okay. And we talked about a couple of different types of what I'll call soft rejects. Can you think of any other reasons why a payment received at the P.O. Box would be subject to a

soft reject?
A. Not really. The ones we spoke to are the main couple of issues. You know, a misalignment between amounts sent and amount -- the direction on the coupon, an inability to unidentify -- you know, or lack of ability to identify the check and its loan ownership.
Q. We may get into this a little bit more specifically with some specific policies and procedures, but you mentioned that part of the team that you oversee processes payments physically received in Fort Mill and that's South Carolina; is that right?
A. That's correct. Yes, sir.
Q. Okay. Is there a big like RoundPoint offices, facilities in Fort Mill?
A. Our headquarters is here, yes.
Q. Okay. What's the address of that headquarters?
A. 446 Wrenplace Road, Fort Mill, South Carolina 29715.
Q. Is that physically where you work?
A. Yes.
Q. Okay. And is that the same place that you've worked since you joined RoundPoint in

2018?

A. No. We move -- so when I started in 2018, RoundPoint was in a corporate office park in Charlotte, North Carolina. The headquarters here were being built at that time and opened in late 2019.

Q. Okay. And you mentioned that there were physical payments received at Fort Mill. What would those physical payments be? Checks and cash? Money orders? Is that --

A. So, yes, you can pay us in cash dollars, but that's very rare and we don't receive cash dollars, you know. I've received very few actual cash payments in my time here. Checks, yes, we receive on-site. While that is not the address that's listed on the billing statement, there are other P.O. Boxes in the Charlotte area, so, you know, borrowers that -- I think typically they're directed for people to send their correspondence to, but borrowers will send their check to one of those P.O. Boxes as well.

So we receive physical checks for payment here, although most of it, we, you know, based on the billing statement, we direct to the lockbox. Accounts that are in bankruptcy,

trustees are directed to send their checks to the RoundPoint office in Fort Mill.

Loss draft claim checks, so we get hazard insurance claim checks here, escrow refunds, anything that we send out the door, that's typically the physical payment work that we're doing.

Q. Okay. And you said the P.O. Box in Charlotte. Is that P.O. Box still active, or you mean there's a P.O. Box in Charlotte and there's a P.O. Box or P.O. Boxes in Fort Mill?

A. No. So the -- so for payments, the P.O. Box that we direct on the billing statement is the P.O. Box in Dallas.

Q. Sure.

A. RoundPoint, however, maintains several P.O. Boxes at the Charlotte post office tied to correspondence, things of that nature. That P.O. Box is still active and it's still active today. I mean, we don't have a P.O. Box at the Fort Mill office. We have a P.O. Box in Charlotte, and the courier runs from the Charlotte post office to Fort Mill.

Q. And then whatever is gathered at the Charlotte P.O. Box is then brought to the

headquarters --
A. Fort Mill offices, yes.
Q. -- in Fort Mill?
Okay. How many P.O. Boxes are there in Charlotte? Do you have any idea?
A. I don't know offhand. There are several.
Q. Directionally like five? Approximately five?
A. Yeah. I would say probably somewhere in that neighborhood, yes.
Q. Okay. All right. I'm going to show you -- and we're going to test out this screen share ability of mine, so we're going to see how this works. I'm going to show you what I will mark as Exhibit 31.
(Exhibit No. 31 marked for identification.)
Q. And I will share it with you. All right. I have something along the top here, and it shows that I'm sharing the screen. Can you see what I'm sharing here, Mr. Waddell?
A. I can. It's small. I'd like to --
Q. Yeah, if at any time I'm showing you a document, I try to show the first page, but I can

zoom in. Can you read that okay?
A. Yes. Can I minimize the participants?
Q. You might be able to -- I have mine moved over to the side.
A. Okay.
Q. What I marked as Exhibit 31 is Plaintiff's Amended Notice of Rule 30(b)(6) Deposition of Defendant RoundPoint Mortgage Servicing, LLC's Designated Agent. Have you seen this document before?
A. I have.
Q. And this is the Deposition Notice that you're testifying pursuant to, correct?
A. Yes.
Q. And you'll see it has the Zoom link and you joined the Zoom. Obviously that's the Zoom link we're on right now, right?
A. Yes.
Q. Okay. So you've reviewed these topics, and you're generally aware of this Deposition Notice; is that correct?
A. Yes.
Q. Now, are there any specific topics like, as you were reviewing it, that you know for which you are not prepared to testify? And I know

there's an objection about time frame, but I'm talking about generally within your time frame of employment at RoundPoint. Are there any --

MS. RENNER: I'm just going to object that the -- we have laid out in what's now Exhibit 30, our November 26th letter, all of the issues that we have and objections we have, including objections relating to Mr. Waddell's knowledge.

So I -- you know, I'm not sure he can state all of them off the top of his head. Some are legal. Some relate to his experience. Some relate to the lateness of the amended notice, but all of those are set forth in our November 26th letter of objection.

MR. KAUFFMAN: Okay. Well, let's take this at a different angle.

Q. Let's -- I've scrolled down to what are the subject matters and documents that are -- that are listed here, and as we go through this, I actually want to ask you, what did you do to prepare for today's deposition?

A. So I've met with counsel several times. We've reviewed the pertinent facts of the case, the loan history, the policies and procedures

that I oversee.
MS. RENNER: I'm just going to remind the witness not to reveal any attorney-client privileged information, so you can testify as to what documents you looked at, for example.
A. There are several procedures that have been provided. I think our lockbox maintenance procedure, our cash management policy. Those are the primary documents.
Q. Okay. And you said you met several times with counsel to discuss this. Do you know when you met with counsel?
A. Yeah. Excluding the last week, so if I go back Friday week, which was --
MS. RENNER: You can just estimate.
A. It was the -- so the 21st -- so in November, it's the last three Fridays of the month, the 7th, the 14th, the 21st.
Q. Okay. And I'm going to just identify some of these topics, and I've looked through this and I'm just going to ask you some general questions about them.
A. Okay.
Q. If you see topic 1, and I'm just going

to ask you about 1A. Can you just read that to yourself and then let me know when you're done reading it?

A. I'm done reading it.

MS. RENNER: I'm just going to add an objection to topic 1. As you know, we have not provided documents. We've made objections both in terms of interrogatories and document requests for topic 1. That said, you know, we believe that Mr. Waddell can testify to the extent he has knowledge as a user of the software system referred to in topic 1.

MR. KAUFFMAN: Okay.

Q. And do you understand what topic 1A is asking or what it's referring to?

A. I do.

Q. Okay. Now, what software programs are used at RoundPoint for customer service or account management?

A. So there's a couple of different things to unpack in this question.

Q. Sure.

A. One of our primary servicing system, so all of our loan information, you know, from the pay history to the way groups interact is housed

in a software system now owned by ICE, formerly Black Knight. In the industry, it's referred to as MSP, but its technical name now is the Director Application within that system. So the pay histories and things that you see, those are a result of the recordation of payments and the activity that occurred in that MSP system.

Q. Okay. What about -- what about some of the reports we'll see from the lockbox vendor? What system are those contained in?

A. So the actual -- you know, the file that we're looking at, that's just Excel. They have a -- they had a web portal that's called PINACLE and that was the web application through which the cash user decisioned payments that were exceptions.

Q. Was the web portal PINACLE used at both BBVA and PNC? Do you know?

A. It was not used at BBVA. It was a PNC application.

Q. Okay. Do you know if BBVA had anything similar?

A. They did. I don't recall the name offhand, but they had an application for decision.

Q. Okay. You said that there's a lot to unpack. You mentioned ICE, which is formerly known as Black Knight MSP. What's another system that houses, you know, what we've listed here, customer service account management or servicing information?

A. So customer service has a couple of different tools. So there's a web portal that borrowers can go in, log in, create an account, see and interact with their loan and its information. That's called Servicing Digital. It is also an ICE product.

The call center also uses a tool called [redacted]. That is the application for the software name, and that is the agent portal by which, when a call is received, that a call center agent looks at account information and works through the requests coming from a customer.

It's -- as opposed to MSP which has a lot of screens and fields, it's more of a one snapshot view of a borrower's account information so the customer service agent can, you know, see loan status and take payments and those kind of things over the phone.

Q. Okay. Any other systems or computer programs used at RoundPoint for managing customer relations?

A. Not for customer relations. I mean, there are systems used for just how we do work and data storage.

Q. Okay. And what are some of the ones for data storage?

A. So the biggest thing that is relevant for this conversation, I think, is that behind that MSP system, every night -- so MSP is what we call a batching system. So you do work throughout the day, and at the end of the day, 9:30 p.m. Eastern, the system cuts off and it collects all of the information, everything that's been put into that system throughout the day.

When that happens and the system is done bringing loans forward and figuring out payments, it produces a series of files that from our end, when they're ingested by RoundPoint, [redacted], the MSP produces data files. Those are injected by RoundPoint and those become the basis

for any reports, if you will, that are driven off of what's happened in the system.

Q. Okay. [redacted]

A. Yes.

Q. Okay. Could you go ahead and read topic 1B that's kind of on the screen right there? Just let me know when you're done.

A. Yes.

Q. Do you understand what this topic is referring to?

A. Yes.

Q. Okay. As a user of the system, do you know what types of information, identifying information, for borrowers that RoundPoint maintains?

A. Yes.

Q. Okay. And can you explain to me what some of those categories of information would be for borrowers?

A. Everything you have listed there is available in our data environment, so we store all of the pertinent information tied to a loan

from the time that we receive it until the time it, you know, no longer exists in our system.

Q. Okay. With regard to -- I just want to back up to the -- I know that they can be stored in different places. As I understand it, the information related to the loan in an active environment is processed through ICE Black Knight MSP. Is that fair to say? And then it's archived?

A. That's correct, yes.

Q. Okay. Was -- to your knowledge, was that the software used -- do you know how far back RoundPoint has used that --

A. RoundPoint -- RoundPoint has used MSP as its primary servicing system I'm pretty sure since its inception.

Q. Okay. [redacted] Is that fair to say?

A. That's correct, yes.

Q. Okay. And with regard to the contact information for a borrower, would that include the borrower's residence?

A. Yes. Payment address. So there are potentially two addresses for a loan, its

property address and its mailing address, but yes, those are maintained.

Q. And the property address would be the residence at which the borrower resides; is that fair?

A. Not -- no. The property address is the address tied to the loan itself. So the loan -- the mailing address is typically where the borrower resides. The property address is the address that the loan over -- the loan governs, so to speak.

Q. Okay. To your knowledge, does RoundPoint service any nonresidential loans?

A. No.

Q. Okay. And then would the system also contain a telephone number for the borrower?

A. Yes, I think it would.

Q. Okay. Would it contain a work number?

MS. RENNER: I'm just going to remind the witness not to speculate.

THE WITNESS: Sorry.

Q. I'm going to ask, based off your knowledge, just based off your use of the system and what you may be aware is residing within the system. Do you know if it would contain a

borrower's e-mail address?
A. Yes.
Q. It would contain a borrower's e-mail address?
A. If listed in our primary servicing system, yes.
Q. Do you know if it includes borrowers' social security numbers?
A. It does.
Q. Okay. Do you know if it contains borrowers' work phone numbers, if they have a work phone number?
A. I'm not going to speculate.
Q. Okay. So if you're not sure --
A. Not to my knowledge.
Q. -- it's okay. It's okay. You can just say, I'm not sure. It's okay.
A. Not to my knowledge.
Q. Okay. And then to your knowledge, are those addresses, especially the -- did you call it the payment address --
A. Property.
Q. -- or the mailing address? Right?
A. Mailing address and property address.
Q. So the mailing address, to your

knowledge, is that updated if the -- if RoundPoint receives information that the borrower has moved?

A. That is correct, yes.

Q. Okay. And to your knowledge, does RoundPoint regularly update the mailing addresses?

A. We do not update mailing addresses as a matter of course. Some communication would have to be received notifying us that something had changed.

Q. Okay. And to your knowledge, the property address wouldn't change because that would be the property that's securing the loan; is that correct?

A. That is correct, yes.

Q. Okay. All right. And the system -- does the system also keep track -- I think we've talked about it. It has to keep track of the payments made on the loan by the borrowers, correct?

A. That is correct.

Q. Okay. And it -- as part of that process, does the system track the fees that are collected from a borrower?

A. Yes, it does.
Q. And that includes late fees, correct?
A. Correct.
Q. Now, do late fees, to your knowledge, have codes associated with them that identify that type of fee?
A. Yes.
Q. And those codes are uniform throughout the system?
A. Yes.
Q. And it doesn't matter where the borrower is located, there's only one code for a late fee?
A. That is correct, yes.
Q. Okay. And then the system also tracks the date that the payment was received, correct?
A. Yes.
Q. Now, to your knowledge, where the system tracks when a payment is received, what does that date refer to?
A. There are two dates. There's what we call the receive date, but the effective date of a payment, and then there's the posting date. With the lockbox, for example, if they received your payment yesterday and it comes on the file post today, I could be posting the payment on a

different date than I received the payment. So MSP has an effective date concept where you can backdate a payment's application to the receive date.

Q. Okay. In the situations that we were talking about, about the soft exceptions, is that modification or post dating of a receipt date, is that something that has to be done by the person who is processing the exception?

A. No. In the case of PNC, they report the receive date and that receive date is tracked from the time of receipt until it lands on the deposit file they send to us. So effective date is the -- the receive date in their file is what we used for an effective date of posting in our system.

Q. And for any of the payments that are received through the lockbox, what RoundPoint relies upon are the dates reported to it from the lockbox vendor?

A. Yes.

Q. Okay. Do you know if the information in a borrower's account is kept by RoundPoint as long as RoundPoint is servicing the loan?

A. Yes.

Q. Okay. So it is -- RoundPoint does keep this information for the length of time that it's servicing the loan?

A. Yes.

Q. Okay. Now, how long is the information kept by RoundPoint after the loan may be transferred to another servicer?

A. So the data in our data environment keeps loan information from the period of time the loan was received. So while our general policies and procedures speak to a seven-year timeline for which we retain information, the data environment retains that loan information for every loan back to its inception.

Q. Okay. And then is that the same with regard to keeping loan information back to its inception even if a borrower completes their own obligation and pays off their loan?

A. That is correct, yes.

Q. That information is kept forever? It's not deleted at a point in time?

A. Loans do purge our system, but our data environment is not purged of loan information.

Q. So when you say purge your environment, you mean the act of ICE system?

A. Correct. Two times a year, loans that are no longer active in the MSP system, if there's not been activity on those loans in the preceding year, will be purged from the MSP system. But the data environment retains that loan's history.

Q. And the information that was, you know, [redacted]

A. That's correct, yes.

Q. Okay. Now, I'm going to go down to the next portions of 1, and it's interesting how the page breaks, it kind of works here. If you just read C through H and just let me know when you get done with these -- with reading C through H.

A. I'm done.

Q. Okay. Now, this is asking for some information regarding the processes for the information systems. Which of these, if any, do you have knowledge on with regard to your use of the system?

A. I have general knowledge of all of them.

Q. Okay. So do you know how often the -- these systems are updated as they're being maintained?

A. Our data environment is updated daily.
Q. Okay. Do you know generally -- I'm not going to ask you a quiz on like what does the code X, Y, Z mean, but do you have a general understanding of the codes that are used in the system for different payment types or fee types?
A. I do, yes.
Q. Okay. And then we talked about this a little bit, but you understand the process for deleting or archiving the information in the system?
A. That's correct, yes.
Q. You spoke to that earlier about [redacted]; is that right?
A. That's right, yes.
Q. Okay. And then as far as querying and searching, is this a topic that you have knowledge about?
A. Yes.
Q. Okay. Do you know if the information [redacted] can be queried by like type of information, such as could it query all late fee transactions?
A. It can, yes.
Q. Okay. Can it query -- cross-reference

any late fee transactions with account numbers?
A. Yes.
Q. And those could also -- those account numbers would all contain a property address, correct?
A. Yes. I mean, there's a table structure [redacted], so that data has to be combined, but yes.
Q. Would that archive system, [redacted], would that contain information that would allow someone to identify which payments were received through the lockbox vendor?
A. Yes.
Q. And is that a searchable field?
A. Yes.
Q. Okay. And so, to your knowledge, for a period of time, there could be a search performed of payments received through a lockbox vendor for which a late fee was assessed?
A. Yes.
Q. And to your knowledge, that goes back to when RoundPoint started servicing loans?
A. Yes.
Q. Okay. And along with that information, if we were to have a database spreadsheet that

had payments received for the lockbox vendor for which there was a late fee assessed, those would all be linked to account numbers; is that correct?

A. I don't know -- you mean loan numbers?

Q. Like the payments, if we were to run a query that said these are the payments received by the lockbox vendor for which there was a late fee assessed, each of those transactions, would it have an account number associated with it?

A. A loan number.

Q. A loan number. I said account number. I meant that synonymously with loan number.

A. Understood. Yes, you can cross-reference those things.

Q. Okay. And you can cross-reference the loan number with the borrower's identifying information we discussed earlier?

A. Yes.

Q. Okay. And all of that can be part of a query?

A. Yes.

Q. Okay. All right. And then number 2, go ahead and read that. Just let me know when you're done.

A. Okay.
Q. And we talked about this. With regard to payment processing and your specific field, you understand the organizational structure, right? Cash processing. Your cash processing, is there a counterpart to you that does like noncash processing?
A. No.
Q. No? It's just all payments are referred to as cash processing, whether they come in electronically or check or cash or money order?
A. Correct.
Q. Okay. All right. And then number 3, go ahead and read this. Read through these and just let me know when you're done.
MS. RENNER: While Mr. Waddell is reading through that, I will just interject our objection that 3C, contractual terms governing plaintiff's loan, I'll just let you know that Mr. Waddell is not a lawyer and, you know, he will let you know what he can testify to as to the meaning of contractual terms, but he's not testifying with any legal knowledge.
MR. KAUFFMAN: Okay.
Q. Have you been able to read topic 3?

A. Yes.
Q. Are you knowledgeable on each of these items, you know, subject to the objection that your counsel stated?
A. Yes, I am.
Q. When we talk about the contractual terms regarding plaintiff's loan, do you understand that residential loans have two particular types of contracts; one being a mortgage or deed of trust and the other one being the note?
A. Yes.
Q. Okay. Do you understand that RoundPoint maintains copies -- or does RoundPoint maintain copies of these -- I'll call them security instruments, which are the deeds of trust, mortgages and notes related to the properties that it services?
A. Yes, we do.
Q. Okay. And you maintain that for all borrowers?
A. That is correct, yes.
Q. Do you know where those documents are stored at RoundPoint?
A. We have an image repository system. It's called SBX.

Q. I'm sorry, did you say S?
A. B.
Q. S as in Sam, P as in Paul?
A. No. S as in Sam, B as in boy, X as in X-ray.
Q. X-ray. Okay. SBX. Thank you.
And to your knowledge, are those documents contained in the SBX system, are they queryable?
A. Not in -- no.
Q. Do you know if they could be searched for optical character recognition, or OCR?
A. I do not know the answer to that question.
Q. Okay. Under 4, are you generally knowledgeable about topic 4?
MS. RENNER: Let me just, again, place our objection on the record that rights and obligations is a vague term.
Q. Are you generally --
MS. RENNER: Yeah, you can answer.
A. Okay. Yes. I mean, I'm generally knowledgeable to loan servicing and the rights customers have.
Q. Okay. Are you generally -- do you

generally have knowledge about topic number 5 about when late fees may be assessed?

A. Yes.

Q. Okay. For all of the loans that RoundPoint services, do you understand that there's a grace period associated with the payments?

A. I do.

Q. Can you tell me typically what that grace period is?

A. So the grace period is defined by, you know, general mortgage servicing rights, like the note and things are 15 days post payment due date, which is the 1st of the month. [redacted]

Q. Okay. And is that the same for all of the loans, to your knowledge, that RoundPoint services, that the payment is due on the 1st of the month?

A. There are some exceptions to those rules where a payment can be due on the 17th of the month, but there are very few of those accounts. Those are usually like second -- that kind of thing.

Q. Approximately what percentage if you had to put on it? Less than 1 percent of the loans would have that?

A. Yes. Correct.

Q. And then for those other 99 percent plus of the loans that RoundPoint services, where the payment would be due on the 1st of the month, the grace period would extend 15 days thereafter until the 16th; is that correct?

A. As indicated a moment ago, [redacted].

[redacted]

Q. And then that's the same for all loans that RoundPoint services; is that correct?

A. That is correct, yes, sir.

Q. All right. And then so if a payment is received [redacted]

RoundPoint will assess a late fee; is that correct?

A. If a payment is received [redacted]

Q. [redacted]. Not -- if it's received [redacted], no late fee?

A. Correct.

Q. That's the part that I was not understanding. Okay. So payments received [redacted] do not trigger a late fee, but a payment received [redacted] will trigger a late fee?

A. That is correct, yes.

Q. And any payment received [redacted] will trigger a late fee?

A. Well, the loan is assessed a late fee as of [redacted] if no payment has come in. Everybody gets a late fee on that night. The system automatically assesses the fee.

Q. Understood. So even if the payment -- I guess there could be a sub -- if it's processed, is there -- is there a cutoff [redacted] that's processed after noon? Does it get credited the next day or is there anything like that?

A. So, again, our system cuts off at 9:30 p.m., so any payment received that day that's recorded in our system would not result in a late fee being assessed when the system cuts off. Now, at the same time, we spoke about this earlier, the difference between an effective date and a posting date, so if you -- effective date of payment in our system [redacted] -- prior to the late fee cutoff, the system is configured to automatically waive that assessment.

Q. Okay. So -- all right. So if the payment is received before 9:30 p.m. [redacted], the system is configured to -- although it may assess a late fee, to waive the late fee; is that correct?

A. If the payment came in [redacted], the system would not assess a late fee.

Q. Okay.

A. If the payment was not received [redacted], the system would assess a late fee. A later payment being received that has an effective date [redacted] would result in the late fee being waived.

Q. Can you give me an example of how that would happen? I'm just not understanding. Maybe

because it's difficult to conceptualize.

A. Yeah. So when we talk about the lockbox process, right, we can look at some of those files. There's a column called receipt date, but that is not necessarily the day of posting. So if I get a file from the lockbox today, December 1st, it may have payments that they received on 11-30.

So when I record those payments in our system, I'm going to -- again, there's two dates. There's the posting date and the effective date. And so if I effective date a payment prior -- on the 17th or prior on a loan that already has a late fee assessed, the system is configured to waive that late fee because it recognizes that I got a payment in the system on time.

Q. Okay. And the system -- to put it another way, the system in assessing late fees is looking at the receive date in the -- in the account, not necessarily the posting date?

A. That is correct.

Q. Okay. And if that receive date is [redacted], it will either waive or not charge a late fee?

A. Correct.

Q. Okay. With regard to number 6, are you generally knowledgeable about the procedures for logging and processing payments?
A. Yes.
Q. And I'll note that in this -- when we define payments, I think we define them as those received by mail. Just to let you know, when we're talking about payments, I know there might be electronic payments. You may be knowledgeable about those as well, but I'm going to be referring to payments sent through the mail. Do you understand that?
A. Understood.
Q. Okay. And just to be clear, I'll just go up here. Payments means any funds tendered through the mail to defendant toward satisfaction of a monthly mortgage obligation.
Do you understand that that's what we're talking about on payments?
A. Yes.
Q. Okay. And then number 8, take a second to read that.
A. Yes.
Q. Let me know when you're done.
A. Done.

Q. Okay. Do you have knowledge with regard to topic number 8?
A. I have knowledge, yes.
Q. Okay. Does RoundPoint use any USPS tracking data?
A. No.
Q. Okay. And does it look at any postmarks on -- on envelopes or things like that, to your knowledge, to record when a date -- when a payment was -- was sent or received?
A. No, because we only care about when it was received.
Q. Okay. And with regard to any delivery confirmations, does RoundPoint consider any of those with regard to determining when a payment is received?
MS. RENNER: I'm going to object to lack of foundation. You can answer.
A. I can answer? Okay. So in most cases or maybe in all cases, that tracking, right, is not something that can be ingested in mass, right? If you send a payment to the Fort Mill, South Carolina, office and you put tracking on it, well, the mailroom, and they're going to receive the payment and pay me the payment; and

as I understand it, I received the payment that day.

Now, afterwards, someone can come back and complain and say, no, you signed off on it the day before. Well, in that case, yes, but someone would have to review that item from a payment research perspective to understand whether or not there's a disconnect between the day we received a payment and the day the tracking showed it was received. But that's here to this office. It is not, you know, part of what the lockbox -- they're providing the data receipt, so no.

Q. Okay. Well, let me ask this. With regard to the payments that you receive at the Fort Mill office, those mail payments, are those collected in a mailroom?

A. They are.

Q. Okay. Do you know if the people at the mailroom, if there's some type of confirmation? Do you know if anyone in the mailroom marks when mail is received at the Fort Mill office?

A. I do not.

Q. Okay. You don't know or you don't think they do it?

A. Well, I don't know. I mean, from a cash perspective, so we have a cash room on-site in the Fort Mill office. It is a secure room where the cash team works. The mailroom, as they open mail that has checks in it, they are handing those checks to the cash room. There's a window between the two offices, so the checks go directly into the cash room. At that point, the cash team appends the day of receipt to those items.

Q. Okay. And then -- and so at the Fort Mill location, the mailroom and the cash room are physically located right next to each other?

A. That's correct.

Q. And as you said, there's a window in between them where a check can be passed from the mailroom to the cash processing?

A. That is correct, yes.

Q. Okay. And then the date that is marked in the system with regard to when a payment is received is what date?

A. So to make sure I understand your question, when the cash team receives a check, the goal is to process those payments on the day of receipt, and so when they apply a payment in

the system, it's being recorded as of that day. If there was a reason why the cash team could not process that check, they would then -- we have a safe in the room. They would -- that we stamp those checks, so it would have a date stamp on it and they would store that check for processing, you know, whenever we could resolve the exception or whatever the issue may be so that we would understand its day of receipt.
Q. Okay. And then if there was an exception with regard to the cash room, do they mark down the date at which they process the check in the cash room regardless of whether the exception was resolved a day or more later?
A. That -- that discrepancy would be denoted in the pay history because there would be a difference between the posting date and the effective date.
Q. But the effective date, that is marked as the date that the cash department receives and processes the check?
A. It is the day we receive the check, yes.
Q. The day you receive the check regardless of whether there is an exception or not?
A. Yeah. Yes. Posting could be a date

later, but they would effective date the payment back to its receive date.

Q. And the cash office keeps track of the dates that the checks were received, correct?

A. That is correct, yes.

Q. Okay. Do you have any understanding of whether there is any such similar process with regard to the lockbox vendor?

MS. RENNER: Objection as to vagueness. You can answer.

A. No.

Q. Okay. So you don't know if the -- if the lockbox vendor contains a mail sorting facility and a cash processing portion?

A. No. I think what I understand from the question is unlike the cash room, the lockbox is built to receive those checks, OCR them, and provide us an image. Like from an exception standpoint, the -- you know, the time between receipt and application at the lockbox is controlled by the configuration of what constitutes an exception and then someone decisioning that payment.

So the lockbox receiving a check and not putting it through the system, there's two

different things happening, right? In the cash world, it's we have the check and we have the loan information so we are going to conduct a review to determine there's some reason we can't apply funds. In the lockbox, they're pushing all the checks through the OCR and it's not until we receive the image that the review of that exception can be done.

Q. Okay. And then just to back up a step, when we talked about the Fort Mill office, the mailroom and the -- and the cash room or the cash processing room are located right next to each other, and there is a mark within the cash room when it's passed through the window of when that check is received, correct?

A. Yes. There's a stamp and they stamp the checks.

Q. There's a stamp. Do you know -- are you aware of any other such stamp from the lockbox vendor when it collects mail from the P.O. Box?

A. I am not aware, no.

Q. Do you have any reason to -- is there any reason why, to your knowledge, RoundPoint could not instruct its lockbox vendor to perform such a stamp?

A. I do not know a reason, no.
Q. Okay. You can't think of any reason why that couldn't be done?
MS. RENNER: Objection. Lacks foundation. You can answer.
A. No.
Q. Okay. All right. With regard to number 9, do you have knowledge of -- with regard to compliance programs or internal controls related to timely crediting payments?
MS. RENNER: I'm just going to interpose an objection here. As we stated in our November 26th letter, we believe that the term compliance program is overly broad and vague. With that, you can answer.
A. So there are internal quality controls in place. There are audit programs. However, those -- all of those things are geared to us taking right action on loans, but determining that a receive date is not the receive date is not going to be accounted for, so to speak, in those controls.
Q. Are you aware of any internal controls or procedures or audits with regard to the lockbox vendor?

A. So as my group has oversight of the lockbox, we maintain a monthly score card. Again, it's not tied to receiving payments before payments are received. It is tied to their general performance of deposit balancing, timeliness of the receipt of the deposit on our side into the bank account, and then accuracy of payment application, meaning loans that they accepted money for that are not on that accept file we talked about earlier. You know, if incorrect money should get posted to the incorrect loan, those kind of things are, you know, maintained from a scoring perspective in the score card.

Q. Are you aware of any score card or related audit with regard to the frequency with which the lockbox vendor collects payments from the P.O. Box?

A. No.

Q. Are you aware of any score card or auditing with regard to the process by which the lockbox vendor records when a payment is received?

A. No.

Q. I'm sorry, was that no?

A. No. That was a no.
Q. Okay. The audio cut out. I just didn't hear it.
Okay. As far as number 10, this is dealing with responding to borrower inquiries. Do you have general knowledge with regard to this topic?
MS. RENNER: I'm just going to interpose again. We have an objection that we stated in our November 26th letter as to the vagueness of this topic, and RoundPoint continues to stand on its objection to any RESPA-related questions, as RESPA was dismissed from this case by the judge in January of this year.
You can answer.
A. I have general knowledge. My knowledge in this area is not as specific as to the cash processes, but yes, I have general knowledge of the complaint and correspondence process.
Q. And you testified already to number 11. Is it fair to infer that you have knowledge or general knowledge of record retention of loan servicing data?
A. Yeah.
Q. Okay.

A. Yes.
Q. And then -- and then we're going to talk through various policies and procedures as I go through it. I don't know how much we're going to go into the reasons for changes, but we'll deal with that one as it comes. I understand that that may -- your knowledge, is it fair to say, will depend on what policies and procedures I show you?
A. To a degree, yes. I will say that for every policy and procedure change, the last page of those -- those documents does provide a change history that explains what is changing in every policy and procedure.
Q. You anticipated a question that is further down in my -- in my process, but I appreciate that. And we will go over that briefly.
And to your knowledge, are those -- that change log or -- I believe it is called a revision history, maybe, or something along those lines. Are you generally aware that those are listed for all of RoundPoint's policies and procedures?
A. Yes.

Q. Okay. And then number 13, I will next be showing you some of these document requests responses. Are you generally familiar with RoundPoint's discovery responses in this case?

A. Yes.

Q. Okay.

MS. RENNER: And we're just going to, again, state that, you know, we have an objection in our letter as to topic 13, and he will -- Mr. Waddell will answer to the extent he has knowledge.

Q. Okay. And then at the end of today's deposition, I'm going to show you the answer and some of the listed affirmative defenses therein. Have you seen the answer in this case?

A. I have seen it, yes.

Q. Okay. All right. And I know that we had said all facts and witnesses and documents, but are you generally aware of the facts, witnesses, or documents that would support RoundPoint's affirmative defenses?

A. Yes.

MS. RENNER: And, again, we'll just stand on our objection here to topic 14, that even though you removed the word all, we think

it's premature for you to be asking testimony about facts and witnesses and documents at this point which RoundPoint will present as the case continues. And while Mr. Waddell may have some limited knowledge in this regard and he may provide examples, he won't state everything. He doesn't know everything, and he also will be restricted by attorney-client privilege on this -- in answering this question.

MR. KAUFFMAN: Fair enough.

Q. Mr. Waddell, I'm going to move on to another document, and I do note that we've been going for about an hour and a half. Would you like a short break before I go into the next group of documents?

A. I'm okay.

Q. I mean, if you want to go, we can go to the next document. I'm fine with that.

A. You can proceed.

MR. KAUFFMAN: Okay. All right. I'm going to ask the court reporter to mark as Exhibit 32 a document that is entitled Defendant's Objections and Responses to Plaintiff's First Set of Requests for Admission.

(Exhibit No. 32 marked for identification.)

Q. I'll zoom in for you so you can see a little bit better. These are RoundPoint's Responses to Plaintiff's First Set of Requests for Admission. Have you seen this document before?

A. Yes. I think so.

Q. Okay. And then I'm going to go through a couple of these. All right. So request for admission number 1, you understand that RoundPoint is the servicer of plaintiff's mortgage effective April 2023; is that correct?

A. Yes.

MS. RENNER: I'm going to object to this line of questioning to the extent it just asks him to read admissions that have been made.

MR. KAUFFMAN: Yeah, I have some questions that are more specific to where there might be a distinction here, so that's a pretty easy softball one here.

Q. The P.O. Box that's listed in request for admission number 2, do you understand that to be the P.O. Box at which RoundPoint, at least at one point in time, accepted payments?

A. Yes.
Q. Okay. Do you know how many different P.O. Boxes RoundPoint has listed in either the welcome letters or the account statements during the time that you've been there?
A. I do not.
Q. Okay. How many different ones have there been?
A. How many different P.O. Boxes we've had listed?
Q. Yes.
A. In terms of for a payment?
Q. Yes, for a payment.
A. Just for a payment, then, you know, we have changed our address, but from the BBVA to PNC relationship, this was the one payment address.
Q. The one that's listed here, the P.O. Box 674150?
A. Yes. That P.O. Box was at the BBVA relationship and the PNC relationship. Yes, it's the same.
Q. Okay. And in recent years, that P.O. Box has changed, correct?
A. Yes. We're no longer with PNC.

Q. Okay. No longer using PNC as the lockbox vendor?
A. That's correct.
Q. Who are you using now as the lockbox vendor?
A. [redacted]
Q. How do you spell [redacted]?
A. [redacted].
Q. Okay. [redacted].
Do you know why there was a change between using PNC as the lockbox vendor and switching to [redacted]?
A. Yes. Cost.
Q. Cost. Is [redacted] cheaper than PNC?
A. They are. They are. But there's more to it than that. So we started -- I started shopping for a replacement lockbox vendor in February of 2023. We, by the end of last year, 2024, had a contract in place with [redacted] to replace PNC and the relationship change is actually tied to our banking relationships.
BBVA and PNC are both banks, and the lockbox service they provide is tied into the other accounts that we hold with them. So if you

hold -- you know, for every loan payment, there's escrow. That escrow money is held in trusts called a custodial account, so for all of those custodial arrangements that you hold, the bank will offset the cost of the lockbox service by you maintaining bank accounts with them.

When Two Harbors acquired RoundPoint over time, Two Harbors, you know, closed out all of our PNC account relationships. They don't bank with PNC, and so as a result, the lockbox service that was at PNC became a -- you know, a single cost as opposed to something that was offset in bank fees.

Q. Okay. And you said a couple of dates at the beginning of your answer.

A. Yep.

Q. You started looking at a different lockbox vendor in February 2023?

A. That's correct.

Q. And then you said you had a signed contract with a lockbox vendor at a later point in time; is that --

A. Yeah, so the way the process works, when you want to change vendors is the first thing you do is you have to submit what we call an RFP,

which is a request for pricing. So you don't just look at one shop. You send out that RFP to multiple, you know, organizations that do the same work, right? So obviously we're with PNC, we were looking at a couple of other places, and so you send out that request, and those entities respond with a proposal for, you know, the cost of their service and the things that it include.

That takes a while. It takes a while to then narrow through meetings and those kind of things down to who you're deciding to go with. There are legal, you know, things to go through. There's a contract that has to be established and negotiated and signed off upon. So those things take a while.

Q. Okay. And so the RFP process was started in February 2023?

A. That's correct.

Q. And then at the point you landed on Deluxe was when?

A. So we decided on [redacted] -- I don't know a specific date. Probably mid 2024.

Q. How many different lockbox companies did you consider?

A. Four or five.

Q. Okay.

MS. RENNER: I'm going to object to the line of questioning on [redacted] -- of the scope of the deposition in the sense that, again, our class period ends with the filing of the complaint, and you can answer. I just wanted to lodge the objection.

MR. KAUFFMAN: And I'll just note that we always contend that the class runs up until a motion for class certification is ruled upon, and that's consistently what we've done in this case.

Q. But with regard to [redacted], were there any other reasons other than cost and the change of the PNC banking relationship for going with [redacted]?

A. Well, yes. So kind of the way it unfolded is as we sent out RFPs to other banks -- we didn't start with [redacted]. We went to other banks; a couple of them, Citibank, Texas Capital Bank. When they came back with their proposal, they denoted in their proposal that [redacted] was their lockbox provider, that they would basically be the intermediary for the deposits and [redacted] was actually the one doing the work.

And due to the changing nature of banking relationships frequently and they shift, it made sense to go wider so that in the event that banking relationships changed down the road, I don't have to change the lockbox again.

Q. Okay. That makes perfect sense. Do you understand whether [redacted], in providing lockbox services, tracks the date upon which it receives payments out of the P.O. Box?

A. They do.

Q. Okay. They do log that information?

A. Both in the way that PNC receives it in that we receive a file with a day of receipt.

Q. Okay. But do they -- do they also stamp or mark when they receive or have noted that a payment has been received into the P.O. Box designated?

A. They do stamp their checks, yes.

Q. Okay. And for the purposes of the receive date, does RoundPoint refer back to the dates that are stamped on the checks?

A. We use the date in the file that we receive, because the file -- again, we haven't really talked about how the money is applied in our system, but that deposit file, you know, we

get thousands of checks a day. If they're not input into the system one at a time, that file is used to drive all of the posting, so we are using the receive date in the file we receive, which should tie to the day they stamped it.

Q. Okay. All right. So they send you a report in mass of all of the checks they scanned and received in a given time period, and for Deluxe, the receive date matches the date on which they've stamped the checks as received?

A. Right. The same thing happened as PNC. They just didn't stamp the checks. They also sent a daily deposit file, that Excel file that we've talked about a couple of times. That is the posting file for applying the funds in our servicing system.

Q. But it doesn't necessarily match the date that it was received in the P.O. Box because there may be some lag in between receiving it from the P.O. Box and processing it?

A. No. No. It carries both dates. It carries the receive date and the current day's date, which is always the posting date.

Q. Right. But the receive -- the receive date at PNC, if they don't stamp the checks, how

do they know when a check was received at the P.O. Box?
A. It's not about when the -- I mean, it's when the check arrives at their facility, so it is the date they received the item is the date that they are recording the receipt.
Q. Okay. Do you know where PNC's facility is located?
A. I do not. We have an address. We have an overnight address for them in the billing statements, so it's also in Dallas, Texas.
Q. Okay. But for whatever -- and you will agree that their processing center is not at the post office?
A. Correct.
Q. And it's not at the same location as the P.O. Box?
A. That is correct.
Q. Okay. So if I understand it, someone would have to physically pick up the checks from the P.O. Box and drive them to the other facility for processing?
A. Every day, yes.
Q. Okay. And there's no note at PNC when those checks leave the P.O. Box and are driven to

the PNC processing facility?
A. That is correct. There's no distinction.
Q. Okay. Has RoundPoint ever audited that process to see if there's a lag time between checks being received in the P.O. Box and being processed at the PNC facility?
A. No.
Q. Okay. All right. We're still on Exhibit 32 here, and I just want to be clear. I understand the distinction between there being two different P.O. Boxes, one that was handled by BBVA/PNC. That's the P.O. Box we see here listed in request for admission number 2, correct?
A. Yes.
Q. Okay. That is the same P.O. Box listed in every borrower's account statement that RoundPoint services, correct?
A. Up until the change to [redacted], yes.
Q. Okay. Fair enough. And then prior to that change for [redacted], that would also be the P.O. Box that would be listed on the detach and return coupon --
A. That is correct.
Q. -- on everyone's -- on every single

borrowers' statement; is that correct?
A. That is correct, yes.
Q. Okay. And that was my one question. There's not a different P.O. Box based off of a region? Like there's not one -- like that's not the one for Dallas because Mr. Ventling was located in Wyoming and Dallas is relatively close to Wyoming?
A. That's correct. And, again, prior to the [redacted] relationship, we only maintained one lockbox and that was at the Dallas post office.
Q. Okay. Now, with the [redacted] relationship, are there multiple P.O. Boxes throughout the United States maintained?
A. We have two. So we maintain one in Dallas and we have one in Charlotte.
Q. Okay. Are all borrowers informed of both P.O. Boxes?
A. In terms of their billing statement, no. That is programmed into the statement and so borrowers kind of east of the Mississippi have programming to go to the Charlotte P.O. Box, and everybody west is directed to the Dallas post office. Now, that's only for your billing statement. Any other correspondence that we have

that indicates a payment is communicating to send funds to the Dallas post office.

Q. Do the welcome letters that you send to borrowers -- with regard to the ones that when PNC was the lockbox provider, lockbox vendor, would all of the welcome letters contain this P.O. Box in 674150 in all the welcome letters?

A. I'd have to review the welcome letter, but yes.

Q. Okay. Now, to your knowledge, does the welcome letter make that distinction with regard to [redacted] for properties or mailing addresses that are listed west of the Mississippi or east of the Mississippi to direct them either to Dallas or Charlotte?

A. It does not. It maintains the Dallas one.

Q. The welcome letter only contains the Dallas location, to your knowledge?

A. Correct.

Q. But then the account statement may contain either Dallas or Charlotte?

A. Yes.

Q. Are there any other P.O. Boxes that you can think of during which payments have been

designated regular monthly payments other than the three P.O. Boxes we've just discussed?

A. There are no other P.O. Boxes tied to payment receipt specifically.

Q. Okay. All right. I'm just going through these requests for admissions to see if there's anything specific I wanted to ask you. I have a note here later on, but I haven't gotten to that number yet. I just wanted to check real quick.

I wanted to talk about just your knowledge. Have you reviewed the late fees -- and this is not a quiz. I'll get to a document that has the late fees assessed in the system on Mr. Ventling's account. But in your preparation for today's deposition -- I'm going to refer to the October, November, December 2023 payments and the January 2024 payment. I'm going to focus on those four payments.

Do you have a general understanding or in preparation for today's deposition of which late fees were assessed and which ones were waived with regard to that period?

A. I would need to see a pay history to have exact knowledge.

Q. Okay.
A. I'm aware that, you know, starting in June of '23 I think was the first late fee assessment and that over the course of the window you just described, there was a partial waiver, a reapplication -- or reversal and reapplication of funds, and then two additional late fee waivers across that window, along with of course the assessments that occurred in those months.
Q. So now we're down into -- in looking at -- and we may come back to this. I kind of want to have the benefit of this, but with regard to request for admission number 31, it asks regarding whether RoundPoint had refunded the late fees it had assessed in October 2023.
Did you look at any of this to see if you could match up whether or not those refunds had applied to the October 2023 late fee that was assessed?
A. I don't think there was any -- I mean, again, we'd have to look at the pay history and I can speak to that when I see it. But from memory, none of the late fee waivers resulted in refunds. Where we reversed and re-applied, those funds were applied back to the loan, so there

wasn't --
Q. We may be talking about a semantic difference between refunded and reversed.
A. Gotcha.
Q. Is that fair?
A. Potentially, yes. When I say refund, I mean I'm sending money back to Mr. Ventling.
Q. Okay. And the best evidence of this would be the payment histories that we have?
A. Correct.
Q. Okay. Okay. Would you like a break now? As I said, I'm going to ask you this because we've been going for a little bit. I'm going to go to the next document. Just if you're ready to go, I'm ready to go.
A. I'm okay, but it's also 12 -- almost 12:30 here, so I'm going to have to eat lunch at some point in time.
Q. Okay. Go until maybe 1:00 and then break for lunch?
A. I'm fine with that.
Q. How long would you like for lunch?
A. 30. Is that sufficient? I mean --
Q. That's fine with me.
A. -- it doesn't need to be super long. So

30 is okay if that's --
Q. Okay. We'll break at 1:00 and then I'll bring you back here at 1:35. Give you a little bit longer than that because there will be a little bit of going off and coming on.
A. Okay.
Q. Okay. I'll try to end promptly at 1:00. Okay. So I put before you what I'll ask the court reporter to mark as Exhibit 33.
(Exhibit No. 33 marked for identification.)
Q. It's Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories.
A. I apologize. You froze for a moment here. I don't know --
Q. Oh, I'm sorry. I'm going to ask the court reporter to mark as Exhibit 33 a document that bears the heading Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories. Have you seen this document before?
A. Yes, I think I've seen it. I don't know that I have a --
Q. I think these were verified. Let's see

if -- I don't think it was you, actually. Let me see. That's -- that's your signature, right?

A. Yep.

Q. And to your knowledge, you read through these interrogatories and swore that they were factual based on your firsthand experience, correct?

A. Yes, that's correct.

Q. All right. So if I look at interrogatory response -- let's just kind of look at these one at a time. I'm going to pass by 1 here. That's just asking people who have knowledge, as does number 2. Let's go to number 3 here. We're asking about the fields of information, and as you sit here today, does RoundPoint maintain the information that's listed here as part -- subparts A, B, C, D, and E?

MS. RENNER: I'm just going to object. If you look at the response, the response is purely an objection on page 8. So there was nothing here that Mr. Waddell verified because we objected to the question in its entirety.

MR. KAUFFMAN: I understand there was an objection here.

Q. I'm just asking if, as you sit here today, you understand that your databases contain borrowers' addresses and contact payment; is that correct?

A. Yes. Can I make one clarifying point, though? Because you just said something.

Q. Oh, yeah. Absolutely.

A. When you say contact information, one thing I want to make clear is the contact information that we maintain is the contact information we had at the time we serviced the loan. If the loan's moved on, I can't obviously provide contact information today of the customer.

Q. Right.

A. But yes, the information that we had at the time we service the loan is available, yes.

Q. Right. And if there was -- but there would be information, although it may not be current if RoundPoint's no longer servicing the loan, but there would be information that could be used to identify a borrower such as their prior addresses, their social security numbers, their names, their spouses, things like that; is that -- is that fair to say?

A. Where that information was listed on the loan, yes. So for example, a married borrower whose wife is not a co-borrower on the loan, I do not have information.
Q. But all of that information -- prior addresses, telephone number, social security number, things like that -- would be information that RoundPoint would have on the borrower?
A. And the prior addresses, those kind of things, again, specific to the information we had for the time we serviced it. I don't have all of their prior, but yes.
Q. Understood. And the property address that secured the loan, correct?
A. Correct.
Q. Okay. And then the dates associated with the payment history, that's information that RoundPoint maintains, correct?
A. Yes.
Q. And does RoundPoint track the method of payment, whether it's check or electronic?
A. Yes. There's a methodology by which we understand that, but yes.
Q. And there's a way that it tracks everything that's received at the P.O. Box,

correct?

A. Same concept, but yes.

Q. Right. And then we asked about the -- it maintains the mortgage agreement and deeds of trust for borrowers, correct?

A. At an image level, yes.

Q. All right. And then this is just any other fields, and that -- that may be a little bit broad, so I'm not going to ask you about that. That's kind of a catchall in case we got a response that didn't identify certain things.

Okay. We talked about P.O. Boxes. On number 5, we asked for the recordkeeping systems and practices used to track borrower physical payments, including lockboxes and to identify the dates of any changes in practices, and then the answer -- I'm not trying to fool you, but there's an objection and then there was a discussion that this would be produced in response to a request for production for this information.

I'm going to jump over to that request for production, and then there is a supplement to this interrogatory response. So I'm just going to kind of show those to you here right in a row here.

So I'm going to ask the court reporter to mark as Exhibit 34 Defendant's Objections and Responses to Plaintiff's First Set of Requests for Production.

(Exhibit No. 34 marked for identification.)

Q. And that is the document that I'm putting before you on the screen. Is this a document that you recognize?

A. Scroll down beyond this. They all look the same to me.

Q. Yeah, they all have these requests. This is request for production with responses. Interrogatories are typically verified or signed by an employee or someone with knowledge. Requests for production are just signed by counsel, but I don't know. Have you seen these responses to request for production before?

A. I've seen these, yes.

Q. Okay. I'm going to ask about 12 at least initially, and 12 was asking for all documents regarding policies and procedures related to the receipt and crediting of borrower's physical payments. I paraphrased it, but you see it before you. And then subject to

an ESI protocol, there's a time period listed here and that those policies would be produced.

To your knowledge, have the policies and procedures that were responsive to this request for production, have they been produced?

A. Yes.

MR. KAUFFMAN: Okay. I'm going to ask the court reporter to mark as Exhibit 35 -- oh, wait. I went to 36. We'll get to the welcome letter here in a second. I need to move my control over. I hate when it's at the top of the document. Okay.

So what will be marked as Exhibit 35 is Defendant's Supplemental Objections and Responses to Interrogatory No. 15 of Plaintiff's First Set of Interrogatories.

(Exhibit No. 35 marked for identification.)

Q. And if we saw with regard to Exhibit 33, 15, it was a question about the number of borrowers who were paid via physical mail -- or who paid via physical mail who were assessed late fees. And there was an objection with regard to an audit and summary, and then we asked for a supplemental response to this. Sorry, I keep

going to the welcome letter.
So if I go back to Exhibit 35, this also -- Exhibit 35 has your signature on the verification page, correct?
A. Yes.
Q. Do you know if you did anything to understand how many payments may have been received by RoundPoint via physical mail in any time period for which those borrowers were assessed late fees, like how many borrowers that would be?
MS. RENNER: I'm just going to caution the witness not to reveal any attorney-client privileged conversations.
THE WITNESS: Can I still answer?
MS. RENNER: Yeah, go ahead.
A. So specific to your question, no. In general, do I understand how many payments go through the lockbox in a given period of time? Yes. Late fees, no.
Q. Okay. All right. So do you know directionally about how many payments received, what percentage of them have a late fee associated with them?
A. I do not. Not offhand.

Q. Okay. With regard to the ones that have a late fee, do you understand that there is a -- that at least there is a response that there will be some document forthcoming with regard to the documents that are identified with -- in response to request for production number 15, and request for production number 15 in Exhibit 34 is documents regarding complaints or grievances from borrowers. So I'm not sure if those are really overlapping, but do you deal with identifying questions, complaints or grievances that have been received by RoundPoint?

A. Do I? No, I do not.

Q. Okay. All right. And we may ask your counsel later if this was intentional. I don't know if 15 is really dealing with the same information in substance.

MR. KAUFFMAN: But we can confer on that later, Ms. Renner, about this, if this supplemental response is only going to be referring to complaints that were received.

Q. But let's just talk generally about mail-in payments received in the lockbox.

A. Okay.

Q. So do you have an idea about how many

payments are received in a lockbox in a given month? Let's say in October of 2023.
A. Yes, in general because we track that, the trends of our payments. The lockbox -- the amount of payments that are applied through that payment channel hovers between 4 and a half and 5 percent of loans. It's one of the smaller payment channels. Most funds are electronic.
Q. Okay. And how many -- and that is for -- that is with an 800,000 or more population?
A. Yeah, it's fairly consistent. I mean, we haven't really talked about the history of RoundPoint and the history of the loan servicing that we've done, but you asked about October of 2023. Around that point in time, RoundPoint was acquired by Two Harbors and began bringing loans from Two Harbors servicers into the RoundPoint, which will include Mr. Ventling's loan, right?
So at the end of '22 through all of 2023 and the beginning of '24, there's a constant effort at RoundPoint to bring Mr. Cooper and Flagstar loans onto our portfolio. So towards the end of 2023, we may not have been at the full -- the full population, but, you know, we

had 800 plus thousand loans on the books at that time.

Again, most of our customers pay online, and so as part of the transfer -- I know we're not talking about ACH payments, but part of the transfer activity between Cooper and Flagstar and RoundPoint was we actually brought the ACH, which is the drafting of those borrowers' accounts, into our system.

So the vast majority of customers that transferred into RoundPoint as part of that activity stayed on their ACH plan and continued to draft payments. So, you know, there might be some fluctuation in that 4 and a half to 5 percent number, but it's been fairly consistent overtime that most of the payment activity hovers in, you know, a sub 10 percent in terms of checks.

Q. Okay. And then -- so let's unpack that a little bit as far as the history.

A. Yeah.

Q. Can you please explain to me your knowledge of RoundPoint's history from the earliest period of time that you're aware and about how many loans it serviced over that period

of time? And take me through the Mr. Cooper/Flagstar onboarding as well.

A. Sure. So when I started at RoundPoint in July of 2018, RoundPoint was owned by a company called Tavistock, a hedge fund type thing. They had a bunch of, you know, companies rolling up under them. And at that time when I started, up to its sale to Freedom Mortgage, RoundPoint maintained around 400,000 loans, thereabouts, slightly north of that.

Q. Okay. Back up one second.

A. Yeah.

Q. When did the sale of Freedom occur?

A. Late 2019.

Q. Okay.

A. Okay. So that portfolio of 400,000 loans -- so I guess first, the first thing to say is RoundPoint doesn't own a lot of loans. We own the servicing rights, and the loan itself belongs to in most cases a government agency; Fannie Mae, Freddie Mac, or Ginnie Mae.

Now, there are privates as well. So, you know, a company that is contracted with us to handle the servicing, they may hold a portfolio of loans that are their loans, what we call whole

loans, but they're not agency loans, but most of our loans are in the agency space. So a Fannie Mae, a Freddie Mac, a Ginnie Mae loan.

And around the time of the Freedom sale, our portfolio was pretty evenly divided. Like Ginnie Mae and Freddie Mac were probably around 100,000 loans each and Fannie Mae was 200,000 loans for rounding purposes. The numbers aren't quite like that, but for rounding purposes, 200,000, 100-, and 100-.

Okay. With me so far? Keep going? Am I frozen again? James looks frozen.

(Zoom interruption.)

(A discussion was held off the record.)

Q. Mr. Waddell, I heard through your discussion of the history and then the sale to Freedom, and then you were talking about GSE loans, and at that point, I started to go. I don't know how long you went after that before you realized I was frozen, but --

A. Me either. So what I can tell you -- so I mean, basically the only thing I really covered is part of like -- just kind of where the loan portfolio sat at the time of the Freedom sale,

which is, you know, a little north of 400,000 loans on the platform with a split between the three main GSE entities; Fannie, Freddie, and Ginnie Mae. And I indicated that, you know, Fannie Mae had the lion's share of those at around 200,000, and there was a kind of an equitable split between Ginnie and Freddie Mac, around a hundred and a hundred. It's not quite those numbers, but for rounding purposes, that's kind of ballpark where our portfolio sat.

Q. Okay.

A. Okay. So when the Freedom --

Q. And when you say Ginnie, you mean Ginnie Mae and you mean Freddie Mac as a --

A. That's correct. Correct. All right. So we were acquired by Freedom Mortgage late 2019. Freedom is big in the Ginnie Mae servicing space. One of the nuances with Ginnie Mae servicing is that for an entity that services on their behalf, you can only have one what we call ticket or servicing ID with them.

So when Freedom acquired RoundPoint, all of the Ginnie Mae service loans move from RoundPoint's platform to Freedom's platform, so RoundPoint was down from 100 -- 400,000 loans to

about 300,000 loans as a result of the Ginnie Mae -- or the Freedom sale.

Q. Now, when you say sale, I just want to understand something here. As I understand it, you can have the lender or the owner of the loan and then you can have the servicing rights and you can have a servicer and then you can have a subservicer who contracts with the servicer.

A. Correct.

Q. Is RoundPoint typically a servicer or subservicer?

A. Until that sale, RoundPoint was a primarily a servicer with subservicing clients. With that sale of Freedom, we became holistically a subservicer, right? Because Freedom is now the owner of the company and we're servicing the Fannie and Freddie MSR, the servicing rights that Freedom now as an ownership of. Does that make sense?

Q. That does make sense.

A. All right. So the servicing of Ginnie Mae went to Freedom. RoundPoint maintained, you know, just shy of 300,000 loans of Fannie and Freddie primarily along with some privates that we were subservicing on behalf of other entities,

but that was the makeup of our portfolio.

When Freedom -- so then, you know, that was late 2019. By late 2021, early 2022, Freedom is in discussions to sell us -- you know, I think the decision to sell RoundPoint to Two Harbors Financial occurred in early 2022, and so by mid '22 when -- even though it was kind of an agreement in principal that the final papers weren't signed, and all those things, but the deal was moving forward, Freedom took their Fannie and Freddie loans off the books. They took our Fannie and Freddie that we serviced on their behalf up to the Freedom platform.

So at that point in time, Freedom took the lion's share of what -- a little over half of probably what was left on RoundPoint's portfolio and we were left with sub 150,000 loans on our platform that were, you know, primarily being subserviced on behalf of other -- of other entities. So we had one or two still big subservicing clients that had Freddie and Fannie, but Freedom took all of their Fannie and Freddies away.

Q. And at that point in mid 2022, you're saying that the total number of loans serviced by

RoundPoint at that point in time was likely less than 150,000 loans?
A. Yes. That's correct.
Q. Okay. But you said approximately half, and it was 300,000, so it may have been around 150,000?
A. Right. Maybe a little but less than that, but yeah. Around that number or -- yeah.
Q. Okay. That number is a pretty good approximation?
A. It's a pretty good approximation, yes, but I would say it's pretty accurate.
Q. Okay. Okay.
A. Okay.
Q. And then what happened after that?
A. So then in June of '22, kind of the agreement in principal I guess between Freedom and Two Harbors Financial that, you know, Two Harbors was going to acquire RoundPoint as their -- you know, their -- their wholly owned servicer, you know, took place, and so starting in the back part of 2022, I think October of 2022, RoundPoint began boarding -- so Two Harbors had -- they were the MSR owner and they had two subservicing relationships, Mr. Cooper and

Flagstar.
And so starting in late 2022, October 2022, we began transitioning those loans from those two servicers onto the RoundPoint platform in bulk. So 100,000 loans at a time. You know, like every other month leading up to the full consolidation of all of the loans, again, all Fannie and Freddie, no Ginnie Mae servicing, all into the RoundPoint platform.
Q. Okay. And you're saying that -- so from October 2022 on for the onboarding and subservicing of Cooper and Flagstar loans, there was a process where you added about 100- -- RoundPoint added 100,000 loans every month going on their -- until it grew to above 800,000 loans?
A. That's correct.
Q. Okay.
A. Yeah.
Q. So roughly six months?
A. It took -- it took all of 2023. So it started at the end of October of '22 and I bet we brought the last loans on at the beginning of 2024.
Q. Okay.
A. Because it was an every other month

boarding. It wasn't -- we didn't do -- it was like all the even months. Like we boarded October, December, February, April, June, if that makes sense.

Q. Okay. And by the end of that process to the beginning of 2024, at that point in time, how many loans are being serviced by RoundPoint?

A. 910-, -15,000 loans probably at our peak.

Q. Okay. And then from that point in time, has that peak declined?

A. Yes. I mean, we're around 850,000 loans. We haven't really -- Two Harbors has not bought any new MSR, really, in that window. There may have been small deals here and there, but nothing of size, and so mostly where the portfolio sits today is in a runoff. You know, the loans are paying off, right? And so as loans pay off, the volume of loans on the platform declines.

Q. In your cash management department, you know, as you were on -- as these loans were being onboarded from October 2022 on, were you adding personnel and staff during that point in time? And can you give me an idea of how, if at all,

your staff grew during that point in time?
A. So it did grow, but it was only marginally. So when -- when the loans left and went to Freedom, right, the landscape was already such that the Two Harbors deal was coming. It was in play, right? So we didn't wind all the staff down. We didn't release everybody that worked for us, right? We basically did a projection on the portfolio to understand what we thought we would be. You know, we did let some people go at that point in time, but it was only a few months later that we started adding back.
So we only really probably added one or two FTE across both of the cash teams. That was based on the staffing model, but as the portfolio grew back.
Q. What's an FTE?
A. Full-time employee.
Q. Okay. And in your department, you think you maybe added one or two?
A. Correct. It wasn't -- yeah.
Q. Okay. And did the workload increase substantially because you're onboarding 100,000 new loans every month?
A. So the workload that -- earlier in the

discussion, we talked about this concept between departments called tasks where one business unit, the call center, for example, gets a call. They can open up a work ticket, if you want to think of it that way, to my department. That's the kind of work that grew, right?

You have more loans that need a misapplication review, more loans that need payment research, more loans that need a payoff quote, what have you. But the vast majority of our payments are electronic, so in-house payment processing, you know, I quoted 4 and a half to 5 percent for the lockbox.

In-house processing and the cash room has stayed around 2 percent historically. So we didn't see -- yes, we saw a bump in volume. Servicing is kind of one of those things where like as long as there's one loan on the platform, somebody's got to be here to do the work, right?

Q. Sure.

A. So we don't -- you know, the amount of automation that we have in play, yes, there were staffing increases, but they were largely geared toward the support functions that we have around the process because enough of it is automated

that it didn't require some full ramp-up.
Q. Okay. And then when you said 4 and a half to 5 percent of the payments, you're saying that that's roughly the run of the payments that go through the lockbox; is that fair to say?
A. Yes.
Q. Okay. So at 150,000 loans, you'd agree with me that 4 to -- 4 and a half to 5 percent is like approximately 7,000 loans, ish?
A. That's right.
Q. Is that right? If you do the math --
A. Yeah.
Q. -- it's like 100 would be five, and then half of that would be 2.5?
A. Seven, yeah. Somewhere.
Q. Seven is fair?
But then as you're adding 100,000 per month, you're adding -- you know, it's fair to say that there would be, let's just say, 5,000 more checks received at the lockbox location?
A. Per hundred thousand loans, yes.
Q. So every month from October 2022 on, let's say -- is it fair to say that leading into that, if we use that 150,000 number, there were maybe 7,000 checks being received? Are you with

me there?
A. We were boarding a hundred thousand at a time.
Q. I'm saying -- but I'm trying to take our percentages and apply it to the volume at the lockbox that we would expect to see.
A. Right.
Q. So before the ramp-up of the onboarding of 100,000 per month, we'd be -- is it correct that with 150,000 loans, it'd be expected that you'd have about 7,000 pieces of mail coming through the lockbox?
A. Yes. Right. That's correct.
Q. Okay. And then as you're adding, starting in October 2022, it may -- it may have a tail effect where the payments start coming in November or something like that, but starting with those payments coming in, let's just say, November of 2022, after they're onboarded and they have to pay, then you're adding another like 5,000 --
A. That's correct.
Q. -- to that process, right?
So goes from 7 to 12. Following me?
A. I am.

Q. And then you understand that it would go up until we get to that 900 number. So each month, there's 5,000 more pieces of mail coming into the P.O. Box?

A. Correct.

Q. Okay. Do you know if the lockbox vendor changed any -- and the lockbox vendor at this time of the ramp-up was PNC, correct?

A. That's correct, yes.

Q. Do you know if PNC changed any of its practices --

A. I do not.

Q. -- to accommodate --

A. I don't have any --

Q. -- the increasement?

A. I don't have any knowledge that they changed practices.

Q. Okay. Do you know if you guys did any audits to see if they were able to keep up, you know, if -- if a regular office is receiving 5,000 pieces of mail or 7,000 pieces of mail and it doubles or triples or quadruples over time, that might change kind of the way that you do things. Did you have any knowledge of that?

A. No. I mean, they're a national retail

lockbox vendor, so no. We expected them to be able to handle the volume.
     Q. Do you know if the lockbox was physically big enough -- or the P.O. Box was big enough to accommodate this number of pieces of mail?
     A. The P.O. Box itself is not, but I mean, every day, it's a -- the mail is not actually put in the P.O. Box. It's put in trays to be delivered to the courier.
     Q. So it's put in trays and then the courier comes and picks it up?
     A. That's correct.
     Q. Do you know how often the courier at PNC picked up the mail at the lockbox -- or at the --
     A. I don't know their schedule. I don't know their schedule offhand.
     Q. Okay. All right. I promised you a break, and I'm going to be true to that and we're going to take a break right now, and we're going to come back at 1:35 your time.
     A. Okay.
     Q. And I hope that the Internet will be kind to us because I'm going to just log off here and we can take a break, and we will come back at

1:35.

A. Okay.

(A lunch recess was held.)

MR. KAUFFMAN: I'm going to ask the court reporter to mark as Exhibit 7 [sic] a document I'm going to show you.

(Exhibit No. 37 marked for identification.)

Q. It bears Bates number RoundPoint 6018 to 6019.

MS. RENNER: I'm sorry, is this -- did you say this is Exhibit 7?

MR. KAUFFMAN: Oh, I'm sorry, 37. We need to put a 3 in front of everything. So this is Exhibit 37.

Q. So Exhibit 37, rather, is a document with those Bates numbers as I stated before. It's a letter from RoundPoint dated September 26, 2025, to Mr. and Mrs. Ventling regarding updating the payment address. Actually, I think I'm skipping one here. Weren't we on 36 before? Hold on.

MS. RENNER: I think this might have been Exhibit 7 from Mr. Ventling's deposition.

MR. KAUFFMAN: It may have been. I meant to do 36 first. So I'm going to get back to 37 in a second, but before I do, it makes more sense for me to do this in the right order.

And I'm going to ask the court reporter to mark as Exhibit 36 a letter from RoundPoint to the Ventlings bearing Bates numbers RoundPoint 5848 to 5855.

(Exhibit No. 36 marked for identification.)

Q. And this is a notice of servicing transfer. Mr. Waddell, do you recognize this as a -- as a letter that RoundPoint has sent the Ventlings notifying them of a servicing transfer?

A. Yes.

Q. Okay. And this is a type of letter that gets regularly sent to borrowers when they're onboarding with RoundPoint?

A. Yes. That is correct, yes.

Q. Okay. And is this a form letter that's generated in the system?

A. It is, yes.

Q. So it's the same -- although the loan number and property addresses and things like that may change, the substance by and large will

be the same for all borrowers, correct?
A. That is correct, yes.
Q. And it says to mail payments and there's that P.O. Box that we saw there, correct? This is the one that PNC -- I tried to not get it highlighted, but yeah, down here in the bottom left, P.O. Box 674150, that's the one for PNC, correct?
A. That's correct, yes.
Q. And he was onboarded from Mr. Cooper, right?
A. Yes.
Q. So is this -- you know, Mr. Ventling would have been one of the approximately hundred thousand loans that were coming in on April 2023?
A. That is correct, yes.
Q. Okay. All right. And so for all of those loans that were being onboarded, fair to say there were about a hundred thousand welcome letters going out a month?
A. That is correct, yes.
Q. Okay. All right. I'm going to ask the court reporter -- referring back to Exhibit 37, which, again, bears Bates numbers 6018 to 6019, RoundPoint 6018 to 6019. This is a letter to the

Ventlings dated September 26, 2025, informing them of an update of the payment address, correct?
A. Yes.
Q. And at this point, Mr. Ventling had retained counsel, and he had local counsel in Wyoming, and so this -- at the top, this has been sent to his attorney, Mr. Kessner, correct?
A. Yes.
Q. And this is informing the Ventlings that they are to send their new payment to this new P.O. Box, 650011, in Dallas, Texas, correct?
A. Yes.
Q. And is the -- it's still the same ZIP code there, right, 75267, and 752 -- no, it's a different -- it's a different ZIP code, correct?
A. Yes.
Q. Okay. And this is the P.O. Box maintained by [redacted], correct?
A. Yes.
Q. Now, the question I have there is -- well, let me ask this. Overnight payments, that's still the Fort Mill -- that's the Fort Mill headquarters that we have been talking about earlier, correct?

A. That is correct, yes.
Q. And that's the -- that's the location that has the mailroom and the cash processing center that we talked about earlier?
A. That is correct, yes.
Q. Okay. Now, for this particular payment, if Mr. Ventling -- because it had to get sent through his attorney and then sent to him, and then he may have already written the October check to the old P.O. Box, what happens in that circumstance where he took the October payment and maybe wrote it to the old P.O. Box?
A. Okay. So we changed our payment address in April of 2025. Starting in April of 2025, Mr. Ventling's billing statements would have reflected the P.O. Box referenced below.
For 90 days post transition, so from April to July, the PNC box was still active and still accepting payments. From July to October -- so we closed that P.O. Box in July with PNC but agreed with them that for 90 days post transfer, they would continue forwarding payments that they received on our behalf to the Fort Mill location.
So for six months -- or three months,

PNC continued to accept the payments they posted. For the window of time after we closed the lockbox for 90 days starting in July through October, they forwarded payments they continued to receive to the Fort Mill office for processing. After that point in time, they are returning payments they receive.

Q. And they are returning them back to the payor, to the -- to the borrower who pays?

A. Correct. They are returning them back to the address on the check, which is not always the same thing.

Q. Okay. So if the address on the check was 32 Equine Drive --

A. That's where the funds --

Q. -- that check, according to PNC's processes, if it was received after they stopped picking up from the lockbox in October, it would be returned to the Ventlings at the 32 Equine Drive address?

A. That is correct, yes.

Q. Okay. And with regard to the -- this letter, do you see anything in this notice, right -- this is talking about a third party financial institution's bill pay service?

A. Yes.
Q. And that is -- I mean, that is what Mr. Ventling was using, right?
A. Correct.
Q. And it says to contact them and update the address, but as of this time -- I mean, do you know if there's any prior correspondence that explains to them that PNC will only be picking up from the old P.O. Box up until some date in October?
A. First, his billing statement reflected the correct address. So if we're using the billing statement and that the payment address that was on the billing statement, it would have gotten routed to the new lockbox.
Secondly, yes, there were call campaigns, e-mails, and other letter campaigns tied to informing borrowers that our payment address had changed. However, we're here today due to a lawsuit. The coding that goes on our system when there is a litigation event prevents some of those events like an outbound call campaign to notify a customer of a payment change.
Q. So your understanding that if

Mr. Ventling was in litigation, which he is as of this period of time between -- really we're talking -- what are we talking? April to -- April to October, right, is this period of time of transition; is that fair to say?
A. Yes.
Q. Okay. So April to October of 2025, there's a transition. And I've got a question, why wouldn't this type of letter be sent to Mr. Ventling back in April?
A. Well, I don't know the answer to that offhand. I mean, the way that we determined who needed the letters was by an evaluation of who had not pivoted to the new payment method, right? Like those communications were in the billing statement. There were previous campaigns to this one. I'd have to look and see if there was an earlier version of this sent. It's possible that there was. I don't know that offhand --
Q. Right.
A. -- because it's based on who we're posted -- like how the payments are being received that drove these campaigns.
Q. Okay. And if that had been generated, if a prior letter had been generated, that would

be responsive and produced? You don't see any reason why that wouldn't have been produced in litigation?

A. Correct.

MS. RENNER: I'm going to object that that's really a question for counsel, not for this witness.

Q. Yeah. Well, if he understands from his operational knowledge if there would be a reason why a previous letter -- I mean, subject to, you know, some decision that counsel had made to withhold it, do you understand any reason why a previous letter wouldn't have been produced just like this letter has been produced?

MS. RENNER: Yeah, let me just object further because, as you know, our production is rolling, and I can -- I can represent to you that we will be producing any previous letters to the extent they exist if they haven't already been produced.

MR. KAUFFMAN: Okay.

Q. The reason I ask is because Mr. Ventling has written a check in October that is still not yet cashed and it hasn't been returned yet, and so we're -- you know, he's trying to figure out

what's happening with that check.

Do you have any idea of what's happened with his October payment that has been -- that was -- in fairness, it was sent to the previous P.O. Box, but do you have any idea of what's happened to that check?

MS. RENNER: I'm going to object to that being outside the scope of this witness's knowledge, but if you know the answer, you certainly can answer.

A. I can only speculate.

MS. RENNER: Well, no speculation, so --

Q. Okay. Under these circumstances, if it's now two months later and the October check has not been processed or returned to Mr. Ventling, what would you recommend from your position as VP of cash management that Mr. Ventling should do?

MS. RENNER: Again, I'm going to object as outside the scope of this deposition, but if the witness has an answer that is not speculative, you know, go ahead and answer.

A. I would contact my bank and have that check stopped.

Q. Okay. Do you know if it's RoundPoint's position that in that type of circumstance, if someone has to stop payment because the payment hasn't been returned to them, that they sent to a previous P.O. Box, do you know if RoundPoint's policy is to pay the stop payment charge that the bank may charge Mr. Ventling?

MS. RENNER: Objection. This is completely outside the scope of the deposition. You can answer if you know the specific answer without speculating.

A. There's not a blanket policy to refund those stop pay charges in mass, but as with other complaints, that complaint can be logged and directed to my department to review, at which point we would take it under consideration.

Q. Okay. As you sit here today, do you think it would have been fair to allow the PNC to process the P.O. Box for three months after letters such as the one that we see in Exhibit 37 went out to a borrower?

MS. RENNER: Again, I'm going to object. Mr. Waddell is not here to testify as to what is or what isn't fair. He's here to testify as to the facts. And that's also outside the

scope of the deposition topics.

MR. KAUFFMAN: I'm trying to understand the policy and culture at RoundPoint, and I think that is fair game given that we're going to go through a number of issues with regard to frustrations and whatnot associated with payment processing.

Q. And I'm just wondering, do you think it's fair for RoundPoint to send him a letter on September 26th that may be within a couple of weeks, maybe even less than a week, shut down the previous P.O. Box?

MS. RENNER: I'm going to object as to lack of foundation. As I already stated on the record, our production is still rolling and you don't know if this is the first letter or not.

Q. You can answer the question. We see this letter. Do you think it's fair to have the P.O. Box only operate for maybe even a couple days after this was shut down in October?

A. No, I think you misunderstand. We shut down the lockbox at PNC in July. We changed the address on the billing statements in April. At this point in time, the only reason he got this

letter is he continued to pay to the wrong address, so we held the old lockbox open for three months. There was no change to the behavior of where the check was being driven from the time we changed it to the time we shut the old one off. And then we held that lockbox -- their forwarding open for another 90 days.

So should there be other communications preceding this one, yes, but we did those things as well. There were call campaigns. There were e-mail blasts and letters to borrowers. Whether Mr. Ventling fell into those populations, again, I do not know offhand.

Q. I understand. And you would agree with me that an address that's listed on a billing statement at the bottom on the coupon is less prominent than the change of address that we see in Exhibit 37?

MS. RENNER: I'm going to object as a leading question.

MR. KAUFFMAN: I can ask him questions that are leading. He's not my witness.

MS. RENNER: You can answer if you -- I mean, again, that's not -- whether, you know, he thinks something is fair or not, which

is really what this question asks, is not why he's here to be deposed. He's here to be deposed as to the facts.

Q. You can answer the question. Is it more prominent in this letter or in a billing statement? Which is more prominent?

A. It's more prominent in this letter.

MR. KAUFFMAN: Okay. I'm going to ask the court reporter to mark as Exhibit 38 a cash management policies dated -- or effective date December 5, 2022, version 15, bearing Bates numbers RoundPoint 48 through RoundPoint 70.

(Exhibit No. 38 marked for identification.)

Q. And Mr. Waddell, I'm going to show you a number of these that we're not going to go through tremendously in detail, but I am going to ask you if you recognize it and if it's kept in the ordinary course and where it's kept. That's kind of where I'm going to go with a bunch of these things, okay?

So do you recognize this policy, cash management policy number 3340, table of contents? I'll represent that this is what was produced, a 23-page document. Do you recognize this

document?
A. Yes.
Q. Okay. This is a cash management policy that follows -- that falls under your supervision, correct?
A. Yes.
Q. Okay. Now, where are these policies kept physically at RoundPoint?
A. Electronically in what we call a SharePoint, so it's like an intranet web application.
Q. And who has access to the policies on the intranet?
A. All RoundPoint employees.
Q. Okay. And is there any reason why this cash management policy wouldn't be available to all RoundPoint employees?
A. No. It would be available to all RoundPoint employees.
Q. And are they kept in the normal and usual course of RoundPoint's business?
A. Yes.
Q. Now, are prior versions of this policy archived by RoundPoint?
A. Yes.

Q. And if we go to the bottom -- we talked about this earlier. There's a revision history. Do you see where I've scrolled down to this -- there's two pages. I'm not trying to trick you here. It's 23 and 22, but the last -- second-to-last page starts with the revision history. This shows the revisions that have been made to the policy over time, correct?
A. Yes.
Q. And this would be the same not just for this cash management policy but for any written policy similarly stored at RoundPoint, correct?
A. Yes.
Q. And it has all of the policy authorities and approvals, including yours, correct?
A. Yes.
Q. All right. So this one has been approved by seven different people, correct?
A. Yes.
Q. Okay. Is that typical at RoundPoint that every policy or procedure has a list of policy authority approvals that are signed by various employees?
A. Yes. It is typically dependent on that department's level of interaction with the

activity involved.

Q. Okay. All right. We'll look at paragraph 3. I'm just going to go through a little bit of this. [redacted]

Is that nonconforming payment, is that synonymous with some of the hard and soft exceptions that we were talking about earlier?

A. Yes. The concept is -- it's generally more specific to electronic funds, but yes, basically you can use nonconforming as synonymous with exception.

[redacted]

A. To have some SLA affixed to our receipt of funds that we are holding for application, yes.

Q. Do you know if that same policy [redacted] applies to lockbox vendors?

MS. RENNER: I'm sorry, I'm going to ask for clarification. I don't understand the question.

Q. So this is asking for a payment that's a

nonconforming payment if it's accepted. [redacted]. Do you know if the lockbox vendor receives a nonconforming payment? We talked about several of the exceptions earlier, if this same policy applies to the lockbox vendor.

A. Theoretically, yes. But, again, we're circling this concept of when was it received.

Q. Right. And we're circling this concept of RoundPoint having control -- I shouldn't say control. The cash management policies here on receipt are mostly dealing -- or almost exclusively dealing with payments received at the Fort Mill and Charlotte areas, right?

A. Yes.

Q. Okay. And primarily as far as your cash management oversight, you're overseeing those employees and their processes there, correct?

A. That is correct, yes.

Q. You're not exercising -- during the time that you've been with RoundPoint, you've never exercised any supervision or review of the daily processes of the lockbox vendor; is that fair to say?

A. We had no oversight of the lockbox, but

yes, we do not review their associates and their activities specifically.

Q. Okay. All right. If we look under 4, Prompt Crediting of Payments, and you understand that the policy in part A -- I'm just going to -- you can read it here and I'm just going to summarize it. [redacted] is that correct?

A. That is correct, yes.

Q. Okay. If it's received after 5:00 p.m., it may be credited the following business day?

A. It would be posted the following business day. The borrower would still get the effective date of the day it was received. If it's after 5:00 p.m., that effective date concept becomes essentially a next day item.

Q. Okay. And that's because at the Fort Mill and within -- I guess within Charlotte as well, you can identify the date that the mail hit the mailroom; is that correct?

A. Yes. Yes.

Q. Okay. All right. Record Retention. And so this is -- this is -- part A, for example, is dealing with like, let's say, a borrower sent into Fort Mill a check and had a change of address form like included in it. That would apply to part A, correct?

A. Yes.

Q. [redacted]

A. That's correct.

Q. Okay. And what does the mailroom do with it from there?

A. It's scanned and sent to our correspondence department.

Q. Okay. And that's to ensure that the -- that any correspondence are going to the new change of address?

A. Correct.

Q. Okay. Now, under D, it says that [redacted]

[redacted]

That's referring to the ICE/Black Knight system, correct?

A. Well, it's system reports. So yes, I mean, the concept is we're retaining the reporting of the loans payment history for [redacted].

Q. And those system reports are generated out of the ICE/Black Knight system?

A. Their -- no. Their data is used to create those reports internally, so I would say we have those pay histories in excess of [redacted] where it's applicable.

Q. Okay. And then [redacted], what does that mean?

A. Well, like you referenced in A, sometimes we receive checks with more than just a check, right? There are, you know, other -- whether it's not just documents, but there's, you know, like an invoice sheet with it or something like those. Those hard copies we retain and we hand off to an image team in our -- in our company. There's a doc retention group that they take scans of all of that backup material so that

it can be -- so those images can be retained, so that's what it's referring to.

Q. Okay. I just didn't understand the [redacted]. So the -- like let's say we've got a change of address that comes in with the check, and maybe checks are -- I guess checks would be more applicable. If -- so let me withdraw. I'll repeat the question.

If there's a check received, it gets imaged, but what does it mean like [redacted] after you receive it, you scan it? I'm just not following that part of it.

A. Yeah, I honestly -- I think that, you know, the way the process works and probably what this states aren't 100 percent aligned because we're going to hand off any image -- any documentation for imaging in real time, right? Those images, those extraneous documents are kept in our cash room and handed off to doc retention on a daily basis.

So I think the [redacted] is trying to affix some SLA by which we are ensuring we are handing those things off, but in reality, it happens much more organically than some [redacted]

[redacted] before those things are passed off for scanning.

Q. The next one, part F, says that [redacted], correct?

A. That's right.

Q. The checks are imaged [redacted], correct?

A. Well, they're deposited and so that depositing creates an image, so yes, we have images of the checks we deposit.

Q. Are those images retained --

A. They are.

Q. -- in perpetuity?

A. Yes.

Q. Okay. And those checks that are received at the Fort Mill would reflect the stamp of when it was received, correct?

A. Yes.

Q. And that's done by the mailroom?

A. No. The stamping of our checks is done by the cash room.

Q. But it's the window, like the mailroom

opens and passes it through the window and the cash room stamps it?
A. Yes.
Q. That typically happens same day?
A. It always happens same day, yes.
Q. Because they're right next to each other, right?
A. Correct.
Q. Okay. All right. And then number 9, Lockbox and Payment Vendors. Who is the RoundPoint vendor manager? Is that an actual person?
A. It is.
Q. Who is it?
A. At present, his name is Ben Johnston.
Q. Is he one of the people that signed this at the bottom?
A. No, probably not.
Q. Let me see.
A. Of course this is also dated 2022. Ben is part of the Two Harbors organization, not necessarily the RoundPoint, so I don't think he would sign.
Q. Are any of these people vendor management?

A. No.
Q. Okay. But there is a vendor management position -- as long as you've been at RoundPoint, there's been that position?
A. Yes.
Q. Okay. Do you have any idea if that position existed before you got to RoundPoint?
A. It did. I'm sure it did.
Q. Okay. And is it -- are these two different people, vendor manager and cash supervisor? Are you the cash supervisor?
A. I have managers over the cash teams that we discussed earlier, so yes. So I mean, in the context of this policy, the cash supervisor applies to me.
Q. Okay. And then what oversight, according to this policy, does the vendor manager and cash supervisor do with regard to third party lockbox service providers?
A. The vendor management is more related to the maintenance of the contract that we have with them. When it's going to renew, when we're going to discontinue services, that's where vendor management plays a role in the -- you know, they -- we -- I mentioned earlier that we

maintain a score card and monitor performance in general. Vendor management, they also collect and hold the score card repository performance-related things.

Q. Other than the score cards that we talked about and the maintenance for the contract, is there anything else you can think of that is involved in the oversight of the third party lockbox service provider?

A. I mean, there is -- in cash in general, there is a day-to-day oversight of the actual process. I mentioned the accept file that goes out every morning. There's also, you know, an image and deposit file that we have to receive at the end of every day to, you know, understand the payments that the lockbox has collected, that it's depositing, and the relevant payment specifics tied to that deposit so that we can post those payments.

So every day, cash in terms of, you know, the nonvendor management side, the actual cash operation part of it is validating receipt of that file, validating it balances to a deposit file, processing those payments, coming in the next day and running controls to make sure that

what we posted reconciles and balances to what hit the bank, it balances to what we deposited, we didn't see anything trip those exception markers that we have in terms of our accept file. So that's the general day-to-day oversight of the lockbox process.

Q. And part C talks about, [redacted].

Does RoundPoint keep these monthly reports?

A. Yes.

Q. Okay. Is that -- is that the score card that you're referring to?

A. It is.

Q. Okay. So a monthly report of lockbox or payment vendor performance is synonymous with the score card that we've been talking about earlier?

A. Yes.

Q. Okay. All right. I'm going to ask the court reporter to show you what has been marked as Exhibit -- what I'll ask to be marked as Exhibit 39. It's the cash management procedures

dated December 5, 2023, version 16, bearing Bates numbers RoundPoint 141 to 163.
(Exhibit No. 39 marked for identification.)
Q. Again, that's your signature that we see on the last page?
A. Yes.
Q. Okay. And you recognize these as the cash management policies?
A. Yes.
Q. And these are kept in the ordinary course of business?
A. Yes.
Q. Okay. And, again, if we wanted to understand the revision history of this, we would just have to turn to the end and look through the revision history and it would show the dates that this policy was updated and a summary of what those changes were, correct?
A. That is correct.
Q. Okay. In your experience, are the revision histories accurate?
A. Yes.
Q. Okay. I'm going to ask the court reporter to mark as Exhibit 40 -- I have to --

you can't see this, but I have a little bar that pops up if I get too high at the top of my screen where I have this, so I need it to go away so I can get to the next document. Just bear with me a second. Otherwise, I'm just going to go back and -- hold on. I'm going to stop the share and look at it this way. Just bear with me for a second. I'm just organizing the documents.

There's a menu that pops up when I'm sharing from Zoom, and it -- there's a way to move it. I'm not exactly sure how it is, but it interferes with hitting tabs. So I'm going to reshare now that I've changed this.

Now, Mr. Waddell, do you see what I've marked as Exhibit 40, the in-house monthly payment processing procedures dated August 8, 2023?

(Exhibit No. 40 marked for identification.)

A. Yes.

Q. And these are kept in the ordinary course of business at RoundPoint?

A. Yes.

Q. And how is this different than the cash management policy that we saw earlier?

A. The previous documents that we've looked at are policies. This is a procedure, and the distinction is this is the step-by-step instructions for a frontline associate doing their daily work.

Q. Okay. And we see that down, starting with there's -- there's -- there's some roles and responsibilities -- overview of roles and responsibilities, but then there's an actual discussion of the procedure here and this is a step-by-step how to do it, right?

A. Yes.

Q. Okay. And this is referring to payments that are received at the Fort Mill headquarters, correct?

A. That is correct.

Q. Okay. These are not the same processes necessarily that the lockbox vendor was?

A. Correct. This is specific to, you know, as it's titled, in-house payment processing, so that is what a cashier has to do on-site in our office to process a payment.

Q. Okay. And then if we wanted to see the revision history on these policies -- or these procedures, we would go back and we see the

revision history going back to 2012, correct?
A. Yes.
Q. Okay. I'm going to ask the court reporter to mark as Exhibit 41 the lockbox maintenance tasks -- actually, let me make sure on Exhibit 10 -- I'm sorry. Let me go back to Exhibit 40, and I'm going to read in the Bates range real quick. The Bates range on Exhibit 40 was RoundPoint 496 to RoundPoint 513.
All right. Exhibit 41 will be the lockbox maintenance tasks -- make this a little bit this way -- dated July 11, 2022. It bears Bates numbers RoundPoint 514 through 530.
(Exhibit No. 41 marked for identification.)
Q. Now, these are the lockbox maintenance tasks for cash management, correct?
A. Yes.
Q. And, again, as we saw with the previous in-house monthly payment, these are the processes that the RoundPoint employees follow with regard to the exception reports we've been talking about, some things that may come from the lockbox vendor, correct?
A. That is correct. This is the

step-by-step process for a cashier to navigate the PNC system, you know, find their queue of exception items that needed review and decisioning and make those decisions.

Q. And this is, again, kept in the normal course of business at RoundPoint; is that correct?

A. Yes, that is correct.

Q. And these are the instructions for the RoundPoint employees when interfacing with the lockbox vendor, correct?

A. Yes.

Q. Okay. All right. I've got three of these to show. They -- they're different dates, but I just wanted to be clear that we had these in the record. 41, as I said, are the lockbox maintenance tasks dated July 11, 2022 [sic].

MS. RENNER: I think that's January 11th.

MR. KAUFFMAN: Oh, January 11th. Did I say July?

MS. RENNER: Yes.

MR. KAUFFMAN: Okay.

Q. And then, again, I'm going to -- I'm going to switch back. We saw 40, so let's get

rid of that. Let's get rid of 41. All right.

42 is the lockbox maintenance tasks dated February 22, 2023, bearing Bates numbers RoundPoint 531 to 548.

(Exhibit No. 42 marked for identification.)

Q. Again, this is the same document but updated for February 22, 2023, correct?

A. Yes.

Q. And if we wanted to know what was changed between these two, we could just go to the revisions and we'd see that there's an update of some stakeholder names and titles and there was an adding of Appendix A, but those would be the changes that were made and it actually has your editor listed there, correct?

A. Yes.

Q. So you're the one that would have made those changes?

A. Yes.

Q. And functionally, those changes didn't change what the procedure was for interfacing with the lockbox vendor, correct?

A. Correct.

Q. All right. I'm going to ask the court

reporter to mark as Exhibit 43 the lockbox maintenance tasks dated February 23, 2024, with Bates numbers RoundPoint 549 through 566.

(Exhibit No. 43 marked for identification.)

Q. Again, these are the same step-by-step procedures for interfacing with the lockbox vendor, but these have been updated in some way as of February 23, 2024, correct?

A. That is correct, yes.

Q. Okay. And then if we look at the change, there's been an update to the stakeholder names and titles, updated business trigger in the daily lockbox -- daily processing. Do you know what that means?

A. Not without reviewing that applicable section.

Q. Yeah. Business trigger in the daily lockbox data. So let's see. That's referring to a section of this?

A. Yeah. I mean, daily lockbox data transmission processing and report, that ought to be some, you know, designation within the process, but daily lockbox report speaks to, you know, some --

Q. This one right here, right?
A. In that section, yeah. There's a change in that subset, the business trigger.
Q. There's a change in the business trigger?
A. Yeah.
Q. Now, it says, This process is now completed via automation.
So was it not automated -- the daily lockbox data transmission, was it not automated before this point?
A. Correct. This one was dated -- what was the date on this?
Q. I'll scroll up. I'm pretty sure 2024, February.
A. Yeah. So once upon a time, the PNC deposit file that we receive at the end of every day was -- when it landed on our system, someone had to pick that file up, run it against our logic, and drop a file to post all of the money in that file.
These steps still lay out how to do that, but what the business trigger is saying is now that's automated with our IT department; and when the file lands, our IT is grabbing the file

and running it off of our logic instead of someone having to do that in the cash world.

Q. Okay. And then this says that it's now been automated and [redacted] is that correct?

A. That's correct.

Q. What's that?

A. I said correct.

Q. Okay, sorry. Sometimes I can't hear.

Okay. All right. I'm going to stop the share for a second and just get ready for the next document. Just bear with me one second. I'm just putting it up so I can see it.

Okay. Let me share my screen. Okay. Do you see the file that is -- I'll say this was produced as Ventling Payment History 11.5, and it bears Bates numbers RoundPoint 6022. It's an Excel file related to payments received. Do you see that?

A. Yes.

Q. Okay. So let's go through some of this payment history.

(Exhibit No. 44 marked for identification.)

Q. So if we look here, the first line, for example here, I think we saw from the welcome letter that the Ventlings were onboarded with RoundPoint in like April, correct, of 2023?

A. Yes.

Q. Okay. And so the first payment they made was in May of 2023, and it looks like there was a payment received. Is that what you understand this to mean?

A. Yes. If you scroll back to the left, I can walk you through it if that would be simpler.

Q. Yeah, let's walk through these fields one by one, sure.

A. So payment transaction date is the day we applied the money in our system. Column B is the effective date that we appended to that application. So like we've talked about several times, there are a couple of dates, a posting date and an effective date or receive date. So that is B. B is the effective date or the date we gave credit to the loan; whereas, A is the day it actually happened in the system.

Q. Okay. Question. If it's blank, does

that mean that it's just basically the same as the transaction date?
A. That is correct.
Q. Okay.
A. Okay. So those are A and B. C is what the loan was due for at the time of that payment application, so --
Q. And that's the date that that payment was applied to, so the payment received with an effective date of May 1st was applied to the payment due on April 1st?
A. That's correct.
Q. Okay.
A. Then the next pieces define how the payment was split or, you know, bifurcated that the payment's not all necessarily one thing. Mr. Ventling doesn't have escrow, so that's why his payment -- how much of his payment received was allotted to escrow is always zero.
F is the fee column, you know, if we applied any money to a fee bucket, a principal interest. So, you know, of his initial payment of 2,805.12, on that first line 3, $564.54 went to interest. The balance went to principal.
Q. Okay.

A. And I doubt there's anything beyond that. There's another column, but --
Q. Yeah.
A. -- that's just the loan and UPB, I guess reduction --
Q. Unpaid principal balance is the same as the previous day ending first principal balance?
A. Yeah. That's escrow, so he doesn't have escrow or an escrow advance or --
Q. You're talking about this last column, M --
A. Well, L and M are your two escrow balance columns, so as Mr. Ventling doesn't have escrow, we're not paying his taxes or insurance. There's no escrow total or escrow advance. Escrow advance means that we paid out taxes and insurance in excess of the amount you had in escrow that creates a negative, right, an advance balance in your escrow position.
And then N is your suspense or your trust account money. Like when we reversed and reapplied payments, you have to put that money somewhere. Same where we withhold partial payments received, is that money goes into suspense and then, you know, once we finish the

payment application, reapplication work, it probably came out and went to zero. If you scroll down, it takes a couple of days to -- all of that activity is probably like one or two days' worth of event on your left-hand column.

Q. Okay.

A. It's a lot of in and out of what's happening.

Q. We'll take a look -- we'll take a look at that real quick here. So if I follow this before, there's a principal -- there's a payment with an effective date also of 5-18 and there's a principal curtailment?

A. Correct.

Q. And it looks like it's in the amount of 4.88. That, would you agree, is the amount that Mr. Ventling paid in excess of his -- what his monthly payment due was for that given payment?

A. That's correct. Curtailment means a reduction to the principal balance, so that is money being applied against his UPB.

Q. Okay. So the one that we see in column -- I'm sorry, in Row 4, that curtailment applied the extra amount to the principal?

A. Yeah. If you look at the due date column and see that, that curtailment actually applied after the -- so first, we apply the 5-1 payment, and then the curtailment went as excess after the 5-1 payment was applied because the due date is now reflecting 6-1, and it's the mechanism of the way the report spits out the order of events. But the payment posted first on 5-18, and the curtailment came after.

Q. Can you tell me what's happening down here with these misapplication reversals?

A. Yeah. So at this point in time within the -- you know, the order of events, I know that there were some calls and questions about the timing of payments and those kind of things; but at this point, you know, there's a request sent to the cash team to reverse the previous payments that were made and credit the $4.88 curtailments that initially went to pay late fee. So if we're looking up on the 7-1, what in column C reflects 7-1 --

Q. Right here we've got -- we've got it in row 6, right? We got --

A. Yeah. So as those payments --

Q. So what's here, it is now paid to late

fee; whereas, before it was paid to principal?

A. Right. He didn't have any late fee at that point in time, right? When a loan transfers from servicer A to servicer B, there's a 60-day moratorium on late fees to give a borrower time to react to their payment change address. So that's why in April and May, even though the payments were late technically by the grace period, there was no late fee assessed.

So for 60 days post transfer, there's a moratorium; but then in June, that's when the late fee block was lifted and a late fee was assessed. So when the June 1st payment is applied, now the excess waterfalls to late fee as opposed to principal curtailment.

Q. Okay. And waterfall is a term that you just used. That just refers to the allocation of the borrower's payment to principal, interest, escrow, and fees and the like. There's an order in which it applies under the mortgage agreement, correct?

A. That is correct, yes.

Q. And by waterfall, in cash management, you have to kind of understand the order of operations for the waterfall to deal with

exception reports and things; is that correct?
A. That is correct.
Q. And in your experience, is the waterfall generally the same for all residential loans?
A. It is.
Q. Okay. All right.
A. Also logic driven. Payments are -- you know, outside of the in-house processing procedure, most of this work, including the lockbox posting, is done through automation, so the posting is run off of logic that evaluates your due date and whatever else is owed on the account to apply funds. So --
Q. Okay. So what's happening with these misapplication reversals? There's two payments where there was a late fee. The extra amount was paid towards the late fee that was charged.
A. That's right.
Q. And because of some conversation with Mr. Ventling or something that happened internally, it was decided to reverse those?
A. Yeah, so --
Q. And this is the process by which it gets reversed?
A. Yes. So when we talk about payment

application, the interest that is paid per installments is -- the word we use is amortizes, so it is a calculation based on your UPB. So if I owed you a $4.88 curtailment after the first payment and I want to correctly allocate your next payment, I have to do everything sequentially.

So what happens is at this point in time, cash has received a request to back off two payments, back off two late fees, and re-apply those two late fees as curtailment. So in order to do that so that the second payment's interest is based on the lower principal balance, you have to reverse all of the payments off and then put them all back on in sequence.

So that's what's happening with the misapplication reversal. Cash received a task to back off payments and re-apply the money initially applied as late fee to curtailment, so that -- that -- the four that we're looking at on rows 12 through 15, that's the initial reversal activity. It took the two payments and the two late fees back off the loan and the money went to suspense, so that's why you'll see the suspense account bucket in the far right go up. Right now

we're holding those totals.

All right. I want to put a pin in that thought and circle back to a conversation we had about the way our system works. It is a batching process. It requires an overnight cycle to understand the aggregation of all daily activity. So day one you can take the payments off, but you can't put them back on. So that is why this bled into a multi-day process is day one you take the payments off, day two you put the payments back on.

In this case, it looks like we put one back on, but I don't know if we did that wrong, so that resulted in, ooh, back that off again even more on the next day and then re-apply everything in order from that point forward. So in this application --

Q. If I'm following --

A. Go ahead.

Q. I just want to follow just based off of this, right? So we have -- in this, we have $4.88 being applied from the July payment due date, the August date, and the September 2023 date. We agree on that? Like that was -- that was where it was to begin with?

A. Correct.
Q. The $4.88 was applied to fees for those three months, correct?
A. That's correct.
Q. And then it was reversed on two of those, right? So it was reversed on September and the August payment, but not on the July payment; is that correct?
A. So I mean, when we talk about the due date and the late fee, these things are a little disconnected, right? Like we reverse the July and August payments.
Q. Okay.
A. We reverse the late fees that were applied after those payments.
Q. Okay. But there were three --
A. Right. But at some point --
Q. -- $4.88 --
(Overlapping dialogue.)
A. And one of the things that --
Q. -- two reversed, right?
A. Yeah.
Q. At least from what we see so far?
A. What we see so far. But one thing I want you to keep in mind, there's a fee

transaction tab.
Q. Yeah, I'm going to come to that.
A. Yeah. Because there's also a waiver process to consider and so reversing the two that -- you know, instead of the three, I don't know offhand without doing the math what was waived at that point in time. They may have only required 4.88 to be removed or they could have -- you know, I mean, it's a human operation. They may have, you know, just done two and come back and done the next one later or something along those lines.
Q. Yeah. And so -- and so here, we see -- these -- and I went to the fee transaction tab that you're referring to in this document.
A. Yeah.
Q. And take me through what these -- we'll just say what these first six --
A. Yep.
Q. -- columns mean.
A. Okay. So the first one -- and column C is kind of the definition. There's transaction codes. So the first row, Row 3, the 152 tran, that is the assessment of a late fee. So on June 20th, probably because it was a weekend or

something involved, the first late fee was assessed to the loan, okay?

Then from the pay history, we saw 22nd and the 17th payments come in, so those 73s are payment applications and so that's where $4.88 per installment that was paid and had some little excess got applied against the late fee that had been assessed on the loan.

Q. Okay. And then there's another code in Row 6 that has a transaction code of 32. That's a reversal of the rest -- or of -- of $130.50 worth of late fees assessed, correct?

A. That is a waiver of the balance of the late fee. 32 is a --

Q. Yeah, I called it a reversal, but a waiver of it, right?

A. Well, I want to make that distinction because the reversals are on here as well and those are the transaction 47s.

Q. Okay. So the transaction 47s are -- okay. Let's just be really clear. The transaction codes in part C, one -- code 152 means the amount of a late fee that's been assessed against the account?

A. Correct.

Q. And that means that the borrower owes that amount for late fees, right?
A. Yes.
Q. 73 are amounts that have been paid that are credited towards the late fee; in this case, late fee balance or the fee balance where those amounts owed are paid down by the borrower, correct?
A. Yes.
Q. Okay. 32 are late fee -- how would you call it? I want to use the right terminology on this because I would say it's a refund, but I don't know if that's right.
A. No. It's -- we call it a waiver.
Q. A waiver. Okay.
A. It's not a refund because the assessment --
Q. There's no money going to Mr. Ventling. It's just saying you don't owe this anymore?
A. That's correct.
Q. So 32 is a waiver of a previously assessed late fee?
A. Yes.
Q. Okay. And then we come down to 47, and you were going to explain that that was something

different.
A. Yeah, that's a reversal. That's -- if you compared this spreadsheet against the first pay history tab we're looking at, those 47s align with that misapplication reversal activity that was happening on those days where we're not waiving those late fees, but we're backing the accreditation of those late fees off the application. You know, initially, they were applied against late fee. Now we're reversing them off because we're going to credit that money to the loan.
Q. Okay. But in this -- the thing that's confusing to me is when the late fee was assessed, it's a positive number --
A. Yes.
Q. -- right?
And then when it's reversed, it's also a positive number?
A. Right.
Q. That would increase the late fee balance, so I'm not following that part.
A. Well, okay. So the late fee is assessed. Column F has your running balance total, right?

Q. Okay.
A. So in the first record, $140 is assessed, his late fee balance is now $140. In columns 3 and 4 in each instance, he pays in $4.88. Credits are negatives in our world. So you know, he pays in $4.88, he pays in $4.88, and that drops the late fee balance to 135 and then 130. And then someone comes in and waives the balance owed, so the 130 drops to a zero.
Q. Understood.
A. Okay? So now we repeat. We get an assessment.
Q. Another late fee?
A. We get a $4.88 payment toward that late fee that drops the late fee down to $4.88 -- or I'm sorry, by $4.88.
Q. 135.38, yeah. Right.
A. Okay. Now that gets waived too. So now he's zero balance, right? And this is where I think probably the confusion comes in is, in the middle of this reversal activity, you know, the first two payments that were made in Row 3 and 4, those didn't get waived because they were paid in. Whoever did the waiving, they just waived the balance that was outstanding on the loan.

Q. Right, right.
A. So then they queue up cash to go reverse that money and apply it to curtailment, which they did, but reversing that money basically re-assesses the fee to the loan. So that would have to be waived too, and it doesn't look like that happened. The $9.76 just -- you know, it got unpaid.
Q. Yeah. When the curtailment came through, it increased the late fee balance to $9.76 for the two 4.88 transactions?
A. When the reversal happened, yes.
Q. So that actually increased his late fee owed balance, right?
A. So now he had a $9 balance at that point in time, and he gets a late fee assessment --
Q. And he gets a late fee on --
A. 10-17.
Q. -- October 17?
A. He pays -- his payment -- his October payment arrives. 4.88 of that went to pay that down. He got another assessment.
Q. Another late fee assessment on November 17th is what you're referring to?
A. Yeah. Correct.

Q. And so now his late fee balance is 285.40?
A. Yes.
Q. And then there's another 4.88 paying it down?
A. Correct.
Q. Okay. And then there's another -- we are repeating the process, right? We've got a --
A. So the distinction on the December one is that we did waive after the --
Q. It looks like it was waived, the December one, right?
A. Right. Correct.
Q. But nevertheless, there was still 4.88 from the payment applied to his late fee balance?
A. Yes.
Q. Okay. How come -- after this one gets reversed and the 4.88 gets applied, how come that didn't go down? Do you see what I'm talking about between 16 -- 17 and 18? Here, I'll highlight the row for you. See 17, this is a waiver of the late fee, correct?
A. It is.
Q. Okay. So that reduces it from 420 --
A. It's the math for -- I just have to do

the math.
Q. Yeah, yeah, yeah. But my point is on 18, there's an application of an extra 4.88 that was paid probably on the December payment, and the late fee balance doesn't go down?
A. Well, the question becomes, because those things happened on the same day, is the cumulative ending balance the same? Like if you highlight 420.78 --
Q. Oh, I see what you're saying. Yeah, yeah, yeah.
A. And that 275 is probably the ending position, so if you clicked on that 420.78 --
Q. And if you did the math between those two, you're saying it would add up to --
A. 145 --
Q. You're probably right, yeah. I can see --
(Reporter requests clarification due to overlapping dialogue.)
MR. KAUFFMAN: I'm sorry, Ms. Paula. We were just discovering and figuring out one of these sheets at the same time.
COURT REPORTER: That's okay. No, I understand.

Q. All right. And then if we look at January 2024, there's an assessment of another late fee that increases the balance to $415.90, and then there's also an application in that payment paying that down by the amount that he paid more than his monthly payment; is that correct?
A. Yes.
Q. Okay. And then for the rest of these, if we look from February on to the bottom of this report in September, the extra 4.88 has been applied to pay down his late fees?
A. That's correct.
Q. Is that correct?
A. Yes.
Q. Okay. All right. And when you -- prior to today's deposition, did you review any of these payment histories?
A. Yeah, I've looked at it, yeah.
Q. Do you understand them to be accurate?
A. Yes.
Q. Okay. When you reviewed them, you didn't find any inaccuracies; is that fair to say?
A. That's correct. Yes.

Q. I'm going to stop share a second and get the next document. And, Mr. Waddell, if at any point in time you want a break, let me know. I'm just waiting for you to tell me to stop, really here. We're just kind of moving right through, but -- okay?

A. Good deal.

Q. So I'm going to ask the court reporter to mark as exhibit -- what will be 45, a document which is the BBVA Compass. It is the treasury management agreement with the effective date of November 6, 2012. It bears Bates numbers RoundPoint 5984 through 6017.

(Exhibit No. 45 marked for identification.)

Q. Mr. Waddell, do you recognize this document?

A. Yes.

Q. Did you review this prior to today's deposition?

A. Not recently, but yes.

Q. Okay. Do you know whether or not there's been any changes to this agreement other than the one that's been produced here? Do you know if there are any subsequent agreements?

A. No. There are probably not. I'm not aware of any. I'll say it that way.
Q. Are you aware of any amendments to this agreement after 2012?
A. I'm not aware of any, no.
Q. Okay. So for your knowledge, this would be the same agreement from 2012 through the present?
A. That's correct.
Q. Okay. If we go down to Lockbox Services, which starts on page 5993, do you see where I've kind of put those -- I'm going to try to zoom in on that a little bit so we can see it a little bit easier.
Do you see on the bottom right where I've shown you the Lockbox Services on this page?
A. Yes, I do.
Q. Item Number 1 talks about Service Instructions, and I'll represent that company as defined in this agreement is the company that is requesting the services, so in that case, it would be RoundPoint.
Are you aware of any service instructions or also referred to as lockbox instructions that RoundPoint provided any of its

lockbox service vendors, BBVA or PNC?
A. This is a -- what we consider a master servicing agreement, right? Typically, you know, with a lockbox arrangement, there is -- you know, you have to do a configuration setup on how you want the process to run. So, you know, at the outset of the relationship with BBVA and with PNC, you know, there were requirement gatherings. I don't know offhand like what kind of documentation that was retained.
Q. And you don't know whether or not any of that's been produced in this litigation?
A. No. That's correct, I do not.
Q. But your understanding is that that type of def- -- defining the parameters of the relationship at the outset would be a document in addition to this treasury agreement, right?
A. I don't know that for a fact. I don't know when this was established in 2012 if there was a requirements doc or if it was conversation based. Typically there is a document, though.
Q. Okay. Do you know who would know or would be the best person to ask to identify any lockbox instructions that may have existed under this agreement?

A. Our vendor management team would be the group responsible for retaining any instructions along those lines that existed.

Q. And we talked about the vendor manager or the manager in charge of -- of -- I'm trying to remember the name of it without going to the other document, but it was the manager in charge of vendor management. I hate to say that and define it with some term, and you had identified someone for that, correct?

A. That is correct.

Q. Is that the same person who would be the head of the vendor management team that you described earlier?

A. Yes, we have -- yes, that is the current -- the person I named earlier, Ben Johnston, is the head of our current vendor management team. He was also not, you know, party to this agreement in 2012, so, you know, but, again --

Q. Do you know who held Mr. Johnston's position before he took the position as the vendor management --

A. I do. That person is no longer at RoundPoint, but I do, yes.

Q. Do you know who the person was?
A. Yes. His name was Kashmere [phonetic] -- I don't know -- I can't pronounce the last name, but we can find that name.
Q. Kashmere. Do you know what the last --
A. It's like was Nekowski [phonetic] or something like that, but I can't pronounce it offhand. I haven't seen --
Q. Can you just say that one more time? I was cross-talking like crazy.
A. Yeah. First name was Kashmere. The last name was Nekowski or something along those lines. I can't remember offhand without seeing it written.
Q. Do you know what letter that started with, the last name?
A. N.
Q. Okay. Okay. And prior to Kashmere, are you aware of anybody who held the vendor manager role?
A. I am not.
Q. Okay. All right. In part 2 under the lockbox services, there's a sentence here that I'm trying to highlight, and I don't know if it's going to highlight correct. Okay. I don't want

to -- this is just going to -- I mean, but this sentence that starts where I was just starting to highlight, BBVA Compass. Go ahead and read that to yourself. I'm just going to ask you if you're aware of any written schedule for mail pickup established between BBVA or PNC and RoundPoint.

A. I am not aware.

Q. You've never seen anything like a schedule of mail pickup --

A. I have not.

Q. -- during your employment at RoundPoint?

A. Not for BBVA and PNC.

Q. Okay. Have you seen one for the -- I keep forgetting the name of the new company.

A. [redacted].

Q. [redacted]. That's right. Have you seen one for [redacted]?

A. So we have a requirements document with our configuration for the [redacted] setup. I don't know offhand if that document actually details the courier pickup schedule.

Q. But this kind of, you know, outset document that we were talking about, about service instructions, you're cognizant and aware that there's one for Deluxe, right?

A. Yeah, correct.
Q. Okay. And those instructions may or may not include a schedule for mail pickup?
A. Correct. The courier relationship belongs to the vendor.
Q. And then under 3, the checks that are sent to the lockbox, as you understand it, the P.O. Box that was provided in Dallas, that -- would you understand that to be an address that was provided to RoundPoint by BBVA Compass or PNC?
A. The P.O. Box, the one we've been talking about, that is their Post Office Box.
Q. Okay. And do you understand that BBVA keeps a permanent record of all checks, drafts or other instruments processed under its lockbox services?
MS. RENNER: If you know.
A. Well, I mean, A, BBVA doesn't exist anymore.
Q. Right. It's PNC now, but I'm saying there's a period of time when this is BBVA and when it's PNC. Are you aware they retain images of checks?
A. I don't know if they retain images.

Q. Okay. Do they transmit -- during the time that you're aware, would PNC, did they transmit check images to RoundPoint?

A. Yes. Both BBVA and PNC transmitted images to us.

Q. Okay. And then we saw in the in-house procedures that those check images that are received in-house are kept in perpetuity, correct?

A. That is correct.

Q. Do you know if the check images that are received from the lockbox vendor are also kept in perpetuity?

A. I'm sorry, were those different things?

Q. Yeah. So -- so if the check is received through the lockbox address --

A. Yes.

Q. -- BBVA or PNC would be the company imaging the checks --

A. Right.

Q. -- and sending a copy of that image to RoundPoint, correct?

A. That is correct, yes.

Q. We saw earlier with the in-house procedures that when a check is received in-house

and imaged in-house, that image is kept in perpetuity, correct?

A. Sorry. Yes. I agree, yes.

Q. Yeah. I'm asking if the images received from the lockbox vendor are also kept in perpetuity.

A. They are.

Q. Okay. Okay. All right. Get the next document up. Okay. The next document is -- I'm going to read these into the record and I'm going to show these to you. It's a series of Excel files, and they bear Bates numbers RoundPoint 5968 through 5979. And I'm just going to read them in on which one I'm going to mark as which exhibit, okay? So the one marked with RoundPoint 5968 is Exhibit 46.

(Exhibit No. 46 marked for identification.)

Q. The one marked as 5969 is Exhibit 47.

(Exhibit No. 47 marked for identification.)

Q. The one marked as 5970 is Exhibit Number 48.

(Exhibit No. 48 marked for identification.)

Q. The Excel file marked RoundPoint 5971 is going to be marked as Exhibit 49.
(Exhibit No. 49 marked for identification.)
Q. The exhibit [sic] marked RoundPoint 5972 is the exhibit marked Exhibit 50.
(Exhibit No. 50 marked for identification.)
Q. The one marked RoundPoint 5973 is going to be Exhibit 51.
(Exhibit No. 51 marked for identification.)
Q. RoundPoint 5974 is going to be Exhibit 52.
(Exhibit No. 52 marked for identification.)
Q. 5975 is going to be Exhibit 53.
(Exhibit No. 53 marked for identification.)
Q. 5976 is going to be Exhibit 54.
(Exhibit No. 54 marked for identification.)
Q. 5977 is going to be Exhibit 55.
(Exhibit No. 55 marked for identification.)

Q. 5978 is going to be Exhibit 56.
(Exhibit No. 56 marked for identification.)
Q. 5979 is going to be marked as Exhibit 57.
(Exhibit No. 57 marked for identification.)
Q. So we're going to have a group of about a dozen spreadsheets that I'm going to put up, but I'm only going to ask you questions with regard to a couple of them, but I'm going to try to authenticate them through you and just ask if you recognize them.
So I'm going to start with the first one, which is RoundPoint 5968 marked as Exhibit 46. I'll share that with you.
Okay. Have you seen any of the lockbox reports that have been produced in this case?
A. Yes.
Q. Okay. Do you recognize Exhibit 46 as a lockbox report related to payments received by RoundPoint?
A. Yes.
Q. Okay. And if we see at the top left, it says DAL-674150. Is that the P.O. Box that these

were received at?
A. It is, yes.
Q. Okay. And then there are a number of items here, and as I scroll down, we're going to -- we're going to lose these, but have you seen these reports from time to time working at RoundPoint?
A. Yes. These are the -- this is an example of the daily A/R deposit file, accounts receivable deposit file, that we receive from, at this point in time, PNC. That is the detailed recordation of what they collected and deposited on our behalf for -- A, for that day's purposes.
Q. Okay. And we've got a number of these that have been redacted, but I'm just trying to understand, who generates this information?
A. PNC.
Q. PNC. And before that, it would have been BBVA?
A. That's correct.
Q. Okay. And now, do you know what NUM is referring to?
A. Yes. It means number, and it's literally the count of records on the file.
Q. Okay. And when this says -- if you look

in the file, this was the native file name at the top, PNCLBX Data Trans 20230919.

A. Yep.

Q. Do you understand that to mean that this was the lockbox report on a given day?

A. Yes.

Q. Okay. So these were all of the -- for this particular file and for -- see in part E we have a date here, 2023-09-19?

A. Yes.

Q. Is it fair to say that these are all the payments that were transmitted as received on this particular date?

A. Not received on that particular date. Received is in column O.

Q. Right. At that -- processed by them on that date?

A. Processed by them on that date, yes.

Q. Okay. All right. And so I'm just going to ask about some of these fields just to kind of understand. If you have an understanding, let me know. If you don't, then that's okay.

So NUM refers to just the number of the item, right? Each one is given a unique number; is that right?

A. That's correct.
Q. What does ENV mean?
A. Envelope number. Can you scroll down? The Ventling records are on this file, which is why we would have --
Q. Yeah. The problem is that when I -- I mean, I guess I could freeze panes if I could do this.
A. That's okay. If I just see one record, I can -- I'll I think be able to --
Q. I wish we had one at the top, but here's one right here. His is 131, so we have 129 listed.
A. The envelope number based on that designation, but it's off from the number count. My guess is -- and this is speculative, but I think there is a difference between the count of checks we're receiving and the count of envelopes we're receiving because if I get an envelope with multiple checks, that can adjust the count identifier.
Q. Okay. So -- all right. So they're counting the number of envelopes that they receive?
A. Yeah, because that can be different from

the number of checks received.
Q. So at least up to this point, Mr. Ventling's on this particular day was the 129th envelope they had received at the lockbox?
A. Correct.
Q. Okay. And these other ones, do you know why these other fields are redacted?
A. Because they're not Mr. Ventling.
Q. Okay. And -- but those would be other borrowers who have accounts at -- or that serv- -- that -- other borrowers for which RoundPoint services their loan?
A. That is correct, yes.
Q. Okay. And it's just redacted because we're not disclosing other people's loan information; is that fair?
A. That's fair.
Q. But you would expect those other fields to have the same information that we see for Mr. Ventling?
A. Yes.
Q. Have you seen these unredacted?
A. Yes.
Q. Okay. So if I go through to the bottom of this -- we'll remember he's at Row 134. So if

I go to the bottom of this, I'd be able to count that there were at least 274 payments received that day; is that correct?

A. Yes.

Q. Okay. I'm going to ask you this. You know, this is the first one we're looking at and it's probably the earliest one in time, but would that be any different with regard to any of these other reports that we're going to look at today, that this count would be the number that they received on that particular day?

A. That's correct. No difference.

Q. All right. So I'm going to ask you this one, and then I'm just going to authenticate the next, okay?

A. Okay.

Q. So for -- going back up to the top, and we can go back and forth. Let me see if I can freeze panes here, if that will work. I've got to think about where the freeze panes is.

A. Probably under view.

Q. What's that?

A. Try view. Try view.

Q. View. Yeah. See, I have this -- I have this thing at the top. I have this screen share

at the top that causes me not to see what's behind here, so I'm kind of like going in the dark here. Like when I clicked review, I don't know what's next to it. I maybe can make this smaller. Hold on. It will serve our purposes because we just need to see -- okay. There we go. So now I've minimized it a little bit, I can see better. Where are you, freeze panes?

A. Right up from where you just were.

Q. There it is. Yeah. Yeah, I don't know if it's going to -- I don't know if I did that right. I don't know if I was supposed to do the one above, but hey, it worked. How about that. That's amazing.

All right. So I froze the panes and we can go down to where Mr. Ventling is. All right. So envelope, do you know what this number is referring to?

A. I do not.

Q. Okay. And then transaction, do you know what that refers to?

A. I do not.

Q. Okay. Lockbox, that's the P.O. Box, right?

A. Correct.

Q. All right. Date, do you know what that refers to?

A. That's the current day's date, the processing date for the file.

Q. Okay. And so -- and that's the time it was processed?

A. Yep. Correct.

Q. Is that right?

A. Yes.

Q. What does batch refer to?

A. So as with any -- the payment application, and the same goes for how we handle payments in a processing environment. You have 200-plus payments on this, but you're not going to do them all in one grouping, right? Like we've already talked about how Mr. Ventling's checks are a soft exception to the process due to not having a coupon with them.

So the work items, the checks, are processed in batches or groups. So this just defines the batch and the item within the batch that that check was processed in.

Q. So if I were to get a full list of these, any check that was in the 200 batch would be a check that came in at the same time as

Mr. Ventling's?
A. It was a check that was processed in the same group with Mr. Ventling's.
Q. Oh, would they group all the exceptions together?
A. Yes. The checks fall into different, you know, populations based on their exceptions and what's going on with them. So like the checks that, you know, have no exception are maybe in batch like 100 or something like that.
Q. Okay. So they may use a code for that to mean a batch that are -- it may not mean that there were 200 items in the batch. It may be a code that they used for items that were presented with an exception?
A. That's correct.
Q. Okay. Are the batch item -- but that's what you understand is that this was the 31st item in that batch?
A. Within that grouping, yes.
Q. And then check 131, what does that mean?
A. I think that just ties back to the number. I think that's just the count of items in the total grouping, total fund.
Q. And then we've got check amount. That's

the amount on the check that was written, correct?
A. Yes.
Q. It says ABA bank routing number, right?
A. Correct.
Q. Account number?
A. Yes.
Q. The check number?
A. Correct.
Q. And then it has the receipt date?
A. Yes.
Q. All right. And what do you understand the receipt date to mean?
A. The day they received the payment.
Q. Okay. Do you know if that is the actual date that Mr. Ventling's check arrived at the P.O. Box?
A. I have no information to the contrary.
Q. Okay. But you believe it to be the same date that it was received in the P.O. Box?
A. Yes.
Q. What is -- what are the facts that cause you to believe that that was the same date that it was received at the P.O. Box?
A. It is the date the vendor received the

payment, and that's the date that I have to go on.
Q. Okay. But that's the date that the vendor received payment, so as we said before, what has to happen is PNC has to pick up the mail from the P.O. Box, correct?
A. Yes.
Q. They have to drive it to their own facility?
A. Yes.
Q. And then they have to process it at their own facility, correct?
A. Yes.
Q. And then when they process it and they present it for payment, that's the date that is recorded there on receipt date, correct?
A. No. Receipt date should be the day that it is delivered to their facility. The processing date is the 19th that we see in column F.
Q. Okay. So you're saying that this was received at the PNC facility, is what you understand, on 9-16?
A. Yes.
Q. Okay. So when I asked before, do you

understand what the receipt means, that's not the date it was received at the P.O. Box, but the date that it was received at the PNC facility?

A. Those two things should be one and the same.

Q. But you would expect them to be the same date because you would expect the lockbox vendor to be picking up the mail daily and processing it daily?

A. Yes. Correct.

Q. Okay. All right. We'll ask more specifics here when we get into some of these other ones.

Under fees, what does this refer to?

A. So that's always going to be zero. Our coupon -- so they're reading a coupon and designating the amounts listed on the coupon to the applicable bucket. So I mentioned earlier if you look at our coupon, it has a place for additional principal, additional escrow, the form itself, the spreadsheet that we're looking at, this is their layout, so they potentially have other clients who have a coupon that has more options so they allow for additional fields where if a borrower is sending in a coupon had a space

for fees, they could input that. So --
Q. And so that would be if -- if the borrower wrote those items on the coupon?
A. Right.
Q. Those would be reflected in that --
A. Right. T --
Q. -- in the principal, escrow, fees, and other?
A. Correct. T through X is their OCR scan of the coupon and placing that data in the file.
Q. Okay. When like, for example, for Mr. Ventling, if they don't have a coupon, they just take the amount on the check and put it into column X, the total due?
A. That's correct.
Q. Okay. Invoice page, what does that refer to?
A. I don't know.
Q. Okay. Check image, do you know what that refers to?
A. I do not.
Q. Okay. How about envelope image?
A. No. I mean, again, I can speculate counts, but what it relates to, I don't know.
Q. Do you know if PNC or BBVA did any

stamping of the envelopes to record when the envelopes were received?

A. I don't. But now that I look at them, actually what I think these refer to is I think these numerical sequences are the cross-reference to the image file we get.

Q. Okay.

A. So I think check image 3375, when I get the base image file, it's not named with every loan number. It's named with a -- you know, an image number, and so I think these are probably cross-reference sequences for that, but --

Q. Okay. So you think that the check image and invoice image would be cross-referenced as item 3375; is that correct?

A. Yeah. If not, 131. It's going to be one of those two, but --

Q. Where did you get 131 from?

A. That was the count initially.

Q. Oh, okay. Understood. And then the envelope image would be 3367?

A. Something like that, yes.

Q. Okay. All right. I'm going to stop the share, and I'm going to open up -- if you want to take a break right now, I'm going to put up all

of these in a row. That's going to take a little bit, and I want to make sure my computer does it correctly, so why don't we take like a five-minute break while I do that and then we'll come back on the record.

A. Okay.

Q. Okay.

MS. RENNER: Thank you.

(A recess was held.)

Q. Mr. Waddell, I'm going to share with you what I had marked previously as Exhibit 47. Do you see the Excel sheet that I have up here that I've marked as 47? It bears 17. We're adding just 30 to all of these, but 47. Do you see this?

A. Yes.

Q. This is the lockbox transmission file from PNC for the items received on October 27, 2023, correct?

A. Yes.

Q. And you'd expect that -- these fields to be the same as -- same -- any different answer for the fields for this file than for the ones that we saw previously in Exhibit 46?

A. No. There were no changes.

Q. Okay. And these were kept in the ordinary course? These would be transmitted daily to RoundPoint?
A. That is correct, yes.
Q. And if we wanted to know how many items, we would just have to add up the number of items in this file, correct? Or that would be the number of items that were received by the lockbox vendor on that day?
A. That would be the number of items processed, deposited by the lockbox on that day, yes.
Q. Okay. Okay. Thank you. All right. And then I'm just going to do this as quickly and as efficiently as possible. I'm going to show you what's been marked as Exhibit 48. This is the lockbox report for those items that were processed by PNC on November 22, 2023, correct?
A. Yes.
Q. And same type of report that we saw in the previous two exhibits, correct?
A. Yes.
Q. All right. And your answers apply equally to this one as well, correct?
A. Yes.

Q. All right. I'm going to show you what's been marked as Exhibit 49. This is the lockbox report for those items processed on December 19, 2023, correct?
A. Yes.
Q. And same -- your answers hold the same as you saw in the previous lockbox reports as for this exhibit?
A. Yes.
Q. Okay. I'm going to show you what's been marked as Exhibit 50. Exhibit 50 is the lockbox report for the items received on January 19, 2024, correct?
A. Yes.
Q. And are your answers equally applicable to this exhibit as they were to the previous exhibits?
A. Yes.
Q. I'll show you what's been marked as Exhibit 51. This is the lockbox report for the items processed on February 20, 2024, correct?
A. That's correct, yes.
Q. And your answers apply equally to this one as they did to the previous exhibits?
A. Yes.

Q. All right. Show you what's been marked as Exhibit 52. These are the report for items processed by the lockbox vendor on March 12, 2024, correct?

A. Yes.

Q. And your answers apply equally to this report as the previous ones?

A. Yes.

Q. All right. Here is the report that I've marked as Exhibit 53, and this is the lockbox report for the items received on April 15, 2024, correct?

A. Yes.

Q. And your answers are the same -- or your testimony is the same for this report as for previous reports?

A. Yes.

Q. Okay. Showing you what's been marked as Exhibit 54, this is the lockbox report for items received on May 13, 2024, correct?

A. Yes.

Q. And your answers are the same for this report as for previous reports?

A. Yes.

Q. All right. Three more. This is

Exhibit 55. It's the lockbox report for the items received on June 14, 2024. Same answers for this report as previous reports?
A. Yes.
Q. Exhibit 56 is the lockbox report for items received on July 16, 2024; is that correct?
A. Yes.
Q. And same answers with regard to this exhibit as we've seen in the previous lockbox report exhibits, correct?
A. Yes.
Q. All right. And finally, Exhibit 57 is a report for those items received by the lockbox vendor -- I'm sorry, processed by the lockbox vendor on August 14, 2024, correct?
A. Yes.
Q. And your testimony is the same for this report as we saw in previous reports, correct?
A. Yes.
Q. All right. Moving on. I'm going to show you what's been marked as Exhibit -- it will be 58.
(Exhibit No. 58 marked for identification.)
Q. This is a correspondence policy with an

effective date of February 20, 2023. It bears Bates numbers 424 -- RoundPoint 424 through RoundPoint 443. And this is not necessarily something that you sign off on, correct?
A. Correct.
Q. All right. Correspondence is handled by a different department than yours; is that fair?
A. That is correct, yes.
Q. Okay. Are you familiar with these policies and procedures?
A. I have a general knowledge of them, yes.
Q. Okay. But these are kept in the usual course on the intranet, correct?
A. That is correct, yes.
Q. And even though you don't -- you're not in charge of correspondence, you still as an employee, like other employees, have access to the same policies and procedures, right?
A. Yes.
Q. Okay. All right. I'll ask the court reporter to mark as Exhibit 59 the customer resolution policies dated February 28, 2024.
(Exhibit No. 59 marked for identification.)
Q. And it bears Bates numbers RoundPoint

444 through RoundPoint 464. And, again, you're not listed as any of the policy authorities or approvals on this, correct?

A. Correct.

Q. All right. And what -- but you recognize this to be the customer resolution -- I guess this is -- is this a decision tree as opposed to policies? This is like --

A. It's a policy.

Q. Let me double-check here. There's a glossary of terms and then it's not always that way. Objectives. Now, these are actually policy statements, correct?

A. Correct. One of the defining features, if you look at the subtitle of the document -- right there like on that page that we were just on. Scroll down slightly. See where it says POL under the --

Q. Yeah.

A. Yeah, so that's policy.

Q. Okay. So if we went back to like 58. I missed this, but this one has POL 2250, so that's policy as well, right?

A. Yes. Correct.

Q. As opposed to like the instructions on

like this is how you do things?
A. Correct.
Q. Okay. And these are kept in the normal course?
A. Yes.
Q. Okay. And they're available to all employees?
A. Yes.
Q. Okay. And then Exhibit 60 is entitled, Complaint Management. Now, if this has a policy number right here, does that mean that it's policy as opposed to like instructions?
A. Yes, I think so.
(Exhibit No. 60 marked for identification.)
Q. Okay. We can see in the document. But see it has a POL number, so that would indicate to you it's a policy?
A. Yes.
Q. Okay. Well, Exhibit 60 is complaint management under the correspondence department dated March 6, 2024. It bears Bates numbers 257 -- RoundPoint 257 to RoundPoint 280. And you're not one of the signatories on this, correct?
A. Correct.

Q. All right. But you're generally familiar with this policy?
A. Yes.
Q. And it's kept in the usual course at RoundPoint?
A. Yes.
Q. Okay. All right. I'm going to ask the court reporter to mark as Exhibit 61, it's a -- it's got the heading Proof of Payment, ID 568, and it is a handwritten notice from Mr. Ventling, and it bears Bates numbers RoundPoint 5980 to 5983.
(Exhibit No. 61 marked for identification.)
Q. And do you see the information that's listed in Exhibit 61 with regard to some payment tracking that's at the top?
A. Yes.
Q. Now, we saw that there were some reversals, correct, with regard to Mr. Ventling's account? We can go back to it. It's not a real quiz here. We can look back at it real quick. Give me one second. If we go back to the payment history. We saw that there were these fee transactions -- that there was a fee transaction

originally assessed on 6-20, and then there were some crediting and there was a -- I want to use the right word -- waiver there, correct?

A. Correct.

Q. All right. And here, we see -- sorry. Let me get back to where I want to go. We see here that this is the -- the information that Mr. Ventling provided regarding that June payment. Do you agree with that?

MS. RENNER: I'm sorry, could you repeat that question? I don't understand.

Q. Do you agree that what Mr. Ventling was provided was proof of payment for the check that he sent in June of 2023 that originally had a late fee assessed to it that was later waived?

MS. RENNER: Objection. Lack of foundation. You can answer if you know.

A. I agree this is the -- appears to be the tracking that Mr. Ventling provided in relation to his payment.

Q. Okay. Did you ever review this? And I'm not saying -- let me separate this question. As part of your duties, do you know if anybody on your team or yourself reviewed this prior to any litigation?

A. I do not know that, no.
Q. Okay. Because if we -- if we looked at the June payment, if we go back to the lockbox entry for June -- let me see if I can pull it up here. Wait. These lockbox entries don't go back that far, I don't think. Wait, no, June of 2023. So this is a later one, right?
A. This is one of the first ones.
Q. Actually, I don't know if we have a lockbox for this one.
MS. RENNER: I'm almost positive we produced that.
MR. KAUFFMAN: It might have been produced in a different way.
Q. But do you understand based off of -- let me see. The first one I have here, I think they're a different file. But -- so we have October, which is fine. We can talk about that in a second.
MS. RENNER: We went over these, as you may recall, with Mr. Ventling's deposition. They should be in the exhibits there if you're having trouble locating them.
MR. KAUFFMAN: Yeah, I -- I may have to come back to it, but I can ask the

questions I want to ask based off of this.

Q. Do you know if anyone at RoundPoint, when they received this from Mr. Ventling -- let me ask you this. The envelope indicates that -- I don't know if these -- do these envelopes have stamped dates on them? Yeah, received 7-24-2023. That would be what was received at the Charlotte P.O. Box; is that right?

A. Yes. Correspondence.

MS. RENNER: I'm going to object to this line of questioning to the extent it relates to Mr. Ventling's RESPA claim which was dismissed by the court.

Q. Okay. Well, I'm trying to understand something here. When correspondence is sent to the Charlotte P.O. Box, it gets stamped as received; is that correct?

A. Correct.

Q. Do you know if that --

A. Hold on. Let me rephrase my answer. That stamp is not -- I don't think that stamp is the Charlotte P.O. Box. That stamp is when the mail arrives in-house at the Fort Mill location.

Q. Okay. So when it got into the Fort Mill location, that's the date that the mailroom would

stamp it?
A. Yes.
Q. Or does the cash room stamp it? I'm trying to understand if something like this comes in, who stamps it as received?
A. The cash room doesn't stamp correspondence.
Q. The mailroom does?
A. There's no check in this, so it would not have been routed to the cash room. It would have been routed to correspondence.
Q. Okay.
A. That stamp may have been --
Q. Does the mailroom --
A. -- may have been stamped by correspondence directly. They're the ones with an SLA to respond, so they may have stamped it for their own self.
Q. When you said SLA, what are you referring to?
A. Service level agreement. Like the -- generally the internal time frame by which something needs to be processed.
Q. Okay. So would you agree with me that this letter from Mr. Ventling was received at

least in Fort Mill as of July 24, 2023?
A. Yes.
Q. Okay. Do you have an understanding of what process would have been followed upon receiving this information from Mr. Ventling?
MS. RENNER: Again, I'm going to object to the extent your line of questioning has to do with the RESPA claims that Mr. Ventling had which were dismissed by the Court. You can answer.
A. Generally, I don't know the specifics of the routing of this particular item, but there is a correspondence department who reviews paper that is received that relates to questions, complaints, et cetera. If they had a -- like they can conduct their own research. They can reach out to an alternate department like mine to validate their information prior to providing a response if one is needed.
Q. Did you say they can reach out to another department?
A. Yeah, I don't know in every -- I don't know in every instance whether a response to the customer is required. They have policies that we just looked at that dictate when a response is

needed to incoming correspondence and when it's not.

Q. Okay. I'm just going to refer to the payment history here on this particular payment. We saw that the payment history -- the effective date would be the date it was received, correct?

A. Correct.

Q. Okay. And we have a payment from a transaction date and there's no other effective date of 6-22, and there's one that's a 6-22 and 6-21, so certainly at least in RoundPoint's system, this was marked as received on 6-21, correct? No earlier than that?

A. That is correct.

Q. Okay. And then if you were to receive this -- if you were to receive this report with the USPS tracking being received in Dallas, Texas, on 6-13, would you do anything to investigate that in your role as a cash manager to see what the difference and discrepancy is between it being received at the facility and being processed on 6-22?

MS. RENNER: Objection. It lacks foundation and it also has wording within it which is erroneous.

Q. Well, we'll get into some of the other documents, but if you'll take my representation that the 6-13 date is referring to the receipt at a U.S. postal office in Dallas, Texas, and its final destination is this P.O. Box in Dallas, Texas, if it was scanned in Dallas by a postal employee of the United States Postal Service on June 13, 2023, and RoundPoint's records show that the earliest it was credited was 6-21 as received, in your position, would you want to investigate further?

MS. RENNER: Objection. I -- I don't like make speaking objections, Mr. Kauffman, but I think this one calls for it because it is chock full of a lot of assumptions and it's a hypothetical, which this witness is not --

MR. KAUFFMAN: It's not hypothetical. This really happened.

MS. RENNER: It is hypothetical, and it's full of assumptions which there's no foundation for.

MR. KAUFFMAN: I have had this argument many times. I can ask someone how they would react in a situation. It's perfectly,

perfectly fair game.
Q. And you can answer the question.
MS. RENNER: This is not a topic that was outlined even in the amended complaint, and --
MR. KAUFFMAN: This is the servicing of his loan.
MS. RENNER: -- and we're going to stand on our objection.
MR. KAUFFMAN: No, you -- are you going to instruct him not to answer?
MS. RENNER: No. If he knows the answer, he can -- he can answer, but he's certainly not an expert on the U.S. Postal Service, but yes, he can answer the question.
MR. KAUFFMAN: Okay. I'm asking from his standpoint as the manager of cash management or his role in cash management as a supervisor, as a VP, if he saw this and compared this information with regard to checks being received at a U.S. Postal Service facility in Dallas and not being credited for at least eight days later, would you have additional questions?
MS. RENNER: Again, I'm going to object to the question for the lack of

foundation, for the assumptions, for the hypothetical nature of the question. But, yes, Mr. Waddell, if you can answer that question, please go ahead.

A. My process would be to evaluate what the vendor provided me, and evaluate that there's no other information that I can go off of other than the date that they provided me is the date of receipt, which is what we used.

Q. Okay. Do you have any understanding -- and we're going to see this repeated times where the U.S. Postal Service has tracked Mr. Ventling's items as being received in Dallas on a certain date; in this example, on the 13th of the month. Can you account, as you sit here today, for the lack of time between that scan and the report that you received from the lockbox vendor?

MS. RENNER: Objection on the same grounds. It's hypothetical. It has assumptions. It has erroneous facts in it, and it's not within the topics outlined for the deposition today. But you can answer to the extent you're able.

A. The question was can I account for the dates? No, I cannot. I don't have control of

those.

Q. Okay. Is your understanding that the post office is just holding onto Mr. Ventling's mail and it's not being received in the P.O. Box in this situation until June 21st? Is that RoundPoint's position?

MS. RENNER: Again, this is not -- objection. This is not within the scope of the topics for today. It's a question that is not fit for this witness. It's fit for the U.S. Postal Service. But if you can answer the question, you know, I'm not going to stop you from answering.

A. Can you repeat the question?

MR. KAUFFMAN: Can you just read him back the question, please?

(Question read back.)

A. I do not know what was happening at the post office. It is my position that we received the payment on June 21st.

Q. And by you -- your position is that it was deposited by the U.S. Postal Service in your P.O. Box on June 21st?

A. Yes.

Q. At the earliest?

A. That is the day we have marked as the day we received the payment. Therefore, that is the day the Postal Service provided it to us, yes.

Q. And let's be exact here because what we're looking at here is the payment -- that total payment amount, right? So that's what we're seeing has an effective date of 6-21, correct?

A. Yes.

Q. Okay. So as you sit here today, as RoundPoint investigated, the lack of time between the information that's been provided in discovery of when things have been received at the U.S. postal facilities, according to Mr. Ventling's tracking and the receive dates reported to it by the lockbox vendor?

MS. RENNER: I'm going to instruct the witness to answer only to the extent he's capable of answering without impinging upon the attorney-client privilege.

Q. That's a yes-or-no question. Have you investigated it?

A. No.

Q. Even after filing this litigation,

there's been no investigation?

MS. RENNER: Objection. That's attorney-client privilege. I'm instructing the witness not to answer.

Q. Other than what you've talked about from your attorneys, has your department conducted any review of the lockbox procedures to account for any of the gaps in time identified within this litigation between the information provided to you by Mr. Ventling and what the lockbox vendor has provided you?

MS. RENNER: Again, I'm going to object on attorney-client privilege. Anything after the litigation began would be attorney-client privileged as to what we've discussed with our client.

Q. Only if it's a communication with an attorney. It's not -- if there has been an internal investigation that doesn't involve attorneys, if it's not attorney-client privilege, are you aware of anything that has been done at RoundPoint that doesn't involve communications with attorneys to investigate the gaps of time identified in this litigation?

MS. RENNER: I'm instructing the

client not to answer because anything that occurred after the initiation of the litigation would have been attorney-client privilege.

MR. KAUFFMAN: Okay.

Q. Are you aware Mr. Ventling filed this lawsuit in August of 20- -- I have to think about this. It's August 2024.

MR. KAUFFMAN: We agree on that, Ms. Renner?

MS. RENNER: Yes.

Q. Okay. In between his mail that we see here -- and there were subsequent mailings and there's subsequent complaints, but I'll just refer to this one as one of the first ones. That was received in July of 2023.

For the next 13 months between July and the lawsuit being filed in August, for 13 months after this, did RoundPoint do anything to investigate the gaps of time between what was reflected in the dates that the U.S. Postal Service said that it had scanned items and when the lockbox vendor had reported items as received?

MS. RENNER: Okay. I'm also going to say you can answer to the extent that there's

no attorney-client privilege. For example, if you had any instruction or there was involvement with the legal department, you can't answer. But if you can answer irrespective of that, then you can answer the question.

Q. Well, let me ask a question that doesn't infringe on the attorney-client privilege. Was there any engagement with the legal department during that period of time?

A. Only as it relates to the litigation.

Q. Okay. So the answer to my question is, between the litigation being filed in August of 2024 and July 2023 when this is received from Mr. Ventling, there was no discussion with regard to an investigation with the legal department; is that correct?

MS. RENNER: I'm going to object because, as you know, Mr. Kauffman, there were QWRs filed in this case, and Mr. Waddell didn't have anything to do with those, which relate to the RESPA claim. And these were part of the RESPA claim, so he wouldn't have knowledge as to what happened between the legal department and --

MR. KAUFFMAN: He would know if he was engaged --

MS. RENNER: -- correspondence.

MR. KAUFFMAN: Okay. Ms. Renner, he would know that he was engaged in discussions with legal counsel and legal compliance during the period of time of July 2023 to August 2024 regarding gaps in time on payments that are received by the lockbox vendor, and that is my question.

MS. RENNER: You're asking as an individual or as a 30(b)(6) witness?

MR. KAUFFMAN: I'm going to ask him as both. You're going to object that he doesn't have full knowledge as the 30(b)(6), but I'm going to ask him as both.

MS. RENNER: Yeah, I'm -- correct.

Q. So let's start as the -- as the representative for RoundPoint, are you aware of discussions between employees of RoundPoint and the legal department concerning investigations into the gaps of time identified by Mr. Ventling between what he had provided and what the lockbox vendor had provided?

MS. RENNER: Yeah, and I'm objecting to that because it's not a topic that was outlined for discussion today, and I don't

believe it's an area where he has knowledge. But, you know, you can answer to the extent you know.

A. I'm not aware of such.

Q. Okay. As an individual, in your capacity as a manager in cash management, did you personally have any interaction prior to the filing of this lawsuit with anyone in the legal department concerning gaps of time between when items may have been received at different postal facilities and when they were reported as received by the lockbox vendor?

A. No.

Q. Okay. Did you or your department conduct any investigation during the time that you've been employed at RoundPoint prior to the filing of this litigation to investigate the gaps of time between items being received at postal facilities and dates marked as received by the lockbox vendor?

MS. RENNER: Objection. Lack of foundation. You can answer to the extent you know.

A. The answer is no.

Q. What's that?

A. The answer is no.
Q. Okay. And just to be clear, your department is the department that the lockbox vendor sends the reports to, correct?
A. That is correct.
Q. So the communication with the lockbox vendor regarding when they receive certain items flows through your department, correct?
A. That is correct.
Q. So it's not a stretch to believe that if there was an investigation regarding the items that were presented by the lockbox vendor and when they were received, it would involve your department, wouldn't it?
MS. RENNER: Objection. Hypothetical and argumentative.
Q. I'm just saying like if you're the one -- if you're the department that interfaces with the lockbox vendor and gets the reports, if they were investigating it, wouldn't they have had to talk to you?
A. Yes.
Q. All right. Once again, I'm stuck with this -- I need to make everything a little smaller. Hold on. I'm going to stop the share

and come back. Hold on.

Okay. All right. I'm going to share what's been marked as -- jeez, I hate this thing at the top here. You can see my screen. You can see what's been marked as Exhibit -- I want to make sure I've got this right -- 32. Actually, it's 62. These are items received from Glacier Bank.

(Exhibit No. 62 marked for identification.)

Q. Glacier Bank 1 -- Bates numbers Glacier Bank 1 through Glacier Bank 4. I'll represent that these are the checks that returned -- or were showed as paid by Glacier Bank's records.

Have you reviewed any of the checks for the payments made by Mr. Ventling during this period?

A. I haven't seen these, but yes, we reviewed our lockbox -- lockbox image scans.

Q. Okay. Are these as you understand that Glacier Bank would be getting back lockbox image scans or were the same information that lockbox -- the lockbox vendor would scan to you in the cash management department?

A. Yes. A check that clears does image

back to its bank.

Q. Okay. So all of these checks as they cleared, they would have been imaged back to you; is that fair?

A. No. I think we're saying two different things. I receive an imaged scan from the lockbox that I reviewed. Glacier Bank is going to receive an image for everything that clears its bank. That's what these are. So I don't receive these. Glacier Bank received these. We just receive a scan of the check from --

Q. Okay. Fair enough. Now, if you look at the checks, for example, the one that we were looking at from June 9th right here, I'm going to zoom in on the June 9, 2023, one here. Can you see the one that is for June 9, 2023? Can you see that?

A. I do.

Q. And that check is dated June 9th, correct?

A. Yes.

Q. Okay. And I've got a question about exceptions. Now, if this was put in a loan, it would not have the loan number, so as you understand, that would create a -- I forgot the

term that we used. What -- it's not a hard exception but a soft exception? Is that what we called it?
A. Correct.
Q. Okay. Is that true that this would have caused a soft exception because it doesn't have the account number on it?
A. Yes.
Q. Okay. Now, is there anything in the system that from the lockbox vendor where they can look at the address here and this is the same address as the property address? Is there anything that matches those two?
A. No.
Q. Okay. Is there any reason that you can think of why the lockbox vendor wouldn't be able to do that?
A. Yeah, ultimately it's because not all checks are the same and so what's in that field might not be representative of every check depending on where it's coming from. So I think ultimately -- I mean, again, all of these -- all of these processes are geared towards configuration and the configuration is tied to our coupon, not the check itself. So I mean,

ultimately it's a decision on how to program the application and that's based off the coupon.

Q. Okay. And so for this one, the lockbox vendor, as you understand it, cannot scan the check and pull off the person's address and match that, correct?

A. Correct. Correct. We do not provide the addresses to the lockbox. We provide the loan number only.

Q. Oh, why don't you provide the addresses too?

A. We just don't provide the -- our process is just the loan number.

Q. Okay. Is there any reason that you can think of why RoundPoint wouldn't provide the property addresses --

A. Well --

Q. -- along with the account number still?

A. I mean, outside of borrower information, I mean, just typically that's just the way it's established. But, again, we do have it configured to a very specific section of the coupon, so that's what it's reading, and that's the cross-reference between the two. So it's just not addressed, and it's never been

established that way.
Q. Okay. And so in cash management, have you been able to -- are you able to read checks and determine what date it was presented to the bank?
A. Is there a date on -- it's right there. It's in the middle of that screenshot that we're looking at.
Q. Okay. What --
A. Right here. That little top line has the date on it.
Q. Okay. So where this is stamped -- this is where it's stamped at the bank? I'm sorry. I went to the second. This right here is kind of hard to read, but if we were to zoom in on it, this shows -- I keep going to the July one. Sorry about that.
This one that I've -- this one is a little hard to read the stamp, but this is 2023-06-22 from PNC Bank. That shows the date that it was presented to the bank, correct?
A. Correct.
Q. So for all of these checks, if we were to zoom in on the stamp, that would tell us the dates that they were presented to the bank; is

that fair?
A. Yes, that's correct.
Q. Okay. All right. All right. I'd like to mark as Exhibit 63 a response from the Jack Henry corporation. Bates number is Jack Henry 2 through Jack Henry 5.
(Exhibit No. 63 marked for identification.)
Q. Now, do you understand that in this litigation, that when Mr. Ventling sent his checks through Glacier Bank, that they used a delivery vendor run by the Jack Henry company?
A. Yes.
Q. Okay. Do you understand that RoundPoint reached out to Jack Henry with a subpoena? Do you understand that?
A. I do now.
Q. Okay. And Exhibit 63 is the response from Jack Henry regarding a supplemental subpoena that was sent to Ms. Renner and others dated October 28, 2025, and that is what's Exhibit 63, correct?
MS. RENNER: I'm just going to object to this line of questioning as outside the scope of the amended subpoena. But to the extent

you have knowledge, you know, you can answer.
A. I mean, this is the first time I'm seeing this document, so sure.
Q. Okay. I'm just going to ask, in the course of your understanding of Mr. Ventling's complaint and the fact that his complaint is that there's this gap of time between checks that had arrived at what he claims is at the P.O. Box or at the location designated and what you may see on your end from the lockbox vendor. We saw earlier a scan that I showed you that he sent.
Do you remember this where we saw the scanning passing through Oklahoma City and Dallas?
A. Yes.
Q. This one is July. I don't want -- I want to keep it consistent. This one from June. Do you remember that?
A. Yes.
Q. And you understand that the person who was doing this delivery with regard to the ones that he's -- the payments that Mr. Ventling sent through Glacier Bank was Jack Henry. You understand that, right?
A. Yes.

Q. You understand there might be a disagreement in this litigation about what this, you know, final destination on the USPS tracking means? Do you understand that there might be a disagreement about that?

MS. RENNER: I'm just going to -- I'm going to object to the term final destination.

MR. KAUFFMAN: Okay.

Q. Do you understand that there's a disagreement as to what the final tracking on the information denotes?

A. I mean, you're telling me there's a disagreement, so yes.

Q. No, no. I'm just asking if you're aware there's a disagreement.

A. No. I'm not aware.

Q. Okay. You're not aware with regard that -- that -- related to this that RoundPoint's relying on any defenses related to the interpretation of what these USPS tracking codes mean?

MS. RENNER: I'm sorry, can you repeat that question?

Q. With regard to any of RoundPoint's

defenses in this lawsuit, do you understand that any of them are based off of interpretation of these USPS tracking informations?

MS. RENNER: Again, we've objected to the questions about legal strategy and defenses, particularly given this time in the case before we have to present such defenses. But if the witness knows, he can answer.

MR. KAUFFMAN: I've designated him on the facts that supports certain defenses, and I'm asking if this is one of the facts that RoundPoint is relying on to support the defense.

MS. RENNER: Again, I'm saying this is a point in time he may not -- he may not know outside of attorney-client privileged conversations what RoundPoint will present as its strategy and defenses ultimately.

MR. KAUFFMAN: All right. But as you sit here today, you should understand what the -- I mean, those applied to the answer that's already been filed.

MS. RENNER: There are legal defenses pled in the answer, and he can talk about the facts that underlie those defenses if you point him to a defense.

MR. KAUFFMAN: Okay. Well, we'll come back to that.

Q. With regard to -- as you sit here today as the corporate representative, do you have an interpretation of what this tracking -- and I'll just refer to either of these. These all go through Oklahoma City or otherwise and then there's a Dallas location. You'd agree with me that July 11th is after July 10th in time; is that fair?

A. I agree with that statement, yes.

Q. Yeah. Do you have any understanding as the corporate representative today of what is the interpretation of the USPS tracking information that's listed in Exhibit -- I believe this is 61.

MS. RENNER: Again, objection. This is outside -- way outside the scope of the amended subpoena. If you have an answer, you can --

MR. KAUFFMAN: I think it goes to defenses, but we will -- we will see.

Q. Do you have any understanding?

A. No.

Q. Okay. And you've never reviewed this information from Jack Henry prior to today?

A. That's right.
Q. Okay. All right. So fair to say you don't know if any of the information in Jack Henry is being relied on for any of RoundPoint's defenses?
A. I do not.
Q. Okay. All right. Let me see if I can get over to what I've got open. I have to stop share so I can get behind here real quick. All right. We're almost done here, so just bear with me.
All right. So I'll ask the court reporter to mark Exhibit 64, which I hope I've been keeping these in order, but yes, this should be 64, and it bears Ventling 0001 through 00012.
(Exhibit No. 64 marked for identification.)
Q. Have you reviewed any of the documents that Mr. Ventling has produced in this litigation, Mr. Waddell?
(Zoom interruption.)
(A discussion was held off the record.)
Q. I'm showing you what's been marked or what I'll ask the court reporter to mark as

Exhibit 64. It bears Bates stamp Ventling 1 through Ventling 12. And my question is, have you seen these documents before? They are proof of payment and tracking for various payments submitted by Mr. Ventling.

A. Yes, I've seen these as part of the litigation for this.

Q. Okay. And you've reviewed these?

A. Yes.

Q. I'm looking at these specific payment tracking documents that have been produced. Do you know if RoundPoint has a position with regard to the cause of the gap of time between whatever may be listed as the last in time USPS tracking information --

MS. RENNER: You can -- I'm sorry.

Q. -- and anything received from RoundPoint by its lockbox vendor as far as when things are received?

MS. RENNER: I'm just going to advise the witness he can answer to the extent he knows facts, but to the extent his answer is based on attorney-client privileged conversations, he cannot answer.

A. No. What I know is that the -- the date

the vendor provided is the day we received the payment.

Q. Okay. And, again, I may have asked this before, but just in context of these documents, which show, for example -- let's just go to one of the ones that's at issue here. Let me ask specifically.

Okay. We've got an October -- all right. We've got October 2023. Mr. Ventling's bank draws a check on October 6th. Do you see that?

A. Yes.

Q. Okay. If we look at the payment history, October 6th payment -- or the one due October 1st, you agree not recorded as received until October 26th; is that fair to say?

A. Yes.

Q. Okay. All right. Mr. Ventling's bank shows bank check drawn at October 6th, and I'll just represent to you that if we look at the checks up here -- hopefully I can get back to this one. This is back to Exhibit 62 -- you would agree with me that the date of the check that he submitted was October 6th, right?

A. Yes.

Q. Okay. I need to get right there. All right. And then we see that, at least according to the payment tracking, that it arrived in Dallas at a U.S. postal facility on October 14th, right?

MS. RENNER: I'm going to object to the form of the question and the lack of foundation. Mr. Waddell is not an expert on the U.S. Postal Service or the meaning of any of these terms.

Q. Okay. If I represent to you that the -- well, for one, the Jack Henry document, just using this just to show you, they say, It is important to note that the USPS does not guarantee scans at every facility and the final scan typically reflects the U.S. post office responsible for delivery, right?

MS. RENNER: Excuse me. I think you should finish the sentence.

Q. Point of delivery scans are not included, right?

A. Correct.

Q. So this is a -- and then if you were delivering to -- oh, let's just take your address in Fort Mill. The final scan may be at the post

office that delivers to your Fort Mill office. Do you understand that?

MS. RENNER: Mr. Kauffman, you're asking this witness a lot of questions where he has no expertise. He's not a 30(b)(6) as to the workings of the Postal Service.

MR. KAUFFMAN: Well, let's --

A. You're breaking up.

MR. KAUFFMAN: I think -- I think as a layperson in Fort Mill that there's a post office that orders --

(Zoom interruption.)

(Reporter requests clarification due to Zoom interruption.)

Q. Mr. Waddell, do you understand that for your Fort Mill headquarters, that there's a U.S. Postal Service in your ZIP code that is a facility that delivers mail to your headquarters?

MS. RENNER: Again, objection. Outside the scope of the 30(b)(6) deposition for this corporate representative who does not work for the U.S. Postal Service. You can answer if you know.

A. I understand the post office delivers mail, yes.

Q. Okay. And you understand that the mail that --
(Zoom interruption.)
A. You're breaking up again.
MS. RENNER: We can't hear you.
Q. -- the facility that is -- the ZIP code that delivers mail for the post office?
(Zoom interruption.)
MS. RENNER: We can't hear you. We couldn't hear you. I'm sorry. Can you repeat?
MR. KAUFFMAN: All right. No, no, no. It's breaking a little bit late in the day here. Can you hear me?
MS. RENNER: No.
MR. KAUFFMAN: You can't hear me?
COURT REPORTER: You're cutting in and out. It's very choppy.
(A discussion was held off the record.)
Q. So I'm going to ask -- go back. I know that we got garbled a little bit earlier. But with regard to Exhibit 34 -- do you see this, Mr. Waddell, what -- what's been marked as actually Exhibit 64?
A. Yes.

Q. Okay. And these were the documents that were provided in litigation by Mr. Ventling related to the tracking of his check payments. Do you understand that?

A. Understood, yes.

Q. Okay. And my question -- we had looked at the October one, and it was at least received at a USPS facility in Dallas, Texas, on October 14, 2023. Do you have any reason to doubt that his check was at least received at a U.S. postal facility in Dallas on this date in time?

MS. RENNER: I'm going to -- same objection as before, which is lacks foundation, is incorrect in its supposition, and that this deponent is not an expert on the U.S. Postal Service or its terminology. You can answer.

A. I agree that's what the document says, yes.

Q. Okay. And you'd agree that on the one below, there's several different scans or tracks, but the latest in time scan shows that at least at a facility in Dallas, Texas, the packet -- or the envelope was received on November 11th. Do you have any reason to doubt that?

MS. RENNER: Same objection.
A. Same answer. I mean, I agree that's what this says, yes.
Q. Okay. And if we look at the one for December, do you have any reason to doubt that a U.S. postal facility scanned the check that was sent in Dallas, Texas, on December 8, 2023?
MS. RENNER: Same objection.
A. Same answer. I agree that's what this says, yes.
Q. And do you have any reason to doubt that for the payments sent in January of 2024, that a U.S. postal facility scanned it in Dallas, Texas, on January 9, 2024?
MS. RENNER: Same objection.
A. Same answer. I agree that's what this is.
Q. Okay. In the same manner, if you look at this one in particular, if I understand it correctly based off of the information that RoundPoint has -- I'm sorry, hold on a minute.
MS. RENNER: You're breaking up again, James.
MR. KAUFFMAN: God, I hope not. Okay. Can you hear me okay?

MS. RENNER: Now we can.
Q. Okay. So Exhibit 44, the payment history, do you see this?
A. Yes.
Q. The January payment was marked received on January 18th.
A. I'm sorry, you broke up a little bit. Which payment specifically?
Q. Hold on. I'm going to have to do this quickly. I don't know what's going on with the Internet. January -- the payment from January 19, it was marked as received on January 18th, correct?
A. January 24. I just can't see that on the screen. If you'll scroll down, I'll confirm what I understand to be the receive date. January -- so we reflect that that payment was received on January --
Q. Hold on, hold on.
(Zoom interruption.)
Q. The one I've highlighted.
A. Okay. And he's gone.
(Zoom interruption.)
(A discussion was held off the record.)

Q. Let's go back on the record and let's just finish this up here.
So my question is, for any of the information that Mr. Ventling has provided, does RoundPoint have a position on what is the cause of the lag of time, if it does exist, between an item being received at the Dallas USPS facility and it arriving in their P.O. Box?
MS. RENNER: Again, I'm objecting that this is outside the scope of this deposition, but if you have an answer, you can answer.
A. I don't. I don't think -- my understanding of the process is that until the lockbox picks up that payment, they don't have it. So if there is a delay, it is happening before it arrives with us.
Q. Okay. And that delay would have to deal with the U.S. Postal Service because that's -- that's the only person that handles it before it arrives to you; is that correct?
A. That's correct, yes.
Q. Okay. I'm going to mark as an example what will be marked as Exhibit 65.

(Exhibit No. 65 marked for identification.)

Q. It's a tracking from Glacier Bank. It's Bates number Glacier Bank 6. Have you seen any of the documents that were produced by Glacier Bank?

A. Not that I -- I don't -- if they're different from -- like this scan of a glance looks like the other ones we've already seen, so --

Q. Okay. And I just had this in this to note that these documents that were produced by Ventling have also been produced by Glacier Bank. I didn't know if you were aware of that.

A. Okay. If there's a difference between, you know, the Jack Henry ones and the Glacier Bank ones, I've seen ones that didn't distinguish between the two, if that's --

Q. Okay. And with regard to this, I believe that this payment was marked as received on the 18th. Do you remember that when we were looking at the document --

A. January 18, '24, yes.

Q. January 18th. Right. So is it RoundPoint's position that if these scans -- I

understand that you're not a postal employee, but if we were looking at a postal facility in Oklahoma City and a postal facility in Dallas, it took roughly seven hours for the mail to be scanned at one facility to the next; is that fair?

MS. RENNER: I'm going to object again to this line of questioning as outside the scope and also outside this witness's knowledge. He's not a U.S. Postal Service employee or representative.

Q. I understand that. But in your -- in your job and position, you do interpret and do look at schedules of when payments are received, right?

MS. RENNER: Objection. He doesn't look at postal data.

Q. Right. But you look at what's reported to you from the lockbox vendor as far as when things are received. You look at things that are counted in your mailroom as when received, right?

MS. RENNER: I'm going to object. I mean, this is -- this line of questioning is outside the scope and -- of the amended notice and outside the scope of this witness's

knowledge. He's not a post -- he's not here as a postal representative.

MR. KAUFFMAN: Okay.

A. The file we receive contains a receipt date and so, yes, that is ingested into our system.

Q. Okay. And in interpreting the receipt dates, you have to look at those and make sure that those are correct based off of what's in your system, that what's in your system matches what the lockbox vendor tells you, right?

A. No. I think you're interpreting that there's some like loan level evaluation of every item in that lockbox file. I pay the vendor to provide me the checks as they receive them. We load that information into our system. The end.

Q. And in loading that information into your system, you are quality control checking it to make sure that the dates are input in your system correctly even though it's an automated process?

A. Yes. We can evaluate that the dates we input into our system match the dates on the file we receive.

Q. Okay. And in looking at what I've

marked as Exhibit 65, do you have any reason to doubt that it took the post office seven hours approximately to deliver an item between Oklahoma City and Dallas?

MS. RENNER: Same objection.

A. I mean, my answer is based on what I've -- what you're showing me, yes, that is the time it took from an item being scanned in Oklahoma City to be then delivered to the Dallas post office.

Q. All right. And you as just a regular consumer, you understand reading delivery scans that things that get delivered to you -- do you ever -- have you ever ordered anything off of Amazon?

A. Yes.

Q. Okay. You understand that when something gets delivered to you from Amazon, it may go through several different checkpoints before it arrived at your house?

A. Yes.

Q. And you understand that those points in time where it says it got to this facility or that facility reflects the dates and times that your package passed through different points on

that chain, correct?
A. Yes.
Q. Okay. And as you sit here today, do you have any interpretation other than that it took seven hours for Mr. Ventling's check to get from Oklahoma City to Dallas?
MS. RENNER: I'm going to object again to this line of questioning, and I'm also going to object because you're only showing one proof of payment here where there are others that have different data.
MR. KAUFFMAN: I don't think it's a proper objection, Ms. Renner. I've laid the foundation necessary for him as a layperson to review this, and I'm asking if he has any other explanation other than this took seven hours to get from Oklahoma City to Dallas.
MS. RENNER: You're asking him as a -- as a --
MR. KAUFFMAN: He doesn't have to be a postal employee --
MS. RENNER: -- an individual or as a representative?
MR. KAUFFMAN: I'm going to ask him as both, but as an individual, I think that a

human being should be able to answer this question. Any human being --

MS. RENNER: Well, I'm going to -- again, same objection, that this -- Mr. Waddell is not here to testify as to the U.S. Postal Service. Same objection. To the extent he can answer, fine.

Q. I'd like an answer.

A. It is my interpretation -- it is my interpretation looking at the document you're providing me that I would look at the first scan and say that the item was scanned in Oklahoma City at a certain date and time. I don't know how long it was there before it got that scan. And then from that point, it took the delta between those two time stamps to arrive in the Dallas office and also be scanned.

Q. Okay. And the delta is what?

A. The difference between the two dates -- the two times. 3-something a.m. and 10:40 a.m. Same day.

Q. Okay. How many hours is that?

A. Seven plus.

Q. Okay. It's less than seven hours, correct?

A. Okay. Six plus.
Q. Okay. So if I understand RoundPoint's vendor, it took seven hours for this package to get from Oklahoma City to Dallas, but it took nine days for the package to get from a U.S. postal facility in Dallas to the P.O. Box? That's what I am to understand?
MS. RENNER: I'm going to object again. You're badgering the witness. This has been asked and answered several times already. It's time to move on.
Q. Do you have an explanation for that, specific to this particular payment?
MS. RENNER: I think he answered the question already. He told you it was -- he can --
MR. KAUFFMAN: Okay. Objection. Asked and answered, Deborah. Answer.
MS. RENNER: Asked and answered. Move on.
Q. You can answer. No, you can answer the question.
MS. RENNER: He answered the question, but, you know, this has been asked and answered. You talked about the Postal Service

and that you don't understand it. I mean --

MR. KAUFFMAN: Speaking objection, Deborah.

MS. RENNER: -- you're badgering -- you're just badgering the witness, Mr. Kauffman.

MR. KAUFFMAN: At this point -- at this point, I think I'm going to mark this to be read to -- I'll have an objection and we'll take it up with the judge later. That is not a proper objection that you just laid. I've asked him generally. I can ask him specifically.

MS. RENNER: You're badgering this witness -- Mr. Kauffman, we'll go through the whole record. You've asked the same question numerous times. I've objected. This is outside the scope of the --

MR. KAUFFMAN: Okay. Are you -- okay. So -- so your objection of asked and answered is noted.

Q. You can answer the question.

MS. RENNER: I'm actually not finished.

MR. KAUFFMAN: You have more speaking objection to give?

MS. RENNER: You've made many

speaking objections when Mr. Ventling was deposed as well. So look, Mr. Kauffman, I understand you want an answer to this question. This is not the proper witness to answer this question. It's the U.S. Postal Service that you're going to have to ask these questions to. That is my objection in a nutshell, and you can ask him 12 different ways. You're going to get the same answer.

MR. KAUFFMAN: I understand that you're blaming the U.S. Postal Service for this gap in time.

Q. Is that what you understand, Mr. Waddell, that RoundPoint's position is that this is the U.S. Postal Service's fault?

A. My position is I don't know what caused the delay between that day and the pickup by the courier for the vendor.

Q. Okay. And is it your understanding that what the lockbox vendor reported to you is accurate, that this payment was not received in a P.O. Box until January 18th?

A. Yes, it is my position their date is that.

Q. Does this that you see before you as Exhibit 65 shed doubt on the accuracy of that

report?
A. Nope.
Q. Why not?
A. Because there's a difference between the Oklahoma City post office and the Dallas post office. It's not the same thing.
Q. Right. But as I understand your testimony, if you're going to stand on what the lockbox vendor told you, that it was received on January 18th, that means that this package took seven hours to get from Oklahoma City to Dallas, but to get from Dallas to your P.O. Box in Dallas, it took nine days? That's what I am to understand?
A. That's also what I understand.
Q. Is that right?
A. That is also what I --
Q. Is that what you understand?
A. Yes.
Q. And you don't have any concern about that enormous gap of time?
A. I don't have any data that supports anything different.
Q. Because the only data you have is what the lockbox vendor told you?

A. That is correct.
Q. Okay. And that's the same for not just Mr. Ventling but anybody else who submitted a payment through the lockbox vendor?
A. That's correct.
Q. All right. I'm going to show you what's been marked as -- what will be marked as Exhibit 66.
(Exhibit No. 66 marked for identification.)
Q. This is RoundPoint's Answer to Plaintiff's Complaint. Have you seen this before?
A. Yes.
Q. Okay. I'm going to go down to the affirmative defenses. All right. The first one, failure to state a claim, you understand that RoundPoint has moved to dismiss the complaint? Do you understand that that happened?
A. Yes.
Q. Okay. You understand that at least with regard to the breach of contract claim, that that motion to dismiss was denied, correct?
A. Yes.
Q. Do you know of any other facts that

RoundPoint is relying upon after that ruling to state that plaintiff fails to state a breach of contract claim?

MS. RENNER: I'm going to object. As we stated in our letter, and I'll restate now, Mr. Waddell may know some things by way of example. He doesn't know everything. He's not a lawyer. And also, the case is still in discovery and being developed.

MR. KAUFFMAN: Okay. You can have a standing objection to that nature to any of these that I'm going to ask, but I'm going to ask to each one what facts he's aware of that support each defense.

MS. RENNER: That's fine.

Q. So what facts are you aware of that support affirmative defense number 1?

A. What facts am I aware of that support our dismissal of the claim?

Q. Yeah. That -- that Mr. Ventling doesn't state a breach of contract claim.

A. I'm not sure I understand the argument to me. I mean, you know, again, we have payments arrive at a lockbox vendor. They provide us a date, and we're reliant on that data to apply

payment. So, you know, I think from our point of view, from my point of view, the payments are accurately applied.

Q. Okay. And if the lockbox vendor is inaccurate with regard to its recording of a date that a payment was received at the P.O. Box, is your answer still the same?

MS. RENNER: Objection. Hypothetical.

Q. Let me ask you this. Does the lockbox vendor actually record the date that a check was received at the P.O. Box?

A. Sure. They give me the date of receipt on file.

Q. Right. But that's not the date -- that's the date that they process it in their facility, right?

A. No. There's two different dates. There's a process date and a receive date. The files that we went over have a receive date column. That is their recordation of the day they received it.

Q. The day that they received it at their facility, correct?

A. Which is the same as the day they

receive it at the P.O. Box. Those two things are one and the same.

Q. You assume that those two things are the same?

MS. RENNER: I'm going to object again to badgering the witness.

Q. Do you have a separate record of mail items that were received at the P.O. Box --

A. No.

Q. -- separate from items received at the facility?

A. No.

Q. Okay. Number 2, do you know what facts support that Mr. Ventling wasn't damaged?

A. Yes. The same thing that we just talked about.

Q. Okay. Other than the same thing we just talked about and --

A. Nothing else. No, nothing else.

Q. Okay. As far as lacking standing, anything else other than what we previously talked about as far as facts that support his lack of standing?

A. Nothing else.

Q. Okay. Other than what we've talked

about, how about number 4, that he's not entitled to damages or restitution because he suffered no loss of money or property? To that affirmative defense, any other facts other than what we've discussed?
A. No other facts other than what we've discussed.
Q. Okay. Are you aware of any other facts other than what we've discussed that his claims are barred and the fact that he would be unjustly enriched if he were to recover any other money?
A. No other facts other than what's been discussed.
Q. Affirmative defense number 6, any other facts other than those that we've already discussed in this section on this document that his claims are barred in whole or part because the defendant's conduct complied with applicable laws?
A. There are no other facts other than what's already been discussed.
Q. Okay. Are you aware of what that's referring to, what applicable laws that's referring to?
A. In terms of like, you know, regulation

tied to the recordation of payments and, you know, late fee governance? Those kinds of things? Yes.

Q. Are those RoundPoint's processes, or is that state and federal law?

A. State and federal laws. The late fees, there's no federal law, but there are state laws, and then there's your mortgage note.

Q. Okay. So you would put in the security instruments, the mortgage note, mortgage, deed of trust, if that exists --

A. Yes.

Q. -- under this category?

A. Yes.

Q. Okay. Affirmative defense number 7, that Mr. Ventling's claims are barred in whole or part by the doctrine of laches or that he waived his claims or that he should be estopped from bringing his claims. Are you aware of any facts other than those that we've discussed when we're talking about this particular exhibit?

A. I am not aware of any other facts.

Q. Okay. Are you aware of any other facts other than those that we've discussed for this exhibit with regard to affirmative defense

number 8 that defendant acted in good faith at all times?

A. I'm aware of no other facts.

Q. Okay. Is it RoundPoint's position that by relying on the lockbox vendor, it was acting in good faith?

A. Yes.

Q. Okay. Affirmative defense number 9, anything other than what we've discussed to support any facts or witnesses or evidence that you're aware of to support this affirmative defense that plaintiff's claims are barred in whole or part because he didn't comply with the notice requirement in any of his contracts?

A. I mean, I don't know. Your mortgage note says your payment is due on the 1st. Outside of that, no other facts.

Q. Okay. Affirmative defense number 10, that Mr. Ventling's claims are barred in whole or in part because he failed to mitigate any loss, damage, or injury. Anything other than what we've discussed that would tend to support this defense?

A. No other facts.

Q. Okay. Can you give me an example of how

Plaintiff Ventling could have mitigated any of the losses that he incurred because he incurred late fees here?

A. Yes.

Q. What is it?

A. Well, so for example, with mailing check payments, there are outside factors, right? So you can -- today is December 1st, so everybody who is current, their payment is due today. You can pay now and then have your financial institution, you know, send a payment mid month and that way you're always current. There are other payment methods. There are ACH and these kind of other options that allow payments to be sent electronically even from a defendant's bank.

They don't have to send us a check. They can send funds electronically. So there are other options available is all I guess I'm suggesting.

Q. But is there anything in RoundPoint's view that's wrong with Mr. Ventling sending a check?

A. No. No.

Q. Is there anything in RoundPoint's view that was wrong with regard to having his bank

draft a check on his behalf?
A. No.
Q. Is there anything wrong with -- from RoundPoint's view of Mr. Ventling asking his bank to send a payment with tracking to RoundPoint?
A. No. No.
Q. Okay. Anything other than what we've discussed that supports affirmative defense number 11 regarding that Mr. Ventling's claims are barred based on his own conduct?
A. Not to my knowledge, no.
Q. Okay. Anything other than what we've discussed to support affirmative defense number 12 that Mr. Ventling's claims are barred by the doctrine of unclean hands?
A. I don't know what that means, so no.
Q. Okay. Well, I will say that he did something wrong in that basically he has done something that is incorrect contrary to the agreement between the parties or something along those lines that would support a defense to his claim of breach of contract. Are you aware of anything other than what we've discussed?
A. Not to my knowledge.
Q. Okay. I think these separate defenses I

don't have anything. These are all repackaged, these -- these defenses. I'll just represent that these also include some discussions about the federal rules supporting class treatment of a lawsuit.

But with regard to the ones that overlap with Mr. Ventling, are you aware of any additional facts that apply to class members for any of the affirmative defenses that don't equally apply to Mr. Ventling?

A. No.

Q. Okay. All right. I'm going to take a short break. Five minutes. And then we'll be back and I will likely pass the witness.

MR. KAUFFMAN: So Ms. Renner, if you have any questions, I'll be wrapping up soon.

MS. RENNER: Thank you.

MR. KAUFFMAN: All right. I'm going to stop the share, and we'll go off the record for five minutes.

(A recess was held.)

MR. KAUFFMAN: Mr. Waddell, I appreciate you answering my questions and your time today. We will be holding the deposition open because there is a few things that we still

have to resolve as we said at the beginning. But at this time, I will pass the witness to Ms. Renner.

MS. RENNER: Thank you, Mr. Kauffman. I just have a few questions.

EXAMINATION

BY MS. RENNER:

Q. Mr. Waddell, earlier in the deposition, Mr. Kauffman asked you about the transition period from one service provider to another, and I believe you indicated that there's sort of a 60-day grace period where no late fees are charged; is that correct?

A. That is correct. That is correct. It's a 60-day moratorium on late fee assessment from the date of transfer, so Mr. Kauffman's loan transfer 4-1, he's not going to get a late fee in April and May. Starting in June would be the first potential late fee assessment.

Q. Are there any other policies that have been in place beginning in 2020 where any -- there were any waivers of the waiver policy? Any courtesies provided to consumers?

A. There -- there was an operational policy. [redacted]

[redacted], there -- for a time, there was an operational policy to provide a one-time late fee waiver -- a courtesy late fee waiver, and that was regardless of whether there was an error, it was specific to a borrower called in and said, I have a late fee. Can I have this waived? That decision -- that was an operational decision in 2024 to cease that practice.

Q. So that practice was in place until sometime in 2024?

A. Early 2024. I don't know the exact date, but yeah.

Q. And Mr. Ventling benefited from that practice, correct?

A. We saw from his pay history that we waived three -- you know, two were partial and one was a full late fee waiver, so yes.

Q. Earlier today, you also spoke about the current lockbox provider, [redacted].

A. Yes, ma'am.

Q. Did [redacted] have anything to do with Mr. Ventling's payments that are the subject of this lawsuit?

A. No.

Q. You also briefly mentioned something

about state laws as they affect late fees. Could you explain how the state law may affect the late fee?

A. So most states have their own law tied to the late fee cap that is assessed on a loan, but the late fee is also established in the loan note. So there's a provision in the loan note that says, you know, here's the percents and, you know, portion of the payment to which that late fee will be tied, so it's kind of dual process. There's an evaluation to understand that we're not exceeding, you know, the cap set by the State while being adherent to the loan note's specific late fee assessment requirement.

Q. Mr. Waddell, you were asked a number of questions about defenses; and at one point, you were asked about whether plaintiff's claims -- what the basis was for saying the plaintiff's claims were barred because he didn't comply with contractual notice requirement. Do you recall that?

A. I do recall that question.

Q. Do you recall that in Mr. Ventling's mortgage, there is a notice requirement before filing suit?

A. Yes. I'm aware.
Q. Do you recall being asked a question by Mr. Kauffman as to whether Mr. Ventling did anything wrong by paying his mortgage through Glacier Bank?
A. Yes.
Q. Do you -- do you recall the dates that Mr. Ventling initiated payment through his bank generally?
A. Yeah. Like earlier in the month, like they were the 9th. I think for some of the ones we looked at, they were the 6th or -- maybe for some of the others.
Q. So is it fair to say that he initiated payment after the due date, the 1st of the month?
A. Yes.
Q. And is it fair to say that he initiated payment at least several days following that?
A. Yes.
Q. You were also asked similarly whether, you know, Mr. Ventling had done anything wrong, had unclean hands. Do you recall that?
A. Yes.
Q. In your opinion, if payments are not being received timely when they're mailed, if

they're not being received within the grace period -- strike that.
If payments are not being received by the end of the grace period and the consumer knows that, would most consumers decide to pay in a different manner or pay earlier?
MR. KAUFFMAN: Objection to form. Lacks foundation.
Q. You can answer.
A. Yes. I mean, you know, I -- it's our experience that, yes, borrowers are receptive to alternate payment means or ways to change their behavior to -- you know, to bring those things in.
Q. My last question is, you were asked a lot of questions about software systems.
A. Yes.
Q. Can you determine through the software system alone who made a paper check payment and was then improperly charged a late fee?
A. So we can determine --
MR. KAUFFMAN: Objection to form. Calls for a legal conclusion.
Q. You can answer if you know.
A. Yeah, we can determine from our system

who made paper checks and who made -- who has assessed late fees. The improper assessment of late fee, no. I mean, from our view, date of receipt determines the day the payment was posted. So no.

MS. RENNER: Thank you. That's all I have. Mr. Kauffman --

MR. KAUFFMAN: I don't have any questions.

MS. RENNER: Okay.

COURT REPORTER: Ms. Renner, do you want him to read and sign or waive?

MS. RENNER: He's going to read and sign.

(The deposition was concluded at 5:00 p.m.)

CERTIFICATE

I, Paula Maxwell, Notary Public at Large, do hereby certify that the witness in the foregoing deposition was duly sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition took place virtually via video conference. The testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed by computer-aided transcription. The foregoing is a full, complete and true record of the testimony of the witness and of all objections made at the time of the examination.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on December 8, 2025.

PAULA MAXWELL
My Commission expires
November 3, 2031

DEPONENT CORRECTION SHEET

I, the undersigned, MATTHEW WADDELL, do hereby certify that I have read the foregoing deposition and wish to make the following clarifications and/or corrections, if any.

PAGE LINE CHANGE REASON

MATTHEW WADDELL Date

PM

Jeffrey Pope, WSB No. 7-4859
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
Cheyenne, Wyoming 82001
Phone: 307.778.4223
Email: jspope@hollandhart.com

Deborah H. Renner (admitted *pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Phone: 212.768.6700
Email: deborah.renner@dentons.com

Abigail M. Dockum (admitted *pro hac vice*)
DENTONS US LLP
1900 16th Street, Suite 1350
Denver, Colorado 80202
Phone: 303.634.4000
Email: abby.dockum@dentons.com

Margret L. Flodeen (admitted *pro hac vice*)
DENTONS US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Phone: 213.243.6109
Email: margret.flodeen@dentons.com

Michael E. Harriss (admitted *pro hac vice*)
DENTONS US LLP
101 S. Hanley Rd., Suite 600
St. Louis, MO 63105
Phone: 314.241.1800
Email: michael.harriss@dentons.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| GARY VENTLING, in his own right and as a representative of a class of persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROUNDPOINT MORTGAGE SERVICING LLC,<br><br>Defendant. | Case No. 1:24-cv-158-SWS |

**ERRATA SHEET FOR DEPOSITION OF MATTHEW WADDELL TAKEN ON DECEMBER 1, 2025**

I, the undersigned, Matthew Waddell, certify that I have read my December 1, 2025 deposition transcript and I make the following clarifications and/or corrections:

| Page | Line | Original | Change | Reason |
|---|---|---|---|---|
| 15 | 21 | At BBVA, they did not or were unable to designate the day of receipt of a payment, so as a result, every payment that came into BBVA that could not be processed same day had to be put in a FedEx package and overnighted to the RoundPoint office for physical processing. When PNC took over, they were able to record day of receipt and include that in the file they provide to us. | At BBVA, they did not or were unable to designate the day of receipt of an unprocessed ("exception") payment, so as a result, every payment that came into BBVA that could not be processed same day had to be put in a FedEx package and overnighted to the RoundPoint office for physical processing. When PNC took over, they were able to record day of receipt for the "exception" payments and include that in the file they provided to us. | Clarification.<br>*See* 16:18-17:5 for further context and clarification. |
| 85 | 3 | I mean, it's when the check arrives at their facility, so it is the date they received the item is the date that they are recording the receipt. | I mean, it's when the check arrives at their facility—which is the same date it arrives as the Dallas P.O Box—so the date they received the item is the date they are recording as the receipt date. | Clarification<br>*See* 191:12-18 and 192:21-193:5 for further context and clarification. |
| 134 | 25 | We had no oversight of the lockbox, but yes, we do not review their associates and their activities specifically. | We did not have "no oversight of the lockbox" but yes, we did not review their associates and their activities specifically. | Transcription Error and/or Misspoke<br>*See* 142:5-143:6 for further context and clarification. |

Executed on this 7th day of January, 2026.

Matthew Waddell

Sworn and subscribed to before me

this 7th day of January, 2026.

Mari Anne Scinski
Notary Public

MARI ANNE SCINSKI
Notary Public-State of South Carolina
My Commission Expires
October 14, 2031